## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LIAT ATZILI, ESTATE OF AVIV ATZILI BY LIAT ATZILI AS LEGAL REPRESENTATIVE, OFRI ATZILI, NETTA ATZILI, AYAH ATZILI, NADAV PELES, EYAL PELES, HILA PELES, LIOR PELES, D.P., A MINOR, BY HER LEGAL GUARDIANS LIOR AND HILA PELES, ROY PELES, ESTATE OF JOSEPH GUEDALIA BY SENAI GUEDALIA AS LEGAL REPRESENTATIVE, SENAI GUEDALIA, ASHER GUEDALIA, DAVID GUEDALIA, DINA LEA GUEDALIA, SHIRA EPHRAT, YAEL GUEDALIA, ESTHER GUEDALIA, MICHA GUEDALIA, E.G., A MINOR, BY HER LEGAL GUARDIANS DAVID AND DINA LEA GUEDALIA, EITAN EDRI, TAIR EDRI, B.H.E., A MINOR, BY HIS LEGAL GUARDIANS EITAN AND TAIR EDRI, N.S.E., A MINOR, BY HER LEGAL GUARDIANS EITAN AND TAIR EDRI, ITZHAK EDRI, ITAMAR EDRI, ARIEL EDRI , SARAH EDRI, ELIYAHU EDRI, AVIDAN EDRI, ACHIYA EDRI, BINYAMIN SHAIN, ZLIL CHEN, DVORIT SHAIN, RUSSEL SHAIN, MICHAL LUKMAN,  ARIEL SHAIN, SHAY SHAIN, HOSHEA HAGGAI, SHALOM STRAUSS, YAEL STRAUSS, Z.S., A MINOR, BY HIS LEGAL GUARDIANS SHALOM AND YAEL STRAUSS, Y.S., A MINOR, BY HIS LEGAL GUARDIANS SHALOM AND YAEL STRAUSS, D.S., A MINOR, BY HIS LEGAL GUARDIANS SHALOM AND YAEL STRAUSS, ESTATE OF AMITAI BEN ZVI BY AVISHAY BEN ZVI AS LEGAL REPRESENTATIVE, GILAD BEN ZVI, HAGAR MADNICK, ORNA AVISRUR, AND IDO BEN ZVI, AVISHAY BEN ZVI, ESTATE OF CAROL SIMAN TOV BY KOREN SIMAN TOV HAZOUTTE AS LEGAL REPRESENTATIVE, AMIT SIMAN TOV VAHABA, ESTATE OF YAHONATAN SIMAN TOV BY KOREN SIMAN TOV HAZOUTTE AS LEGAL REPRESENTATIVE, AMIT SIMAN TOV VAHABA, ESTATE OF ARBEL SIMAN TOVBY GAD KEDEM AS LEGAL REPRESENTATIVE, ESTATE OF SHACHAR SIMAN TOV BY GAD KEDEM AS LEGAL REPRESENTATIVE, TRUDI DAUB, RAM BUTLER, LARRY BUTLER, CLARIS BUTLER, SHACHAR BUTLER, NINNA BUTLER, E.B., A MINOR, BY HER LEGAL GUARDIAN SHACHAR BUTLER, M.B., A MINOR, BY HER LEGAL GUARDIAN SHACHAR BUTLER,  Y.B., A MINOR, BY HIS LEGAL GUARDIAN SHACHAR BUTLER, RANAE BUTLER, KOREN SIMAN TOV | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | **COMPLAINT WITH JURY DEMAND**<br><br>Civil Action No. |

HAZOUTTE, GUIL HAZOUTTE, Y.H., A MINOR, BY HIS §
LEGAL GUARDIAN KOREN SIMAN TOV HAZOUTTE, §
B.H., A MINOR, BY HIS LEGAL GUARDIAN KOREN §
SIMAN TOV HAZOUTTE, A.H., A MINOR, BY HIS §
LEGAL GUARDIAN KOREN SIMAN TOV HAZOUTTE, §
M.H., A MINOR, BY HER LEGAL GUARDIAN KOREN §
SIMAN TOV HAZOUTTE, AMIT SIMAN TOV VAHABA, §
YISHAI VAHABA, G.V., A MINOR, BY HER LEGAL §
GUARDIAN AMIT SIMAN TOV VAHABA, N.O.V., A §
MINOR, BY HIS LEGAL GUARDIAN AMIT SIMAN TOV §
VAHABA, N.E.V., A MINOR, BY HIS LEGAL GUARDIAN §
AMIT SIMAN TOV VAHABA, S.V., A MINOR, BY HIS §
LEGAL GUARDIAN AMIT SIMAN TOV VAHABA, ARIE §
SHERMAN, LIVNAT SHERMAN, K.A.S., A MINOR, BY §
HER LEGAL GUARDIAN ARIE SHERMAN, G.S., A §
MINOR, BY HIS LEGAL GUARDIAN ARIE SHERMAN, §
S.S., A MINOR, BY HER LEGAL GUARDIAN ARIE §
SHERMAN, RAQUELE NATALIE SANADAJI, DALIA §
YERUSHALMI, ZION LESHAM, RIVKA LESHEM, M.E.L., §
A MINOR, BY HER LEGAL GUARDIAN ZION LESHEM, §
L.A.L., A MINOR, BY HER LEGAL GUARDIAN ZION §
LESHEM, M.D.L., A MINOR, BY HIS LEGAL GUARDIAN §
ZION LESHEM, T.B.L., A MINOR, BY HER LEGAL §
GUARDIAN ZION LESHEM, T.N.L., A MINOR, BY HER §
LEGAL GUARDIAN ZION LESHEM, YEHUDA GUR §
ARYEH LESHEM, CHEMDA RACHEL LESHEM, ZVI §
LESHEM, JULIE LESHEM, DVIR BEN CHAIM, §
SHACHAR BEN CHAIM, M.B.C., A MINOR, BY HIS §
NATURAL GUARDIANS DVIR BEN CHAIM AND §
SHACHAR BEN CHAIM, A.B.C., A MINOR, BY HER §
NATURAL GUARDIANS DVIR BEN CHAIM AND §
SCHACHAR BEN CHAIM, YARON BEN CHAIM, ORLY §
BEN CHAIM, ORIYA BEN CHAIM, TAL BEN CHAIM, §
SHILO BEN CHAIM, RONI BEN CHAIM, TALI GILBERG, §
AVRAHAM SHAHAR, IDIT SHAHAR, Z.S., A MINOR, BY §
HIS LEGAL GUARDIANS AVRAHAM AND IDIT §
SHAHAR, R.S., A MINOR, BY HER LEGAL GUARDIANS §
AVRAHAM AND IDIT SHAHAR, YARDEN SHAHAR, §
YOSEF LAMDAN, EINAV VERED, MAYA LAMDAN, §
SYLVIA ARAD, TOM LAMDAN, GUY LAMDAN, §
JONATHAN STERN, ESTATE OF AMICHAI RUBIN BY §
YISHAI RUBIN AND BATYA RUBIN AS LEGAL §
REPRESENTATIVES, YISHAI RUBIN, BATYA RUBIN, §
DAVID RUBIN, YEDIDYA RUBIN, OZ RUBIN, EITAN §
RUBIN, YAIR RUBIN, ODEYA BEN SHIMOL, AMIYA §
TIFERET GAMLA, ESTATE OF EYAL BERKOWITZ BY §

| | |
|---|---|
| MICHAL BERKOWITZ AS LEGAL REPRESENTATIVE, MICHAL BERKOWITZ, SHMAYA BERKOWITZ, RIVKA BERKOWITZ, EREZ BERKOWITZ, TZUR BERKOWITZ, TAMAR BERKOWITZ, EINAV BERKOWITZ, REUT BERKOWITZ,  AMIT BARELI, ZEE CHANA JOSHUA, BEZALEL BARELI, DAVIRA BARELI, SHAI AMAR, NATALIA AMAR, SHIRLEY AMAR, ESTATE OF ORI MORDECHAI SHANI BY MIRYAM SHANI AS LEGAL REPRESENTATIVE, MIRYAM SHANI, R.S., A MINOR, BY HIS LEGAL GUARDIAN MIRYAM SHANI, SHULAMIT SHANI, YEHOSHUA SHANI, YISHAI SHANI, ZOFIYA ZAGURI, NAVA ROTSHTEN, MALACHI SHANI, ELYSHA SHANI, BATZION GOLDSTEIN, MOR LEVZELTER LAVI, GOLAN BARAK, SHANEE AHARONI, GALIT AHARONI, YANIV AHARONI, ROY AHARONI, ETAY AHARONI, EDEN HAINES, DEENA GOLDFELD, MICHAEL HAINES, YOEL AVRAHAM HAINES, MATAN KAVA, ALBERT KAVA, BETH KAVA, ZVI KAVA, YAEL KAVA, DEENA KAVA, BARAK ELITZUR, M.E., A MINOR, BY HIS LEGAL GUARDIANS BARAK AND RIVKA TAMAR ELITZUR, RIVKA TAMAR ELITZUR, SHAI ELITZUR, RIVKA AHUVA ELITZUR, DANIEL MENACHEM ELITZUR, SHMUEL SPIEGELMAN,  YONINA SPIEGELMAN, I.S., A MINOR BY HIS LEGAL GUARDIANS SHMUEL AND YONINA SPIEGELMAN, N.S., A MINOR, BY HIS LEGAL GUARDIANS SHMUEL AND YONINA SPIEGELMAN, CHANA SPIEGELMAN, ASHER SPIEGELMAN, AMITAI SPIEGELMAN, TAMAR SPIEGELMAN, NACHSHON SPIEGELMAN, AVIGAYIL SPIEGELMAN, AYELET SHITRIT SPIEGELMAN,  MOSHE YEHUDA LILINTAL, ESTHER PEARL LILINTHAL, ELIA NATAN LILINTAL, YAAKOV LILINTAL, CHANA LILINTAL, T.L., A MINOR, BY HIS LEGAL GUARDIANS YAAKOV AND CHANA LILINTAL, N.R.L., A MINOR, BY HER LEGAL GUARDIANS YAAKOV AND CHANA LILINTAL, S.L., A MINOR, BY HIS LEGAL GUARDIANS YAAKOV AND CHANA LILINTAL, E.S.L., A MINOR, BY HIS LEGAL GUARDIANS YAAKOV AND CHANA LILINTAL, YESHAYAHU LILINTAL, TAMAR LILINTAL, Y.M.L., A MINOR, BY HIS LEGAL GUARDIANS YESHAYAHU AND TAMAR LILINTAL, T.L., A MINOR, BY HER LEGAL GUARDIANS YESHAYAHU AND TAMAR LILINTAL, S.L., A MINOR, BY HIS LEGAL GUARDIANS YESHAYAHU AND TAMAR LILINTAL, DANIEL LILINTAL, GAL LILINTAL, J.M.L., A MINOR, BY HIS | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § |

| | |
|---|---|
| LEGAL GUARDIANS DANIEL AND GAL LILINTAL, A.L., A MINOR, BY HIS LEGAL GUARDIANS DANIEL AND GAL LILINTAL, CHAIM TUVIA LILINTAL, TALYA LILINTAL, M.L., A MINOR, BY HIS LEGAL GUARDIANS CHAIM AND TALYA LILINTAL, CHANA LILINTAL HURI, EVYATAR SAADYA SHALOM HURI, LOTUS LAHAV, IRIT LAHAV, IVONEI DA SILVA DANIEL, EFRAIM ABRAMS, DAVID ABRAMS, ARLENE ADAMS, RACHEL LEVY, ESTATE OF CARMELA DAN BY HADAS KALDERON AS LEGAL REPRESENTATIVE, GALIT DAN, AND DOR DAN, HADAS KALDERON, GALIT DAN, DOR DAN, <br><br>       Plaintiffs, <br>v. <br><br>UNITED NATIONS RELIEF AND WORKS AGENCY ("UNRWA"), PHILIPPE LAZZARINI, PIERRE KRÄHENBÜHL, FILIPPO GRANDI, LENI STENSETH, SANDRA MITCHELL, MARGOT ELLIS, AND GRETA GUNNARSDOTTIR, <br><br>       Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

## <u>TABLE OF CONTENTS</u>

NATURE OF THIS ACTION ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................... 4

PLAINTIFFS ....................................................................................................................... 4

The Atzili Family ............................................................................................................ 4

The Peles Family ............................................................................................................. 9

The Guedalia Family ...................................................................................................... 16

The Edri Family .............................................................................................................. 21

    *Eitan Edri, Tair Edri, B.H.E., and N.S.E* ................................................................. 22

    *Itzhak Edri* ................................................................................................................. 24

    *Itamar Edri* ................................................................................................................ 25

    *Ariel Edri* ................................................................................................................... 26

The Shain Family ............................................................................................................ 28

Hoshea Haggai ................................................................................................................ 33

The Strauss Family ......................................................................................................... 37

The Ben Zvi Family ........................................................................................................ 39

The Siman Tov, Butler, Hazoutte and Vahaba Families ................................................. 42

    *The Siman Tov Family* ............................................................................................... 42

    *Trudi Daub* ................................................................................................................ 44

    *The Butler Family* ..................................................................................................... 45

    *Ranae Butler* ............................................................................................................. 50

    *The Hazoutte Family* ................................................................................................. 52

    *The Vahaba Family* ................................................................................................... 54

The Sherman Family ....................................................................................................... 57

Raquele Natalie Sanadaji ................................................................................................ 60

The Leshem Family ......................................................................................................... 64

Dvir Ben Chaim .............................................................................................................. 67

Tali Gilberg .................................................................................................................... 70

The Shahar Family .......................................................................................................... 71

The Lamdan Family .................................................................................................. 74

    *Yosef Lamdan* .................................................................................................... 74

    *Maya Lamdan* ................................................................................................... 75

Sylvia Arad .............................................................................................................. 77

Jonathan Stern ......................................................................................................... 79

The Rubin Family .................................................................................................... 82

The Berkowitz Family .............................................................................................. 85

The Bareli Family .................................................................................................... 87

The Amar Family ..................................................................................................... 90

The Shani Family ..................................................................................................... 94

The Lavi and Barak Families ................................................................................... 96

The Aharoni Family ................................................................................................. 99

The Haines Family ................................................................................................. 103

The Kava Family .................................................................................................... 106

The Elitzur Family ................................................................................................. 108

The Spiegelman Family ..........................................................................................111

The Lilintal-Huri Family ........................................................................................114

    *Lilintal Family in Moshav Naveh* .....................................................................116

    *Chaim Tuvia Lilintal and Family in Kibbutz Kerem Shalom* ...........................118

    *Yaakov Lilintal and Family in Kibbutz Kerem Shalom* ....................................119

    *Elia Natan Lilintal in Kibbutz Sufa* ................................................................ 121

The Lahav Family ................................................................................................... 124

The Abrams Family ................................................................................................ 127

The Dan Family ...................................................................................................... 131

DEFENDANTS ...................................................................................................... 136

BACKGROUND ON GAZA, HAMAS AND UNRWA ........................................ 137

UNRWA'S SUBSTANTIAL ASSISTANCE TO HAMAS ................................... 149

    A.   UNRWA facilitated construction of Hamas command and control centers, attack tunnels, underground bunkers, weapons manufacturing facilities, and prison cells under UNRWA headquarters, UNRWA schools, medical clinics, and offices. ........................................ 149

B.  Defendants knew that UNRWA permitted constructing weapons storage and deployment centers in its headquarters, schools, medical clinics, offices, warehouses and other facilities...................................................................................................... 152

C.  Defendants knew that UNRWA permitted installation of rocket launching platforms and terrorist firing positions within and/or adjacent to UNRWA schools, medical clinics and offices........................................................................................................... 155

D.  UNRWA continues to provide material assistance to Hamas despite public concern and objections from within the UN system. ....................................................... 155

E.  UNRWA staff are and were members of Hamas and participated in the October 7 Attack. ............................................................................................................. 158

F.  UNRWA Staff held and tortured hostages taken in the October 7 Attack...................... 161

G.  UNRWA knowingly and intentionally employed Hamas members as UNRWA management and staff. .................................................................................... 161

H.  Defendants knew that senior Hamas operatives held influential positions in UNRWA. 164

I.  UNRWA pays its Gaza staff in a fashion calculated to further enrich Hamas. .............. 167

J.  Defendants knew Hamas controlled UNRWA's Staff Union in Gaza............................ 170

K.  UNRWA, with Defendants' knowledge and approval, chose to use textbooks and teaching curricula approved by Hamas which contained incitement and indoctrination of Palestinian children to support and participate in Hamas' jihadi culture, rather than using other available textbooks consistent with principles and requirements of the United Nations. ........................................................................................................... 170

L.  The indoctrination of hatred of Jews that is taught in UNRWA's curriculum is further exacerbated by UNRWA's allowance of Hamas' student activities in its schools. ......... 178

THE DEFENDANTS' LONG-RUNNING PATTERN OF COLLABORATION WITH HAMAS LEADERS................................................................................................................... 182

THE NUMEROUS NEW YORK JURISDICTIONAL CONTACTS RELATED TO DEFENDANTS' SUBSTANTIAL ASSISTANCE TO HAMAS ................................................ 187

THE OCTOBER 7 ATTACK AND ITS AFTERMATH............................................................ 192

THE OCTOBER 7 ATTACK VIOLATED FUNDAMENTAL "JUS COGENS" NORMS OF INTERNATIONAL HUMAN RIGHTS LAW ........................................................................ 195

COUNT I.................................................................................................................... 196

COUNT II................................................................................................................... 198

COUNT III.................................................................................................................. 199

COUNT IV.................................................................................................................. 201

COUNT V ................................................................................................................ 202

COUNT VI.............................................................................................................. 202

COUNT VII ............................................................................................................ 203

JURY DEMAND ..................................................................................................... 204

## NATURE OF THIS ACTION

1.     Under the Anti-Terrorism Act 18 U.S.C § 2331 et seq. (the "ATA"), any United States citizen who is injured by an international terrorist attack perpetrated by a designated terrorist organization is entitled to compensation from anyone who knowingly aided the organization in perpetrating the attack.

2.     That simple proposition enacted by Congress, signed into law by the President and upheld by the Supreme Court, applies to everyone.  There is no exception for those who sympathize with the terrorists' cause.  One who knowingly provides material support to, or who aids and abets, or who conspires with, a designated terrorist organization to perpetrate a terrorist act is liable to any United States citizen for their injuries.

3.     Plaintiffs are each United States citizens or the family members of United States citizens killed, injured, tortured, or taken hostage by the acts of international terrorism launched by Hamas on October 7, 2023, and continuing thereafter (the "October 7 Attack").  In the October 7 Attack, Hamas murdered over one thousand victims, wounded or attempted to murder many thousands more, engaged in mass rape and mutilation, and kidnapped over two hundred civilians to hold as hostages.  Hamas' atrocities were systematic and well-planned, involving thousands of armed Hamas personnel and resulting from years of planning and preparation, significant infrastructure for the same, major financial backing, and sophisticated recruitment.  It is the gravamen of this Complaint that the Defendants to this action knowingly provided that support to Hamas.

4.     The Defendants are current or former senior officials (the "Individual Defendants") of the United Nations Relief and Works Agency for Palestine Refugees in the Near East ("UNRWA"), as well as UNRWA itself.  UNRWA and its executives were aware of Hamas' goals

1

and its gruesome history of terrorist attacks against civilian targets.  Moreover, they were aware of Hamas' designation as a terrorist organization by each Presidential administration of the United States dating back to 1997.  Despite this knowledge, Defendants knowingly provided Hamas with the capabilities to launch the October 7 Attack.

5.     As discussed in great detail below:  Defendants provided Hamas with safe havens for weapons and rocket launchers to be used in the attack; they provided Hamas with protected headquarters and planning facilities to plan and stage the attack; they provided Hamas with over $1 billion in cash to pay for the illicit weapons procurement and other materials needed by Hamas to perpetrate the attack; they assisted Hamas in recruiting children into its ranks by employing Hamas-approved textbooks and curricula in UNRWA schools and providing Hamas' youth wing, al-Kutla, direct access to organize in- and after-school programs; and they permitted local employees on UNRWA's payroll to simultaneously be active Hamas members, many of whom personally participated in the atrocities of the October 7 Attack.

6.     Defendants knew what acts Hamas would commit with its assistance.  They continued with these affirmative acts even when they were expressly warned by others to stop.  Brazenly, UNRWA executives repeatedly met with Hamas leaders to coordinate their activities.  In the years leading up to the October 7 Attack, UNRWA executives repeatedly sought to collaborate with Hamas and repeatedly stated their desire to cooperate with Hamas in support of Hamas' goals.  Defendant Krähenbühl, as Commissioner General of UNRWA, went so far as to tell Hamas to keep the extent of that "partnership" secret so that international donors would not reduce UNRWA's funding.  Quoted in full below, Defendant Krähenbühl stated:

> I hope … that the spirit of partnership prevails among us in our meetings and not be public because this is a challenge to us and our credibility, and what is more dangerous is what this could constitute in terms of a loss of trust between the funding countries and

2

UNRWA, which may move towards reducing or stopping its funding.

7.     Defendants' actions in support of Hamas were systematic, knowing, and culpable. They put their own desires to support what they considered their organizational mission over the more-than-foreseeable risk that Hamas would use their support to commit the acts of international terrorism for which Hamas was already infamous.  As a result, Defendants are liable to compensate Plaintiffs for their injuries as provided for by United States law.

8.     As described below, each of the Plaintiffs was either murdered, wounded, tortured, or taken hostage as a result of the October 7 Attack, or are family members of such victims, and are entitled to sue for compensation.  Those Plaintiffs who are U.S. citizens themselves, and/or the estates, heirs, or survivors of such victims, are referred to as the "ATA Plaintiffs."  Other Plaintiffs are non-citizens who are close family members of such citizen victims and whose compensable injuries are inextricably intertwined with the victimization of the ATA Plaintiffs for which Defendants are liable under the ATA.  Several Plaintiffs also have claims against Defendants for aiding and abetting Hamas' violations of the federal Torture Victim Protection Act of 1991 ("TVPA").

9.     Plaintiffs seek monetary compensation for their injuries including, where appropriate, treble damages under the ATA, plus the costs of bringing this suit.  Plaintiffs do not seek an adjudication of political matters, nor any resolution of disputes between Israelis and Palestinians.  Rather, they seek monetary redress as specifically provided by Congress and under ordinary tort principles.  They seek enforcement of the simple principle that anyone who knowingly provides support to designated terrorist organizations is responsible to their victims.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367, because Plaintiffs' claims all either arise under federal statutes or are so related to such claims that they form part of the same case or controversy.

11.    This Court has personal jurisdiction over all Defendants under, among other statutes, CPLR 302, and 18 U.S.C. § 2334(a).

12.    Venue is proper in this Court under 28 U.S.C. § 1391 and 18 U.S.C. § 2334(a).

13.    To the extent that relevant events or omissions giving rise to the claims occurred in buildings or other locations in this judicial district owned or controlled by the United Nations ("UN") as part of its so-called "Headquarters District" in Manhattan, that does not limit or affect jurisdiction, venue, or choice of law, because, among other things, the UN's treaty with the United States regarding control over the Headquarters District provides that "except as otherwise provided … the federal, state and local law of the United States shall apply within the headquarters district."

## PLAINTIFFS

### The Atzili Family

14.    Liat Atzili is a citizen of the United States and a resident of Israel who was taken hostage by Hamas terrorists on October 7, 2023.

15.    Aviv Atzili was a citizen of Israel and a resident of Israel when he was murdered by Hamas terrorists on October 7, 2023.  Liat Atzili represents his Estate.

16.    Ofri Atzili is a citizen of the United States and a resident of Israel who was brutally attacked by Hamas on October 7, 2023. He is the son of Aviv and Liat Atzili.

17.    Netta Atzili is a citizen of the United States and a resident of Israel who was brutally attacked by Hamas on October 7, 2023. He is the son of Aviv and Liat Atzili.

18.    Ayah Atzili is a citizen of the United States and a resident of Israel whose family

members were brutally attacked by Hamas on October 7, 2023. She is the daughter of Aviv and Liat Atzili.

19.     Aviv Atzili and his wife Liat Atzili—an American citizen—had known each other since they were 14. After years of friendship, their bond deepened, and they became a couple at 19. Together, they built a life centered around their family, raising three children and building a home in Kibbutz Nir Oz, where they were deeply involved in the community they loved. As their children began pursuing their own paths, the couple eagerly looked forward to the next chapter of their lives, already planning the trips and adventures they would share.

20.     Growing up in Kibbutz Nir Oz, Aviv always knew he wanted to raise his family there. A man of action, he was the first to lend a helping hand to neighbors in need. From managing the community garage to repairing tractors and maintaining the farming equipment that sustained their livelihoods, he became a central part of the kibbutz and earned the trust and admiration of all who knew him.

21.     On October 7, 2023, at approximately 6:30 a.m., Aviv and Liat awoke to the deafening sounds of rockets and explosions. They rushed to their safe room and contacted their children, two of whom – Netta and Ofri – were in their own apartments within the kibbutz, to check on their safety. Having lived along the Gaza border for years and endured countless rocket attacks, the family followed a grimly familiar routine: each member huddled in their safe rooms, waiting for the barrage to subside.

22.     At approximately 6:45 a.m., Aviv heard the chilling sound of gunfire outside their home. The kibbutz had been breached. Known for his unwavering commitment to those around him, Aviv left his home driven by a fierce love for his community and a determination to protect it at all costs.

23. While briefly emerging from the safe room in his apartment, Ofri saw a frightening scene—terrorists walking through the streets of the kibbutz, others riding in a Toyota truck, all searching for their next target.

24. Netta also heard the gunshots. And he saw messages from neighbors that terrorists were breaking into homes and attacking. Netta snuck out of his safe room, grabbed a knife, and turned off the lights. He was terrified of being seen and certain he would be murdered, though he hoped to put up some resistance.

25. On that fateful morning, Ayah Atzili was in Lotan, in northern Israel where she was volunteering on a farm. A friend alerted her to the events unfolding in Nir Oz. When Ayah checked the Nir Oz community chat on her phone, she found over 300 messages describing terrorists attacking the town—burning houses, firing weapons, and setting off explosives. People were begging for help. Terrified for her family's safety, Ayah called Netta, Ofri, and her mother, Liat. They were unharmed but told her they couldn't talk and had to stay hidden and silent. Ayah fell into deep despair—crying, panicking, and feeling utterly hopeless. A friend had to intervene to help her breathe and calm down as she witnessed the horror through her phone.

26. While hiding in the safe room, Liat Atzili endured the relentless sounds of gunfire, explosions, and screams. Reports from the kibbutz chat group began to filter in, confirming missing and murdered members. Alone with her dog, she was paralyzed by fear and consumed with concern for her children and husband. Her desperate attempts to contact Aviv went unanswered.

27. At some point, terrorists entered Netta's apartment. Terrified, he listened as Arabic shouts grew louder and closer. The intruders ransacked the apartment, stole his belongings, but thankfully, they did not breach the safe room.

28.     At around 7:15 a.m., Aviv briefly returned to check on Liat, reassuring her that everything would be okay. Unbeknownst to them, this would be their final moment together. They had no chance to say goodbye. At approximately 8:30 a.m., Aviv sent a message to the family group, reporting that terrorists had infiltrated the kibbutz, that he had confronted and neutralized several attackers, and that everything would be fine. These were the last words his family would ever hear from him.

29.     Around 9:00 a.m., Aviv was shot and killed by Hamas terrorists in Nir Oz. His body was taken to Gaza, where it remained until an IDF operation in June 2025 recovered his body and brought it back to Israel.

30.     For over a year, his family was denied the chance to provide him with a proper burial.

31.     Around 11:00 a.m., the nightmare took a harrowing turn. Two armed terrorists stormed into Liat's safe room, their intent unmistakable: she was to be their captive. With their loaded weapons, they barked orders at her leaving her no choice but to comply. The terrorists set fire to the home she had built with Aviv, erasing decades of memories in mere seconds. Before leaving, they coldly shot the family's dog, robbing Liat of even the smallest comfort. Utterly alone, helpless, and paralyzed by fear, the terrorists forced her into a cramped stolen car, already packed with five armed men, stripping her of her freedom as they headed toward the Gaza Strip.

32.     For 54 days, Liat was held hostage by Hamas in Khan Younis. Armed terrorists controlled every aspect of her life—what she ate, when she slept, and how she moved. Each day blurred into the next, a monotonous cycle of terror, uncertainty, and despair. She clung to a single hope - that she might survive for the sake of her family, who she prayed were still alive.

33.     At about 3:00 p.m., Ofri was rescued from his apartment. At about 5:30 p.m., Netta was rescued. They met at an evacuation point but their parents were not accounted for. Ofri and

Netta updated Ayah that they were ok, but that they had not yet located Liat or Aviv.

34.     On November 29, 2023, during the final day of a temporary ceasefire and hostage deal, Liat Atzili was finally freed. Upon her release, she experienced immense relief as she learned that her children were safe, but this peace was short-lived as she learned her beloved husband Aviv was listed as injured and missing. Reuniting with her children brought an overwhelming wave of relief and unimaginable emotions, yet the joy was overshadowed by the aching absence of her beloved husband.

35.     The following day, November 30, Liat was summoned into a room where officials delivered the devastating news: Aviv had been killed. The confirmation came through tissue samples—blood and brain tissue—while his remains were absent, leaving behind a brutal and clinical finality that crushed the fragile hope she had clung to throughout her captivity. A day after reuniting with her children, she told them that their father was gone.

36.     Since Aviv Atzili's murder, the lives of his family have been irrevocably altered. Liat Atzili is now a widow carrying the unbearable weight of loss while stepping into the role of being the sole parent to their children. Aviv had been the rock of the family, the one who brought stability, support, and love to their lives. Together, they had shared a lifetime of memories: teenage romance, army service, raising children, and dreaming of a future they would never experience.

37.     Following the unprecedented attack and its tragic aftermath, Liat and the children are each trying to cope in different ways. Ofri canceled his travel plans. Netta has been unable to return to work or school. Ayah threw herself into volunteer work while grieving the loss of her father.

38.     Their family home—a sanctuary where they had built their lives together—now lies in ash and rubble. For nearly a year, Liat and their grown children lived in temporary housing, a

stark reminder of the life they lost. The once-thriving kibbutz community they cherished is now a shadow of what it was, leaving them to navigate a future filled with grief and uncertainty.

39.     Plaintiff Liat Atzili brings this action individually as someone who was taken hostage on October 7, 2023, and subsequently released by Hamas terrorists, and as the surviving spouse of Aviv Atzili who was killed in Kibbutz Nir Oz on October 7, 2023, as well as on behalf of his estate.

40.     As a direct and foreseeable result of the October 7 Attack, Plaintiff Liat Atzili experienced conscious pain and suffering, extreme mental anguish, loss of solatium, and economic loss as a result of being taken hostage by Hamas terrorists who held her in captivity for 54 days before her release from Gaza.

41.     Plaintiff Liat Atzili also suffered severe mental anguish and emotional distress as a direct and foreseeable result of the October 7 Attack in which her husband, Aviv Atzili, was killed.

42.     Plaintiffs Ofri Atzili, Netta Atzili, and Ayah Atzili suffered severe mental anguish and emotional distress as a direct and foreseeable result of the October 7 Attack in which their father, Aviv Atzili, was killed and their mother, Liat Atzili, was attacked and taken hostage by Hamas terrorists.

### **The Peles Family**

43.     Plaintiff Nadav Peles is a citizen of the United States and a resident of Israel.

44.     Plaintiff Eyal Peles is a citizen of the United States and a resident of Israel.

45.     Nadav Peles and Eyal Peles are twin brothers, and they both serve in the canine special forces' unit in the Israel Defense Forces ("IDF").

46.     On October 7, 2023, Nadav was at home in Modi'in on a short vacation from duty celebrating the Jewish holiday of Simchat Torah with his family. Woken by the shocking and

terrifying news of what was unfolding in the south, Nadav soon received a call from his commander, explaining that civilian communities were under attack.

47.    After a quick preparation at base, Nadav headed south with his K-9 partner, Cheetah, to Kibbutz Be'eri—one of the most severely attacked communities. The devastation at Be'eri included 101 members brutally murdered, 31 kidnapped, and hundreds more injured, including men, women, children, and the elderly.

48.    Heading toward the mission with little information about what lay ahead, Nadav and his team passed horrifying scenes that revealed the full scale of the catastrophe. From the window of his vehicle, he saw mutilated and burned bodies, cars engulfed in flames, and scenes of unimaginable destruction. At that moment, it became clear to him: he had entered a full- blown combat zone. These haunting images remain etched in his memory to this day.

49.    Around midday, Nadav entered Kibbutz Be'eri and began the evacuation process. Determined to help as many people as possible, Nadav and Cheetah went from house to house, rescuing civilians who were injured or trapped in their homes. The chaos was overwhelming, but Nadav remained committed to his mission, doing whatever he could to save lives.

50.    During a mission to rescue members of Kibbutz Magen, Eyal drove south, passing rows of lifeless bodies. At first, he couldn't process what he was seeing—entire families brutally murdered. Inside the kibbutz, the atrocities became even more horrifying with bodies scattered on the streets. At one point, while searching, he knelt without realizing there was a body right next to him. The chaos and carnage were beyond what his mind could grasp.

51.    The horrors he witnessed haunt Nadav to this day, affecting his daily life. The smell of burning flesh often invades his senses unexpectedly, triggering painful memories. Despite his need to recover, knowing there were still hostages in captivity and entire communities displaced

from their homes, he believed there was no time to prioritize his own needs.

52.     On January 24, 2024, Nadav was operating in Khan Younis in southern Gaza. His mission, alongside Cheetah, was to detect bombs planted by terrorists. After a long day of operations, as the sun began to set, Nadav's commander ordered the team to rest in a safe zone. While searching for a suitable place, Nadav and his team inadvertently entered an exposed area. Realizing the danger, they rushed to take cover inside a house while sending Cheetah ahead to thoroughly search it.

53.     Within seconds of entering the house, as Cheetah was searching, a massive explosion erupted. Nadav lost consciousness immediately. When he awoke, disoriented, he found himself buried under debris, utterly alone. Upon realizing he was alive, his first instinct was to check if he had lost any limbs. His second thought was of Cheetah. Realizing she was gone, he forced himself to push aside his grief and focus on surviving.

54.     Trapped under heavy concrete, Nadav tried desperately to free himself but found it impossible to move. After several failed attempts, he decided to wait for a rescue team. Suddenly, a fire broke out in the house, quickly spreading toward him. Realizing time was running out, Nadav used every ounce of strength to try and free himself while screaming for help. As the fire drew closer, Nadav could feel the heat searing his legs, burning his uniform.

55.     At last, a rescue team arrived and began working to pull him from the rubble. The flames continued to spread, and the team struggled to free him, their gloves beginning to burn from the intense heat. Just as the situation seemed hopeless, a second rescue team arrived. Together, they managed to pull Nadav out of the wreckage and rushed him to receive medical treatment.

56.     Struggling to breathe due to smoke inhalation and trauma, Nadav was sedated and intubated to open his airway. A rescue helicopter transported him to a hospital in Israel, where

11

doctors performed emergency surgery to remove shrapnel lodged in his pelvis.

57.     When Nadav woke up the following day, his ordeal was far from over. He underwent a series of painful procedures, including skin grafts to treat third-degree burns on various parts of his body, with the most severe damage to his legs. From that point on, he began an agonizing journey of recovery.

58.     As Eyal Peles prepared to go back into Gaza for another mission, his commander informed him of the devastating news—his twin brother, Nadav, had been severely injured. Overwhelmed with panic and dread, Eyal rushed to the hospital. The hour-long drive was consumed by spiraling thoughts and fears. Upon arriving, as the first family member there, he was met with the horrifying sight of his brother, sedated and intubated in intensive care, his body covered in burns and blood, connected to an array of machines. Urged to step back, he refused to leave his brother's side, demanding answers from the medical team. But the absence of clear information only deepened his torment.

59.     On the evening of January 24, 2024, the Peles family was at home when a phone call shattered their world. Hila Peles, Eyal and Nadav's mother, answered to hear the calm but detached voice of an IDF official. Speaking in a calm but detached manner, the official informed her that Nadav had been seriously injured and was in intensive care at Soroka Medical Center. Unable to accept this devastating news, Hila tried to convince herself it was a scam. However, as the official repeated the message multiple times, the reality sank in, leaving her overwhelmed with uncontrollable crying, screaming, and searing pain throughout her body.

60.     Eyal met his family as they arrived at the hospital. Hila was so overcome with grief and fear that she could barely walk, needing support to enter. Their father, Lior Peles, broke down in tears—a sight Eyal had never seen before. Despite his own pain, Eyal felt like he had to be the

strong one, trying to emotionally support his family while inwardly falling apart.

61.    After several weeks of caring for his family and his injured brother, Eyal—torn between his family's pleas for him to stay and his unwavering sense of duty—ultimately returned to the frontlines. One of the most harrowing moments for Eyal occurred during a mission when, inside an APC (armored personnel carrier), he spotted a terrorist through the camera sprinting toward them with an explosive device. Time seemed to stretch endlessly. Trapped and unable to defend himself, all he could think about was his family—how they would cope if he didn't survive. For a few agonizing seconds, Eyal braced for the inevitable explosion that, miraculously, never came. While the immediate danger passed, the mental weight of those moments and the haunting thoughts of his family remain ever-present.

62.    After nearly a month of being bedridden, Nadav could not perform simple tasks like getting out of bed without excruciating pain. His recovery extended to two and a half months in the hospital, where physical therapy felt like relearning how to walk. To this day, Nadav continues to struggle with basic tasks, having lost much of his strength and flexibility, which now severely limits the physical freedom he once enjoyed.

63.    After being discharged from the hospital, Nadav was haunted by nightmares replaying the harrowing moments when he was trapped in a burning building, unable to escape or save anyone. He is tormented by feelings of how he is still alive, repeatedly questioning how even the smallest change in events could have altered his fate. Nadav continues to carry this heavy burden, knowing it will remain with him for life.

64.    Since the October 7 Attack and his subsequent injuries at the hands of Hamas, Nadav is no longer the same person. He bears significant scars on his legs and arms from the burns and must undergo ongoing treatments, such as laser therapy and the application of special creams.

He must always wear protective bandages to ensure his skin remains covered. Additionally, nerve damage in his leg has left him with permanent numbness, preventing him from regaining his full physical abilities. He can no longer serve as an active combat soldier.

65.     Nadav knows this struggle will accompany him for the rest of his life. He continues to grapple with the trauma of the events he endured, the horrifying scenes of October 7, the lingering pain over the loss of Cheetah, and the guilt of leaving her behind.

66.     Since the October 7 Attack, Eyal is no longer the same person. The trauma of the sights of lifeless bodies in Kibbutz Magen, the constant danger in Gaza, his twin brother's injury, and his family's suffering—continue to weigh on him. He has become hypersensitive to every loud noise or sudden movement. At times, his heart races uncontrollably, triggering anxiety attacks without warning. Every day, he carries the heavy burden of how much life has changed since October 7.

67.     Plaintiff Hila Peles brings this action individually.  She is a citizen of the United States and a resident of Israel. She is the mother of Nadav and Eyal Peles.

68.     Hila has struggled deeply to regain any sense of normalcy, preventing her from returning to her routine life and keeping her away from work for several months. Constant questions and intrusive thoughts haunt her—replaying the moment of Nadav's injury, imagining the horrors he endured, and tormenting herself with devastating "what-ifs." The phone call from the IDF echoes in her mind like a broken record, often reducing her to tears.

69.     Plaintiff Lior Peles brings this action individually.  He is a citizen of the United States and a resident of Israel. He is the father of Nadav and Eyal Peles.

70.     Lior stopped working for several months to dedicate himself fully to supporting Nadav and the rest of his family. Despite his efforts, the harrowing memories of those days

resurface often, triggering sleepless nights filled with fear and anxiety. Adding to the family's anguish was their worry for Eyal, who was still serving in the same military unit as Nadav, and shortly after his brother's injury returned to the front lines.

71.    Plaintiffs Lior Peles and Hila Peles also bring this action on behalf of their minor daughter, D.P., who is a citizen of the United States and a resident of Israel. She is the sister of Nadav and Eyal Peles.

72.    For D.P., Nadav has always been her role model—the person she looked up to for strength and confidence. The thought of losing him shattered her sense of security. She now struggles with heightened anxiety and often finds herself unable to sleep. After being away from school for several weeks, the trauma has made it difficult for her to fully return to her studies or achieve the academic performance she once excelled at.

73.    Plaintiff Roy Peles brings this action individually.  He is a citizen of the United States and a resident of Israel. He is the brother of Nadav and Eyal Peles.

74.    The attack on Nadav completely upended the Peles Family's lives. For months, they remained by his side, unable to work or attend school, consumed by the constant worry over his condition. Even now, Nadav is still undergoing extensive treatment and has not fully recovered. His injuries continue to define their daily lives, fueling ongoing trauma and anxiety for the entire family.

75.    As a direct and foreseeable result of the October 7 Attack, and the events that followed, Plaintiffs Nadav Peles and Eyal Peles suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

76.    Plaintiffs Lior Peles, Hila Peles, Eyal Peles, D.P., and Roy Peles experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7

Attack and the subsequent attack in which Nadav Peles was injured.

**The Guedalia Family**

77.     Joseph Guedalia was a citizen of the United States and a resident of Israel when he was murdered by Hamas.

78.     Joseph Guedalia served in the elite Duvdevan Unit in the IDF.

79.     Joseph and his wife, Senai Guedalia, were a young couple who had met at a Jewish summer camp and dreamed of building a life together. Married for just one year, they lived in a small apartment in Jerusalem with their whole future ahead of them.

80.     On October 6, 2023, during the Jewish holiday of Simchat Torah, Joseph and his family gathered in Jerusalem for their cherished tradition of dancing, dining, and celebrating together.

81.     The following morning, on October 7, 2023, at approximately 8:00 a.m., Joseph received a call from his commander ordering him to report to base immediately, citing reports of civilians being killed in the south. Moments later, the shocking sounds of rocket sirens and explosions filled the air. Rockets targeting Jerusalem with such intensity was unusual, leaving Joseph certain that something horrific was unfolding.

82.     As one of the first from his team to arrive, Joseph immediately set out for Kfar Aza where 64 community members had been killed, 19 kidnapped, and hundreds more injured or raped by Hamas terrorists. Determined to act swiftly, he gathered his team and headed south.

83.     By the time Joseph arrived at approximately 11:00 a.m., Kfar Aza was a battlefield. Joseph and his team repeatedly braved enemy fire, rescuing injured civilians from rooftops, roadsides, bushes, and transporting them to safety. On their third entry into Kfar Aza, they decided to enter from the back to cover areas they hadn't yet reached. Tragically, this route led directly into

the terrorists' point of entry.

84.    Fully aware of the dangers, Joseph and his team began driving between the houses, determined to save lives. Spotting an abandoned RPG on the ground, they decided to secure it before the terrorists could do so. It was a trap. Their vehicle came under heavy small-arms and RPG fire. Forced to flee the vehicle, they jumped out just as the terrorists threw a grenade at them.

85.    In the chaos, Joseph ran toward the back entrance to Kfar Aza where a group of terrorists ambushed him near the fence. Alone, he fought bravely against the terrorists but sustained a fatal gunshot wound in the exchange, ultimately leading to his death.

86.    Moments later, a backup team from his unit arrived and found one of Joseph's team members, severely injured. He directed them to search for Joseph. They found him lifeless, terrorists attempting to drag his body toward Gaza. The team opened fire and recovered his body, transporting it to an army base designated for fallen soldiers.

87.    Plaintiff Asher Guedalia brings this claim individually. He is a United States citizen and a resident of Israel. He is the surviving brother of Joseph Guedalia.

88.    Asher Guedalia was serving as a reserve soldier in the special forces' unit in the IDF.

89.    On the morning of October 7, Asher and his brother Joseph had planned to continue their holiday celebrations. However, air raid sirens in Jerusalem jolted Asher awake. As a reserve combat soldier, he immediately reported to his unit and was deployed to the south.

90.    By 10 a.m., Asher and his team had arrived in the south. They received reports of terrorists ambushing an area near the Ma'on Junction. While attempting to locate the terrorists, his commander was shot and struck down. Asher witnessed the incident from across the junction. Under heavy fire, he rushed to evacuate his commander while his team eliminated the terrorists. Tragically, despite his efforts, the commander was pronounced dead.

91.    Amid his shock and overwhelming grief, Asher knew he had to press on with the mission. Alongside his team, he cleared areas in Kibbutz Re'im and assisted forces responding to injured civilians amidst ongoing clashes. Passing through the NOVA Festival site was a harrowing experience—scenes of unimaginable cruelty and devastation seared into his memory – burned cars, mutilated and charred bodies, and shattered remnants of what had once been a joyous celebration.

92.    Asher returned to base around 9:00 p.m. to prepare for further operations. Exhausted and emotionally drained, he tried to locate a teammate who hadn't returned to base only to learn he had been killed. The realization shattered him—he had now lost two team members. Notifying one of their wives was a heart-wrenching task that left him paralyzed with grief.

93.    At that point, Asher hadn't even considered that his brother Joseph was in the fierce battles against Hamas near the southern border since he usually operated in the West Bank. However, during Asher's deployment to the border to counter potential terrorist infiltrations, he heard rumors that his brother's unit had suffered losses in Kfar Aza. Desperately seeking information, he reached out to mutual friends, but their fragmented responses only deepened his anxiety.

94.    Asher couldn't sleep that night. Taking over night shifts from his teammates, he was stormed by horrifying thoughts about his brother fighting in Kfar Aza. The following morning, a phone call confirmed his worst fear—Joseph had been killed. Determined to be the one to deliver the heartbreaking news to their family, Asher worked tirelessly to coordinate his arrival with IDF officials to the family house.

95.    Before heading to his parents' home, a devastating realization fell upon Asher: his brother would leave no children, no legacy behind. The weight of this truth shattered him completely. The two brothers were more than siblings; they were best friends. Living close to one

another in Jerusalem, they shared hobbies like sports, studies, technology, building dreams, and inspiring each other. For Asher, Joseph is irreplaceable—a true partner in life. Losing him has created a void that can never be filled.

96.    Since the attack, life has fundamentally changed for Asher. Losing his brother felt like losing a part of himself; the man he was before October 7 no longer exists. The grief and trauma have reshaped his perspective and priorities. He now struggles to find meaning and purpose. Before the attack, Asher worked in a startup, managing a machine learning division. The company was on the verge of a major breakthrough, promising significant financial gains. But after October 7, the weight of the painful loss and the haunting memories, prevented him from working as he once did.

97.    Plaintiff Senai Guedalia brings this claim individually and as heir-at-law on behalf of the Estate of Joseph Guedalia.  She is a citizen of the United States and a resident of Israel. She is the wife of Joseph Guedalia.

98.    After two agonizing days of uncertainty, worry, and fear, Senai Guedalia was notified of her husband's fate. On October 9, 2023, at approximately 6:00 pm, IDF officials knocked on her door to deliver the message that would change her life forever—Joseph was brutally murdered by Hamas terrorists.

99.    The loss of Joseph has devastated Senai's life. She suffers from sleepless nights and declining physical health and is unable to eat regularly despite feeling hunger. Social settings, once a source of comfort, have become unbearable as she can no longer tolerate large crowds. Severe anxiety overwhelms her multiple times a day, disrupting her ability to function. As a result, Senai has been forced to drastically reduce her workload in her social work studies, unable to manage the demands she once handled with ease.

100.    Above all, the most profound loss for Senai is her stolen future. As a young couple, Senai and Joseph dreamed of building a home, having children, and creating a family together. That dream was cruelly taken from her, leaving a deep void and grief.

101.    Plaintiff David Guedalia brings this claim individually. He is a citizen of the United States and a resident of Israel. He is the surviving father of Joseph Guedalia.

102.    Plaintiff Dina Lea Guedalia brings this claim individually. She is a citizen of the United States and a resident of Israel. She is the surviving mother of Joseph Guedalia.

103.    On October 9, 2023, Plaintiffs David Guedalia and Dina Lea Guedalia were supposed to celebrate their wedding anniversary. Instead, a knock on the door would change their lives forever. David opened the door to find his son, Asher, standing there with a pained expression, accompanied by two somber IDF officers. Unable to accept the reality of what was happening, David repeatedly asked, "Who? Who was killed?" Overwhelmed with the answer, he sat paralyzed on the stairs, breaking down completely. Moments later, Dina arrived home, smiling and wishing him, "Happy anniversary." David looked at her and said, "Our son was killed."

104.    A year later, David and Dina couldn't bring themselves to say the words "Happy anniversary," and they will likely never celebrate their wedding anniversary again. David is haunted by recurring nightmares of the moment he opened the door, the devastated look on Asher's face, and the officers delivering the crushing news. Every time he enters his home, he is confronted with the memory—seeing the officers standing in the doorway and the stairs where he broke down. The trauma grips him daily, causing him immense emotional pain. He struggles to work and manage the daily and weekly responsibilities that once shaped his life.

105.    Plaintiff Shira Ephrat brings this claim individually. She is a United States citizen and a resident of Israel. She is a surviving sister of Joseph Guedalia.

106.    Plaintiff Yael Guedalia brings this claim individually.  She is a United States citizen and a resident of Israel. She is a surviving sister of Joseph Guedalia.

107.    Plaintiff Esther Guedalia brings this claim individually. She is a United States citizen and a resident of Israel. She is a surviving sister of Joseph Guedalia.

108.    Plaintiff Micha Guedalia brings this claim individually.  He is a United States citizen and a resident of Israel. He is a surviving brother of Joseph Guedalia.

109.    Plaintiffs David Guedalia and Dina Lea Guedalia bring a claim on behalf of E.G., their minor child, who is a United States citizen and resident of Israel. She is a surviving sister of Joseph Guedalia.

110.    As a direct and foreseeable result of the October 7 Attack, Joseph Guedalia suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, wrongful death, and economic loss. Claims on behalf of his estate are sought here by his wife, Plaintiff Senai Guedalia.

111.    As a direct and foreseeable result of the October 7 Attack, Plaintiff Asher Guedalia suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

112.    Plaintiffs Senai Guedalia, Asher Guedalia, Micha Guedalia, Esther Guedalia, Yael Guedalia, Shira Ephrat, Dina Lea Guedalia, David Guedalia, and E.G. experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack on and the death of their family member Joseph Guedalia.

**The Edri Family**

113.    Plaintiff Eitan Edri is a citizen of the United States and a resident of Israel.

114.    Plaintiff Tair Edri is a citizen and resident of Israel.  She is the wife of Eitan Edri.

115.    Plaintiffs B.H.E. and N.S.E. are citizens and residents of Israel.  They are the minor

children of Eitan Edri and Tair Edri, and their claims are being pursued by Eitan Edri and Tair Edri as their co-legal guardians.

116.    Plaintiff Itzhak Edri is a citizen of the United States and a resident of Israel.  He is a brother of Eitan Edri.

117.    Plaintiff Itamar Edri is a citizen of the United States and a resident of Israel. He is a brother of Eitan Edri.

118.    Plaintiff Ariel Edri is a citizen of the United States and a resident of Israel.  He is a brother of Eitan Edri.

### Eitan Edri, Tair Edri, B.H.E., and N.S.E

119.    On the morning of October 7, 2023, at approximately 6:30 a.m., Eitan Edri and his family awoke to the deafening sound of rockets and sirens. Having lived in Sderot for ten years, they had endured multiple rocket attacks, but this time was different—the sheer volume of rockets was far beyond anything they had previously experienced.

120.    Eitan Edri and his wife Tair Edri hurried B.H.E. and N.S.E. into the safe room as they shook with fear. Suddenly, another horrifying sound erupted: gunfire, followed by the chilling screams of their neighbors. Huddled in the bomb shelter, praying that they would not be hit by the rockets—or worse, that the terrorists would find them. With no help on the horizon, as the police station had been overrun, Eitan, Tair, and their children remained confined in their safe room for the next 24 hours without food, water, or access to a bathroom, unable to escape the relentless danger outside.

121.    The next morning, on October 8, 2023, they packed their car and fled north, shielding their children's eyes from the horrors outside. As they drove out of Sderot, the trauma of what they witnessed became etched in their minds: pools of blood staining the streets, vehicles

abandoned in the middle of the road with entire families—children included—slaughtered inside. Town residents scrambled to recover bodies from the roads amidst the devastation.

122.    The family was evacuated, moving between hospitals and a hotel, displaced from their home with no access to their belongings. They learned that Tair's father, Haim Sasi, had been shot four times during the attack while trying to provide medical treatment to the injured (miraculously, he survived). Their world had collapsed entirely, leaving them with no clarity about how to move forward.

123.    Since the October 7 Attack, Eitan has not been the same. The trauma of that day left him feeling incapable of supporting his family—financially or emotionally. Before the attack, he ran a thriving business specializing in team building and empowerment workshops in the Gaza Envelope. However, as a direct result of Hamas' attack, the business was forced to shut down entirely.

124.    Tair, once a confident and independent professional, is now paralyzed by fear. Overwhelming anxiety prevents her from commuting to her job as Head of the Digital Department at a finance company. What was once a simple train ride to Tel Aviv has become an unbearable thought, consumed by fear of potential dangers lurking at any moment. Since the attack, Tair has suffered from sleepless nights and frequent anxiety attacks, causing breathlessness, trembling hands, and sharp chest pain.

125.    As a result of the attack, B.H.E. has become emotionally withdrawn, struggling to communicate and engage socially. He has also developed a compulsive habit of biting objects, such as clothing, something he never did before. N.S.E., a first grader who once excelled academically, now struggles to focus. Her performance has declined as she battles the trauma of that day.

*Itzhak Edri*

126.    On the morning of October 7, 2023, at approximately 8:00 a.m., Itzhak Edri, a reservist soldier in the IDF, received a call from his commander ordering him to report to base immediately. After a short preparation, Itzhak Edri and his team headed toward Moshav Mivtachim, a community only a few miles east of the Gaza Strip that was overrun by Hamas terrorists.

127.    Along the way, they spotted what appeared to be a police vehicle stationed at an intersection. Assuming it was a checkpoint, they cautiously approached, realizing too late that it was an ambush. Suddenly, machine guns, grenades, and RPGs were unleashed upon them. In the chaos, Itzhak and his team fought back, managing to neutralize the attackers.

128.    What awaited them at the junction was beyond comprehension. Vehicles filled with civilians—including children, the elderly, and law enforcement officers—lay abandoned, their lifeless bodies bearing the unmistakable signs of execution. The sheer brutality of the massacre was unlike anything Itzhak had ever seen.

129.    The horrors continued as Itzhak's team entered Moshav Mivtachim. Every turn revealed another tragic scene. Families had been slaughtered; their homes turned into battlefields. The most devastating moment came when they were sent to nearby Moshav Holit to assist in the ongoing fighting, only to find that two of Itzhak's long-time comrades had been killed. No matter how fast they moved, they were always "one second too late" to save lives.

130.    By nightfall, exhausted both mentally and physically, his team was sent to secure Moshav Pri-Gan approximately five miles to the southwest of Moshav Mivtachim, stationed at a local manufacturing site. For the first time that day, his heart rate began to slow—but the horrors were far from over. As daylight revealed their surroundings, they found themselves surrounded by

the bodies of fallen security officers. One officer's phone lay on the ground, filled with missed calls from his wife and family—an image that will haunt Itzhak forever.

131.    Since the October 7 attack, Itzhak has not been the same. Immediately upon returning home, the nightmares began. He wakes up drenched in sweat, his heart pounding uncontrollably. On multiple occasions, he has woken to find that he has wet the bed. Even routine tasks like driving have become unbearable. Along Route 12 near the Egyptian border, flashbacks of ambushes consume him. In one instance, his distracted state caused him to lose control of his vehicle, crashing into a guardrail and requiring hospitalization.

### *Itamar Edri*

132.    On the morning of October 7, 2023, Itamar Edri, an on-duty vehicle officer, left his wife and three children behind as he prepared military vehicles for deployment. Among the soldiers he helped transport was his younger brother, Itzhak Edri. Despite his duty, he was tormented by the knowledge of where he was sending his brother—and the fact that another brother, Eitan, was also in grave danger in Sderot.

133.    On May 21, 2024, during a mission in the Gaza Strip, Itamar was tasked with providing critical support under intense combat conditions. Under fire from grenades, gunfire, and missiles, he narrowly escaped physical harm. Yet, the traumatic events left an indelible mark, replaying in his mind endlessly.

134.    Since the attack, Itamar has been plagued by sleepless nights and a constant fear for his safety and that of his family. The anxiety has disrupted his daily life, and the prolonged separation from his family during the chaos has strained his relationships, making him feel like an outsider in his own home.

*Ariel Edri*

135.    A combat reservist in the IDF, Ariel Edri was called to duty on the morning of October 7, 2023. The following day, he was deployed to the Gaza Envelope to search for additional threats and assist in evacuating civilians. During this mission, Ariel was exposed to unimaginable atrocities and cruelty carried out by Hamas terrorists.

136.    Following the October 7 Attack, Ariel's unit operated in the Gaza Strip. On November 5, 2023, his team was assigned to conduct ambushes on Hamas terrorists attempting to reach the border in the Jabalia neighborhood of northern Gaza. Within days, on November 11, their position was discovered by Hamas operatives. Chaos erupted instantly— snipers opened fire, at least five missiles and RPGs were launched, and indiscriminate gunfire rained down on them.

137.    As the bullets and explosions surround them, Ariel fought to protect himself and his team, all while witnessing his friends getting injured. He returned fire, determined to hold the line and evacuate the wounded. Moments later, reinforcements arrived, allowing Ariel and his team to withdraw. Tragically, during that incident, he lost one of his closest friends.

138.    Since the October 7 Attack and the harrowing events that followed, Ariel is no longer the same person. Over the past year, he has been forced to be absent from his job as a firefighter, jeopardizing the position he used to enjoy. His role as a husband and father has suffered due to his prolonged absence and the weight of the trauma he carries. The memory of being ambushed, of losing a friend by his side, refuses to leave his mind. He is haunted by those moments daily, easily triggered by reminders, and tormented by the unbearable thought that his friend's family is left without a father.

139.    Plaintiff Sarah Edri brings this action individually. She is a citizen of the United States and a resident of Israel. She is the mother of Eitan Edri, Itzhak Edri, Ariel Edri, and Itamar

Edri.

140.     Plaintiff Eliyahu Edri brings this action individually.  He is a citizen and resident of Israel.  He is the father of Eitan Edri, Itzhak Edri, Ariel Edri, and Itamar Edri.

141.     Since October 7, Eliyahu and Sarah Edri have suffered immense emotional distress and ongoing anxiety. They are haunted by persistent thoughts of "what if"—what could have happened had events taken an even darker turn. Their thoughts remain consumed with concern for the safety and wellbeing of their children and grandchildren.

142.     Plaintiff Avidan Edri brings this claim individually. He is a citizen of the United States and a resident of Israel.  He is the brother of Eitan Edri, Itzhak Edri, Ariel Edri, and Itamar Edri.

143.     Avidan Edri was a source of calm and confidence for his family. Now he struggles to manage his panic and fear, often visibly distressed and urgently guiding his family to the safe room during alarms. As a direct result of the October 7 Attack, Avidan and his family are profoundly changed.

144.     Plaintiff Achiya Edri brings this claim individually.  He is a citizen of the United States and a resident of Israel.  He is the brother of Eitan Edri, Itzhak Edri, Ariel Edri, and Itamar Edri.

145.     For Achiya Edri, his brothers were a source of shared laughter, conversation, security, and belonging. But since the attack, every gathering has been overshadowed by the trauma they endured. Their conversations have turned into emotional discussions about coping with their collective pain and processing the horrors they witnessed. The profound suffering they experienced has irreversibly changed their lives and strained their relationships.

146.     As a direct and foreseeable result of the October 7 Attacks and injuries suffered,

Plaintiffs Eitan Edri, Tair Edri, B.H.E., N.S.E, Itzhak Edri, Ariel Edri, and Itamar Edri suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

147.    Plaintiffs Sarah Edri, Eliyahu Edri, Eitan Edri, Tair Edri, B.H.E., N.S.E., Itzhak Edri, Ariel Edri, Itamar Edri, Achiya Edri, and Avidan Edri each experienced severe mental anguish and extreme emotional distress, as a direct and foreseeable result of the October 7 Attacks involving their immediate family members.

### **The Shain Family**

148.    Plaintiff Binyamin Shain is a citizen of the United States and a resident of Israel.

149.    Plaintiff Zlil Chen is a citizen and resident of Israel. She is the domestic partner of Binyamin Shain.

150.    On the evening of October 6, Binyamin Shain and Zlil Chen, filled with joyful anticipation for the NOVA Festival, decided to gather all 27 friends going to the music festival and host a holiday dinner for everyone in their apartment to celebrate the Jewish holiday of Simchat Torah. Enjoying their time together and eager to continue the celebration, they set off for the NOVA Festival.

151.    On the morning of October 7, 2023, at approximately 6:30 a.m., Binyamin and Zlil were among hundreds of partygoers who were jolted out of the NOVA Festival's serene atmosphere by the rockets streaking through the pastel sunrise.

152.    Binyamin, Zlil, and their friends immediately dropped to the ground for cover, praying they would not be struck by the incoming rockets. Witnessing his panicking partner and friends, Binyamin realized he either had to act or lose control entirely.

153.    Plaintiff Dvorit Shain is a citizen of the United States and a resident of Israel. She is the mother of Binyamin Shain.

154.    On the morning of October 7, Dvorit woke up to loud explosions overhead. She quickly turned on the TV, only to be shocked by the news that the country was under attack. Reports emerging from the south described the chaos at the NOVA Festival, where attendees were desperately fleeing for their lives. Worried for her son's safety, she immediately called Binyamin. At first, he answered calmly, telling her there were sirens and that they were packing the car to return home.

155.    Panic spread rapidly as machine gunfire erupted around Binyamin and Zlil. Terrorists began shooting into the crowd indiscriminately, causing thousands of people to flee for safety, blocking every exit in a frantic attempt to escape. Two of Binyamin and Zlil's close friends managed to break free from the festival grounds only to be brutally murdered just outside the gates on Road 232.

156.    The group of 27 friends who had begun this journey together separated as they tried to navigate a path through the chaos. That day, each would experience their own harrowing story, some of survival, and others, tragically, of loss.

157.    Panic consumed Dvorit as she realized terrorists breached the border from Gaza. She soon phoned Binyamin again. This time, his voice was filled with terror as he said, "Mom, I can't talk. We're running in the fields. I have to go!" At that moment, Dvorit froze, paralyzed by fear, realizing that her son's life was in imminent danger.

158.    Binyamin, Zlil, and three of their friends managed to get into a car. Desperate to escape, Binyamin broke two posts to access a dirt road, hoping to find an alternate route out. This path led them onto Road 232—a place he would later realize, hauntingly, was where two friends had been murdered just minutes before.

159.    With both directions of the road blocked, security directed them onto an agricultural

path. After driving only a short distance, they encountered yet another traffic jam. Moments later, gunfire broke out nearby, forcing them to jump out of the car and seek cover behind it. The shooting was relentless, with bullets tearing through the trees above them, hitting anything in their path. Paralyzed by fear, they could only hope they would not be caught in the storm of bullets.

160.     The group reconvened and ran to hide in a nearby riverbed, hoping to find refuge. Binyamin considered heading to Kibbutz Be'eri but quickly learned from others that it had been invaded by terrorists who were massacring and kidnapping civilians. With no reliable information about where they could find safety, Binyamin led the group eastward, trying to distance themselves from the Gaza border and the terrorists.

161.     An hour into their eastward journey, Binyamin received a desperate phone call from an old friend needing help, severely bleeding from injuries sustained while escaping gunfire by jumping from a 50-foot cliff. His fall had been broken by barbed wire; it had saved his life but left him with severe wounds on his arm. Despite the long distance between them, the injured friend knew he could rely on Binyamin. Under the blazing sun, with no water, food, or sleep, Binyamin guided him through first aid over the phone, tracked his live location, and coordinated with someone who could pick him up and take him to Moshav Patish—an area where other survivors had found refuge.

162.     Following an arduous ten miles and approximate six-hour ordeal, exhausted and haunted by moments when their lives seemed to hang by a thread, they finally arrived at Moshav Patish. Upon arrival, Binyamin and Zlil were horrified to see the severe injuries of fellow survivors, including the injured friend Natan, whose arm bore a deep, ragged tear. Though relieved to have reached a semblance of refuge, the distant sounds of gunfire, explosions, and sirens reminded them that true safety was still elusive.

163.    Dvorit sat helplessly, waiting for any sign of life from Binyamin and Zlil. The uncertainty of her son's fate was torturous as reports of civilians being murdered and kidnapped flooded in. She could only pray that her son and his partner were not among the victims.

164.    Finally, after five agonizing hours, Dvorit's phone rang. Binyamin told her that after hours of running through fields, they had reached Moshav Patish. Though relieved to hear his voice and learn that the terrorists hadn't caught them, Dvorit remained terrified, knowing that danger still loomed nearby.

165.    After hours of uncertainty and unrelenting tension, a bus finally arrived to take Binyamin and Zlil to Be'er Sheva, where her mother awaited them. As the bus drove away, and just when they thought that the worst was over, they encountered gunfire from an exchange between police and a suspicious vehicle. Forced to travel through the Hamas-ravaged town of Ofakim, the couple passed the lifeless, battered bodies of local civilians, witnessing firsthand the devastation—a horrific scene forever etched into their memories.

166.    Initially, Binyamin and Zlil believed the attack was focused solely on the NOVA Festival. But the devastating scenes during that ride revealed the staggering scale of the October 7 Attacks—a reality they still struggle to fully comprehend. With immense relief, Binyamin and Zlil finally reached Be'er Sheva and, eventually, home. Only that night did the exhaustion overwhelm them— they had been awake for 40 hours, walked the equivalent of a half marathon, and survived an unspeakable tragedy.

167.    In the days that followed, Binyamin and Zlil felt as though everything was on the verge of collapsing. They slowly learned which friends were missing and whom had been killed. Wracked with anxiety and dread, they attended a different funeral each day, mourning the brutal massacre they had witnessed.

168.    Traumatized by what had happened to Binyamin and Zlil, Dvorit is haunted by relentless "what ifs." The thought of her son running for his life while she was powerless to help triggers overwhelming panic and anxiety that continues to disrupt her daily life. The recurring sound of his panicked voice as he fled for safety is unbearable, especially knowing that some of their friends were brutally murdered.

169.    Binyamin experiences nightmares to this day and cannot leave the house without fearing that something extreme might happen. The trauma has made him feel uncomfortable even hiking in nature, fearing that danger could emerge suddenly from the trees. When parking, he now searches for the closest spot to the entrance, seeking a quick exit in case of an attack.

170.    Zlil cannot erase from her mind the terrified faces of her friends and the chaos of the panic attacks. Once a spontaneous and adventurous woman—something she deeply cherished about herself—she now refuses to leave the house without meticulously planning every detail. The terrorists stole her joy for life, transforming her from a curious and carefree young woman into someone perpetually on edge, scanning for potential threats. The haunting thought that someone, somewhere, may be seeking to harm her simply for who she is continues to dominate her mind. While she is making efforts to rebuild her life, Zlil has been unable to fully return to her career as a chemical engineer. She struggles to work full-time, finding it overwhelming to commit to the responsibilities she once managed with ease.

171.    Since the October 7 Attack, Binyamin and Zlil are no longer the same people. They once found joy in organizing celebrations for their friends, being the first two to buy tickets to the NOVA Festival and encouraging the group of 27 to join them. Now, burdened by the guilt that not all 27 made it back home, they can no longer bring themselves to gather friends. As part of their attempt to recover, they have tried attending other parties to recapture some of the joy they once

felt, but the music only triggers flashbacks of that day. The terrorists took from them the freedom to do what they loved most.

172.    Plaintiff Russel Shain brings this claim individually.  He is a citizen of the United States and a resident of Israel. He is the father of Binyamin Shain.

173.    Plaintiff Michal Lukman brings this claim individually.  She is a citizen of the United States and a resident of Israel. She is the sister of Binyamin Shain.

174.    Plaintiff Ariel Shain brings this claim individually.  He is a citizen of the United States and a resident of Israel. He is the brother of Binyamin Shain.

175.    Plaintiff Shay Shain brings this claim individually.  She is a citizen of the United States and a resident of Israel. She is the sister of Binyamin Shain.

176.    As a direct and foreseeable result of the October 7 Attack, Plaintiffs Binyamin Shain and Zlil Chen suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

177.    Plaintiffs Zlil Chen, Dvorit Shain, Russel Shain, Michal Lukman, Ariel Shain, and Shay Shain experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack on the NOVA Festival and Binyamin Shain and Zlil Chen.

**Hoshea Haggai**

178.    Hoshea Haggai is a citizen of the United States and a resident of Israel.

179.    On the morning of October 7, 2023, Hamas terrorists brutally attacked and shot to death Hoshea Haggai's only remaining brother, Gadi Haggai, and his sister-in-law, Judith "Judy" Weinstein Haggai—both American citizens—in Kibbutz Nir Oz near the Gaza border. After they were viciously executed, their lifeless bodies were taken hostage to Gaza, where they remained

until just recently.

180.    For the past 35 years, every morning at 6:00 a.m., Gadi and Judy, both in their 70s, took their morning walk in the scenic fields surrounding Kibbutz Nir Oz, a ritual they followed even on the sacred Jewish holiday of Simchat Torah. They didn't know it would be their last walk.

181.    About half an hour into their walk, rockets began exploding all around them. Without a bomb shelter nearby, Gadi and Judy rushed to take cover behind trees and bushes, laying on the ground with their heads covered, terrified for their life.

182.    After approximately 20 minutes of incessant explosions, Gadi and Judy noticed motorcycles and vehicles speeding from the Gaza border in their direction. As they drew closer, Gadi and Judy realized these were terrorists carrying guns, grenades, and other deadly weapons, intent on a massacre. Hiding on the ground, they texted their children, praying the terrorists wouldn't notice them. Tragically, they were spotted moments later.

183.    Showing no mercy for the defenseless elderly couple, the terrorists opened fire, severely injuring them both. Gadi's injuries were fatal, as brain matter was dispersed after he was shot. Judy was still alive but gravely injured, with gunshots to her face and arm, forced to witness her husband perishing before her eyes.

184.    With what little strength she had left, and desperate for help, Judy called Israel's national ambulance service, describing her and Gadi's injuries in harrowing detail. Yet no one was available to assist, as terrorists had already begun their killing spree in Kibbutz Nir Oz, even attacking ambulances on their way.

185.    Moments later, Gadi and Judy were dragged onto the back of a truck, with two terrorists standing near Gadi's mutilated body, cheering and making victory signs with their fingers as though the human bodies were trophies.

186.    Gadi was an integral part of Hoshea Haggai's life. Only three years apart in age, the brothers grew up side by side, always looking out for each other. More than brothers, they were best friends. With their older brother having passed away due to illness, Gadi was the only remaining birth family member Hoshea Haggai had left.

187.    On the morning of October 7, 2023, at approximately 6:35 a.m., Hoshea Haggai was at his home in Ein Hashofet, in northern Israel, when he received a call from his son urging him to turn on the news. He quickly learned that the southern part of the country was under attack. His first thought was of his brother, knowing Gadi and Judy's morning walk routine. He tried to reach them but was unsuccessful, which led to a foreboding feeling that they were in grave danger.

188.    Taking matters into his own hands, Hoshea gathered family members, including Gadi and Judy's four children. Together, they set up a home-based command center in Hoshea's home, working tirelessly to gather information about Gadi and Judy's fate. They reached out to the police, ambulance services, IDF members, the U.S. Embassy, and survivors from Kibbutz Nir Oz—desperately trying to find anyone who could shed light on what had happened. Despite their efforts, the following days and weeks were filled with unbearable uncertainty about the fate of his younger brother and sister-in-law.

189.    Hoshea spent two agonizing months advocating for their release. He traveled twice to New York to meet with the United Nations Security Council, organized meetings and events with other families of kidnapped loved ones, met numerous times with U.S. Secretary of State Antony J. Blinken, and reached out to anyone who might help.

190.    Hoshea desperately clung to hope that his younger brother was still alive—until the devastating news arrived confirming that Gadi and Judy had been murdered, extinguishing any last glimmer of optimism he had held.

191.    Horrifyingly, Hoshea was given the gruesome task by the Israeli intelligence agency to identify his brother's and sister-in-law's bodies through images. The photos showed Gadi lying lifeless on the back of a truck and both Gadi and Judy wrapped entirely in aluminum foil, only their faces exposed, being buried in an unknown location—scenes that continue to haunt him and likely will forever.

192.    Following his younger brother's death and unable to properly mourn, Hoshea struggled to eat, sleep, or function in daily life. His overwhelming grief eventually left him physically incapacitated, falling into a catatonic state where, despite being awake and conscious, he was completely unable to get out of bed. Fearing for his well-being, his wife intervened, urging him to see a doctor, who prescribed him sleeping pills and tranquilizers.

193.    Until the beginning of June 2025, Hamas used Hoshea's brother's remains as a bargaining tool, refusing to release the body and denying the family's basic request to conduct a respectful burial. This cruel injustice haunted Hoshea, filling him with anger, frustration, restlessness, and even a fear of losing his sanity.

194.    In a joint overnight operation on or around June 4, the IDF and the Shin Bet were finally able to recover the bodies of Gadi Haggai and Judith Weinstein Haggai and return them to Israel for a proper burial.

195.    Hoshea is only now learning how to cope with this extreme loss. While the remains of his brother were finally recovered, he remains dedicated to advocating for the return of the remaining hostages, and how to live with such unbearable grief.

196.    Plaintiff Hoshea Haggai experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack and the murder of his brother Gadi Haggai.

**The Strauss Family**

197.    Plaintiff Shalom Strauss is a citizen of the United States and a resident of Israel.

198.    Plaintiff Yael Strauss a citizen of Israel and a resident of Israel. She is the wife of Shalom Strauss.

199.    Shalom Strauss and Yael Strauss bring this action on behalf of their three minor sons, Z.S., Y.S. and D.S., all of whom are citizens of the United States and Israel and are residents of Israel.

200.    Shalom Strauss, Yael Strauss, Z.S., Y.S., and D.S., are hereinafter collectively referred to as "The Strauss Family."

201.    In the early hours of October 7, 2023, Shalom Strauss was fast asleep when an intense rocket attack erupted outside the Strauss Family home in Kibbutz Nir Yitzhak, shattering the peaceful, holiday-morning silence. He immediately jolted out of bed and rushed with his children to their safe room for protection. Shalom Strauss's wife, Yael Strauss, had not yet arrived home from her work as a nurse at a hospital in the city of Be'er Sheva, and Shalom was caring for their three minor children.

202.    The Strauss Family huddled together anxiously in their safe room, waiting for the rocket and sirens to subside. Their anxiety would soon bloom into immense fear when they heard gunfire just outside their safe room.

203.    At approximately 8:30 a.m., the Strauss Family was horrified to learn via WhatsApp that terrorists had invaded their kibbutz and were hunting down residents.  Shalom Strauss had the difficult task of explaining these unprecedented events to his minor children and instructed them to hide under the bed in the safe room. The gunfire continued to persist all day as the Strauss Family patiently waited for the IDF to arrive and rescue them.

204.     In the early hours of October 7, 2023, Hamas positioned terrorists around the Kibbutz Nir Yitzhak fence before entering the kibbutz. The kibbutz security and response teams fought back. Tragically, six team members were killed by the terrorists, who then unleashed horror on the residents of Kibbutz Nir Yitzhak: setting fire to buildings, vehicles, various kibbutz infrastructure, and anything of value to the Israeli residents living there. Altogether, five Israeli citizens were taken hostage from Nir Yitzhak, and eight Nir Yitzhak residents were killed that day.

205.     Throughout that dreadful day, Yael Strauss was overwhelmed with stress, knowing that the lives of her husband and minor sons were at serious risk while she was unable to leave the hospital. She was gripped with fear and anxiety that she would need to identify the bodies of her own husband and children. These intense feelings were further compounded by the magnitude of casualties arriving at her hospital from the many areas in southern Israel under attack by Hamas.

206.     After approximately eight hours of nerve-wracking waiting, the IDF arrived on the kibbutz and began evacuating residents from their homes. The Strauss Family were instructed to hide in a kindergarten on the kibbutz with other families for 14 hours through the night.

207.     The Strauss Family were horrified at the sight of the destruction and what remained of their kibbutz—homes were ravaged with bullet holes;destruction and chaos was all that was left. After spending the night in one of the kibbutz's kindergartens, the family evacuated south to the city of Eilat. Shalom was given one hour to pack belongings for himself, his children, and his wife for an undetermined amount of time.

208.     Yael was anxious to reunite with her family as she had not seen them since the day before the attacks. It was too risky for her to travel west from Be'er Sheva. The Strauss Family was finally reunited on October 8, 2023.

209.     The Strauss family remained in Eilat for close to one year, where they tried their

best to create a normal routine – the children attended school and Yael gained employment at a hospital in Eilat. Shalom is employed part-time on their kibbutz, so he would return there weekly.

210.    Eventually, the family made a full return to their home on Kibbutz Nir Yitzchak. This was emotionally difficult for them as much of the kibbutz was still destroyed and more than half the evacuatees have yet to return.

211.    The events of October 7, 2023, continue to traumatize the family. In the days following the attacks, they were overwhelmed with sadness to learn of the people they knew, both children and adults, who had been brutally murdered by terrorists and taken hostage into Gaza. Tragically, a best friend of D.S. was taken hostage into Gaza on October 7, 2023. This has caused D.S., a minor child, significant emotional difficulty, and he now suffers from increased anxiety and often breaks down in tears if he sees an old hostage poster for his friend.

212.    Since October 7, Shalom has continued to struggle both physically and mentally. His sense of security and safety for himself and his family has been shattered.

213.    As a direct and foreseeable result of the October 7 Attack, Plaintiffs Shalom Strauss, Z.S., Y.S., and D.S. have suffered severe mental anguish, extreme emotional distress, loss of consortium, loss of services, and economic damages.

214.    Plaintiff Yael Strauss has suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack on her husband and children.

**The Ben Zvi Family**

215.    Amitai Ben Zvi was a citizen of the United States and a resident of Israel when he was murdered by Hamas. He was 80 years old.

216.    On October 7, 2023, Amitai was in his home in Kibbutz Nir Oz, with his devoted caregiver. Amitai suffered from Parkinson's disease and had relied on his caregiver's attentive care for four years.

217.    At approximately 6:30 a.m., sirens blared through the kibbutz, shattering the morning calm. His caregiver hurried into the safe room, which also served as Amitai's bedroom.

218.    Fear and panic set in as the roar of six terrorists screaming on motorcycles circled Amitai's home. He realized that terrorists had infiltrated Kibbutz Nir Oz and he could not mobilize quickly enough to escape. He pleaded with his caregiver to tell his children he loved them and to flee to save himself. His caregiver steadfastly refused to abandon Amitai.

219.    Terrorists yelling in Arabic burst through the door to Amitai's home searching for potential victims. His caregiver hid under the bed while Amitai lay on top of it. They could hear shattering glass as the terrorists ransacked the home.

220.    Eventually, the terrorists left the house, but moments later, they returned, blew open the safe room door, and executed Amitai, a defenseless elderly man lying in his bed.

221.    The terrorists spotted his caregiver hiding under the bed and violently dragged him from his hiding place. As the caregiver passed Amitai's lifeless body, he begged for, and was granted, one final embrace of the man that he lovingly called "Abba," meaning father in Hebrew.

222.    Go-Pro cameras worn by the terrorists captured videos of the caregiver handcuffed and taken captive in a car, Amitai's home set on fire, and later, the caregiver in Gaza surrounded by a mob.

223.    Amitai's caregiver was mercilessly held hostage in Gaza for 49 agonizing days before his release on November 24, 2023.

224.    In the days following the October 7 Attack, Amitai's children suffered tremendous fear and distress as news flooded in from every direction, with no precise or official confirmation of their father's situation. Finally, on October 19, 2023, they received official confirmation that their father had been murdered in cold blood.

225.    Plaintiff Avishay Ben Zvi brings this action individually and as an heir-at-law for the Estate of Amitai Ben Zvi. He is a citizen of the United States and a resident of the State of Georgia. He is a surviving son of Amitai Ben Zvi.

226.    Plaintiff Gilad Ben Zvi brings this action individually and as an heir-at-law for the Estate of Amitai Ben Zvi. He is a citizen and resident of Israel. He is a surviving son of Amitai Ben Zvi.

227.    Plaintiff Hagar Madnick brings this action individually and as an heir-at-law for the Estate of Amitai Ben Zvi. She is a citizen of the United States and a resident of the State of California. She is a surviving daughter of Amitai Ben Zvi.

228.    Plaintiff Orna Avisrur brings this action individually and as an heir-at-law for the Estate of Amitai Ben Zvi. She is a citizen and resident of Israel. She is a surviving daughter of Amitai Ben Zvi.

229.    Plaintiff Ido Ben Zvi brings this action individually and as an heir-at-law for the Estate of Amitai Ben Zvi. He is a citizen and resident of Israel. He is a surviving son of Amitai Ben Zvi.

230.    Ido Ben Zvi was present at Kibbutz Erez when it was attacked by Hamas on October 7, 2023.

231.    As a direct and foreseeable result of the October 7 Attack, Amitai Ben Zvi experienced conscious pain and suffering and suffered economic loss for which his Estate seeks damages.

232.    As a direct and foreseeable result of the October 7 Attack and the death of their father Amitai Ben Zvi, Plaintiffs Avishay Ben Zvi, Gilad Ben Zvi, Ido Ben Zvi, Orna Avisrur, and Hagar Madnick have suffered severe mental anguish and extreme emotional distress, and economic loss.

### The Siman Tov, Butler, Hazoutte and Vahaba Families

#### *The Siman Tov Family*

233.    Carol Siman Tov was a citizen of the United States, a resident of Israel, and was present on October 7, 2023, at Kibbutz Nir Oz when she was brutally murdered by Hamas.

234.    Plaintiffs Koren Siman Tov Hazoutte, Amit Siman Tov Vahaba, and Ranae Butler bring this action as personal heirs-at-law, on behalf of the Estate of Carol Siman Tov.

235.    Yahonatan Siman Tov was the son of Carol Siman Tov. Yahonatan Siman Tov was a citizen of the United States, resident of Israel, and was present on October 7, 2023, at Kibbutz Nir Oz when he, his wife Tamar Kedem Siman Tov, his five-year-old twin daughters, Arbel and Shahar, and his son Omer, were all brutally murdered by Hamas.

236.    Plaintiffs Koren Siman Tov Hazoutte, Amit Siman Tov Vahaba, and Ranae Butler bring this action as personal heirs-at-law on behalf of the Estate of Yahonatan Siman Tov.

237.    Arbel Siman Tov and Shahar Siman Tov were citizens of the United States, residents of Israel, and were present on October 7, 2023, at Kibbutz Nir Oz when they were brutally murdered by Hamas.

238.    Gad Kedem brings this action as personal heir-at-law, on behalf of the Estates of

Arbel Siman Tov and Shahar Siman Tov.

239.    Carol Siman Tov, Yahonatan Siman Tov, Tamar Kedem Siman Tov, Arbel Siman Tov, Shahar Siman Tov, and Omer Siman Tov are hereinafter collectively referred to as "The Siman Tov Family." [1]

240.    On October 7, 2023, in the early morning hours, Carol Siman Tov was alone in her home in Kibbutz Nir Oz when Hamas terrorists broke through her door, violently invading her home. They mercilessly executed her, ending her life in an act of unimaginable cruelty. She was 70 years old. She was the mother of Ranae Butler, Yahonatan Siman Tov, Koren Siman Tov Hazoutte, and Amit Siman Tov Vahaba. She was a proud and active grandmother of 11 grandchildren whom she loved dearly, lived near, and spent time together daily.

241.    On October 7, 2023, at approximately 6:30 a.m., Yahonatan Siman Tov was at home in Kibbutz Nir Oz, together with his wife, Tamar, their five-year-old twin daughters, Arbel and Shahar, and their two-year-old son, Omer, when hundreds of Hamas terrorists armed with machine guns, grenades, and other weapons breached Kibbutz Nir Oz with the intent to assassinate, brutally attack, and ruthlessly abduct as many civilians as possible. Out of the approximately 400 residents of this close community, over one quarter, 117, were murdered or abducted, and at least two women were brutally raped according to interrogations of arrested Hamas terrorists.

242.    The family fled to their saferoom, but the door did not lock, providing no protection from the horde of Hamas terrorists swarming their home. Desperately, Yahonatan and Tamar exhausted all efforts to protect their children and blocked the door by leaning on it; however, without weapons, they were defenseless as Hamas terrorists savagely barraged them with machine

---

[1] Yhonatan's wife, Tamar Kedem Siman Tov and his son, Omer Siman Tov, were both Israeli citizens. Their estates are plaintiffs in Case No. 24-cv-04765 pending in this Court and are not plaintiffs here.

guns through the saferoom door.

243.    Despite their fatal wounds, Yahonatan and Tamar valiantly managed to shield their young children from the brutal gunfire attack.As these brave parents succumbed to their fatal gunshot wounds—first Yahonatan, then Tamar—the relentless terrorists set their home ablaze, leaving the children to tragically suffocate from smoke inhalation while clinging to their parents' lifeless bodies.

### Trudi Daub

244.    Plaintiff Trudi Daub ("Trudi") brings this action individually. She is a citizen of the United States, and the sister of Carol Siman Tov, the aunt of Yahonatan Siman Tov, and the great-aunt of Omer, Arbel, and Shahar Siman Tov, all of whom were viciously attacked and brutally murdered by Hamas.

245.    Trudi was living and present in New Jersey on October 7, 2023.

246.    In the morning hours, Trudi received a phone call from a brother-in-law, her sister Terry's husband, about an attack and fighting in Kibbutz Nir Oz.

247.    At that time, no one in the family could get in touch with her sister Carol and though they suspected she was in her safe room, dread creeped through Trudi.

248.    Hours passed and, still, no one could get in touch with her sister. Trudi knew, at that point, that something had happened to her.

249.    At approximately 2:00 p.m., Trudi's sister, Terry, called both her and their brother, David, to give the horrific news that their sister, Carol, had been murdered.

250.    One hour later, Trudi's niece, Carol's daughter, called Trudi with the news that Trudi's nephew, Yahonatan, Yahonatan's wife, Tamar, and their beloved 5-year-old twin girls and 2-year-old son, had all been murdered in Kibbutz Nir Oz.

251.    Trudi Daub has been devastated by the sudden and immense loss of family.

252.    Though Trudi and Carol lived 6,000 miles apart, they had a good relationship prior to Carol's murder, speaking on the phone regularly about their lives and family, and with occasional visits from Carol so the sisters could spend time together.

253.    Trudi, her brother, David, her sister, Terry, and her entire family have been altered forever with the senseless, overwhelming loss.

254.    Trudi asks herself regularly how this could have happened and cannot stop imagining the horrors and brutality her sister, her nephew and his wife, and her little grand nieces and nephews were subjected to.

255.    To date, Trudi has not made any progress in accepting the situation and suffers daily with endless visions of her family being murdered, unable to escape.

256.    Since the attack, Trudi has been unable to sleep well and needs her television on all night to help block out unbidden thoughts of her stolen family.

257.    Trudi cries all the time and tries to forget what happened to her sister and her family, but she cannot escape reality – the horror and extreme loss of loved ones.

### *The Butler Family*

258.    Plaintiff Ram Butler is a citizen of the United States, a resident of Israel, and was present on October 7, 2023, at Kibbutz Nir Oz when he was brutally attacked by Hamas.

259.    Plaintiff Larry Butler, father of Ram Butler, is a citizen of the United States, a resident of Israel, and was present on October 7, 2023, at Kibbutz Nir Oz when he was brutally attacked by Hamas.

260.    Plaintiff Claris Butler is the wife of Plaintiff Larry Butler and the mother of Plaintiffs Ram Butler and Shachar Butler. Plaintiff Claris Butler is a citizen and resident of Israel

and was present on October 7, 2023, at Kibbutz Nir Oz when she was brutally attacked by Hamas.

261.    Plaintiff Shachar Butler is the son of Larry and Claris Butler, the brother of Ram Butler and Ranae Butler, and the husband of Ninna Butler. Shachar Butler is a citizen of the United States and resident of Israel and was present on October 7, 2023, at Kibbutz Nir Oz when he and his family were brutally attacked by Hamas.

262.    Plaintiff Ninna Butler is the wife of Shachar Butler and a citizen and resident of Israel. She was present on October 7, 2023, at Kibbutz Nir Oz when her family was brutally attacked by Hamas.

263.    Plaintiff Shachar Butler also brings this claim as the legal guardian of his three minor children E.B., M.B., and Y.B., who are all citizens and residents of Israel. They are also the children of Ninna Butler and were present on October 7, 2023, at Kibbutz Nir Oz when their family was brutally attacked by Hamas.

264.    Larry Butler, Ram Butler, Claris Butler, Shachar Butler, Ninna Butler, E.B, a minor child, M.B., a minor child, and Y.B., a minor child, are hereinafter collectively referred to as "The Butler Family."

265.    At approximately 6:30 a.m., on October 7, 2023, sirens began wailing throughout Kibbutz Nir Oz, waking Ram Butler immediately. Ram received a call from his close friend and neighbor who informed him that he was not at home and that his young son was by himself. Ram quickly left to retrieve the child from his home and brought him back to Ram's saferoom for shelter.

266.    Ram heard the front door open and saw his father, Larry Butler, enter. Ram and Larry soon became aware of the storm of destruction that was taking place around them. They began to hear nearby gunshots and the whistling of RPGs piercing through the air followed by the

sound of shattering glass and blood-curdling screams.

267.    Along with the neighbor's child, Ram and Larry locked themselves in the saferoom. They tried to comfort the child who was under their care, urging him to hide under the bed in the safe room, both clinging desperately to hope amidst unimaginable horror.

268.    An overwhelming dread and concern weighed heavily upon Ram and Larry.

269.    Claris Butler - Larry's wife and Shachar and Ram's mother - was home alone, and they could not leave to help her or reach her by phone.

270.    Fortunately, when Claris woke to the piercing sound of the sirens at approximately 6:30 a.m., members of the Kibbutz Nir Oz Security Team advised her to lock the windows and doors, stay inside, and take refuge in her safe room. Her blood ran cold as she saw from her window hundreds of armed terrorists storming the kibbutz, intending grave harm against her and her community.

271.    Also in extreme peril was Larry's son and Ram's brother, Shachar Butler, who was serving as the head of the Kibbutz Nir Oz Security Team. When Shachar could not be reached by phone, they feared something terrible had happened to him and his family.

272.    Shortly after rocket sirens pierced the skies over southern Israel, Shachar called his fellow Security Team members in Nir Oz, and realized terrorists had infiltrated the kibbutz. He rushed outside to get his combat gear from his car and saw pickup trucks with terrorists inside, racing towards him. Shachar then rushed back into his home, slamming the windows shut and locking the doors.

273.    The terrorists began hurling grenades at Shachar's house, knocking out the electricity. To protect his wife and young children and prevent the terrorists on his patio from breaking in, Shachar left the saferoom. A firefight ensued between him and the terrorists through

the windows of the house.

274.    As the shooting persisted, Shachar was hit by a bullet. Realizing that he had been injured, he called Ninna from outside the saferoom. Ninna then opened the saferoom door and pulled him inside. She began applying pressure on his gunshot wound while he was lying on the floor, holding the saferoom's door handle. Whenever the terrorists' voices outside faded, they changed positions while still guarding the door and caring for the children.

275.    Shachar, Ninna, and the children spent hours in the saferoom, with the older children having no choice but to use the diapers of the youngest child. Shachar and Ninna knew that houses across Nir Oz had been set on fire, so they prepared sheets covered with urine to block smoke and fire from entering the saferoom.

276.    Eventually, Shachar, Ninna, and their three children were evacuated by security forces to the kindergarten in Nir Oz, and Shachar was taken to the hospital. The sights of scorched earth and burnt houses around them were heartbreaking. They met with other Nir Oz survivors and waited for more to arrive, but many never did. As the night wore on into the next day, the devastating understanding seeped in; numerous members of Nir Oz had been murdered or abducted. They lost close friends and family members, and their community was shattered.

277.    Shachar returned to Nir Oz from the hospital on the morning of October 8, 2023, while terrorists were still hiding throughout the region.

278.    Israeli security forces later found a map of Nir Oz on the only terrorist whose body remained on the kibbutz. The map marked the location of Shachar's house and identified him as the head of the security team, enabling the terrorists to target and wound him at the start of the attack.

279.    At approximately 11:00 a.m., the chaos continued as Hamas terrorists shattered

Ram's kitchen window, followed by frantic banging on the safe room door. Inside, Ram and Larry braced themselves for the terrorists to infiltrate the room and kill them. They quickly moved the neighbor's son into a closet, covering him with clothes to conceal him from the terrorists.

280.    Hamas terrorists just outside the safe room were violently screaming, "Jews, open the door. We will kill you!"

281.    After an intense few minutes, the terrorists momentarily left, but the assault was far from over. The terrorists returned several more times, firing machine guns at the saferoom door and relentlessly attempting to force their way in. Meanwhile, the assault on Kibbutz Nir Oz continued to escalate.

282.    Terrorists burst into the home of Claris Butler, maniacally tearing through her home, and destroying everything in sight. From the safe room, she could only hear the chaos ensuing, her body paralyzed with fear as she imagined her impending death.

283.    Terrorists then viciously set fire to her home and horrifyingly imprisoned her for hours in the burning home. Thick smoke filled the air, causing her to lose consciousness at least twice, and severely burning and blistering her feet.

284.    Despite the harrowing circumstances, Claris managed to survive by intermittently cracking open a window in the safe room.

285.    Panic ensued as terrorists set fire to the home where Larry and Ram were sheltering with their neighbor's child. Thick, suffocating smoke ominously began to fill the home. Gratefully, at this critical moment, IDF forces arrived and rescued them at approximately 3:00 P.M. Immediately, they implored the soldiers to quickly check on Claris.

286.    As Larry and Ram exited the home, they were confronted by the severity of the attack—hundreds of gravely wounded and bleeding residents were being carried to safety and their

beloved community was reduced to charred and ruined homes.

287.    Accompanied by four soldiers, Ram traveled to Shachar's home and discovered it had been riddled with bullet holes and grenade shrapnel during the fierce battle that raged throughout the day. Upon reaching the safe room, they discovered that Shachar had suffered a severe gunshot wound. His young children (E.B., M.B., and Y.B.) were forced to witness their father suffering and in agonizing pain, and they all feared for his life.

288.    Relieved that his brother and family were alive, Ram rushed to his mother's home. Upon arriving, Ram was elated to discover that although her home was reduced to ashes, the safe room did not burn down, and his mother, Claris Butler, had survived despite suffering severe smoke inhalation and third-degree burns to her body.

289.    This joy was quickly replaced by inconsolable agony as The Butler Family learned of the murders of their extended family: Carol Siman Tov, Yahonatan Siman Tov, Tamar Kedem Siman Tov, Arbel Siman Tov, Shachar Siman Tov, and Omer Siman Tov. This overwhelming grief was compounded by the loss of generations of lifelong friends in their community. The magnitude of the October 7 Attack crystallized in front of them.

### *Ranae Butler*

290.    Plaintiff Ranae Butler brings this action individually. She is a citizen of the United States and a resident of Israel. She is the daughter of Carol Siman Tov and Larry Butler, the sister of Yahonatan Siman Tov, Koren Siman Tov Hazoutte, Amit Siman Tov Vahaba, Shachar Butler and Ram Butler, and the aunt of 14 nieces and nephews, all of whom were viciously attacked by Hamas, and three of whom were brutally murdered by them.

291.    On the morning of October 7, 2023, at approximately 6:30 a.m., Ranae Butler was in her Tel Aviv home when the piercing sound of sirens rang throughout Israel. Immediately, she

took cover and then tried to contact her family who lived in the close-knit community of Nir Oz in which she grew up; she needed to ensure they were all safe from the heavy rocket attack. Her brother, Yahonatan Siman Tov, only briefly replied, "Stay safe," without providing an update regarding his safety.

292.    Dread overtook her as she could not reach her mother, Carol Siman Tov. Larry, her father, quickly informed her that there were terrorists in the kibbutz and that people had been abducted. He told her not to call, fearing the terrorists would hear him speak on the phone. Her sisters communicated later in the day with calls for help for Nir Oz.  Later, one of her sisters texted Ranae, "We love you," which felt like a chilling goodbye message.

293.    Ranae was consumed with fear for the safety of her family. Her body trembled involuntarily as she watched the horrific news reports and witnessed the barbaric attack in real-time on social media and news channels.

294.    On the evening of October 7, 2023, Ranae received a devastating call from her brother-in-law informing her of the catastrophic loss of six of her family members who had been murdered. Amid the overwhelming grief, a small, heart-wrenching sense of relief emerged—since her mother, Carol Siman Tov, had been murdered, she would never have to face the unbearable loss of her son, Yahonatan Siman Tov, her beloved daughter-in-law, Tamar Kedem Siman Tov, and their three innocent young children, Arbel, Shahar, and Omer Siman Tov.

295.    On October 8, 2023, Ranae boarded a bus to Eilat, desperate to be with her remaining family. She arrived with her heart broken at the losses, but she was determined to be a source of love and comfort for the young nieces and nephews who had survived the horrors. She held back her massive grief and tried to be strong for them. As she embraced her family tightly, the stench of fire and smoke filled her lungs; the smell of their clothes seemed to carry the essence

of the inconceivable suffering that would forever scar them.

296.    Ranae barely slept or ate in the days that followed. She experienced an inner trembling that lasted for about three days, with her mind consumed by the relentless coverage of the tragedy on the news, unable to escape the haunting reality of the devastation to her family and community.

### The Hazoutte Family

297.    Plaintiff Koren Siman Tov Hazoutte is the daughter of Carol Siman Tov and the sister of Yahonatan Siman Tov, Amit Siman Tov Vahaba, and Ranae Butler. She is a citizen of the United States, resident of Israel, and was present on October 7, 2023, at Kibbutz Nir Oz when her family was brutally murdered by Hamas.

298.    Plaintiff Guil Hazoutte is the husband of Koren Siman Tov Hazoutte, and a citizen and resident of Israel. He was present on October 7, 2023, at Kibbutz Nir Oz when his family was brutally attacked by Hamas.

299.    Plaintiff Koren Siman Tov Hazoutte also brings this claim as the legal guardian of her four minor children Y.H., B.H., A.H., and M.H., who are all citizens of the United States and residents of Israel.  They are also the children of Guil Hazoutte, and they were present on October 7, 2023, at Kibbutz Nir Oz when their family was brutally attacked by Hamas.

300.    Koren Siman Tov Hazoutte, Guil Hazoutte, Y.H., B.H., A.H., and M.H. are hereinafter collectively referred to as "The Hazoutte Family."

301.    At the sound of the first rocket sirens slicing through the skies at 6:30, Koren and Guil were jolted awake and rushed into their safe room with their young children.

302.    As the sirens persisted, Koren and Guil began receiving horrifying WhatsApp messages from other kibbutz members, informing them that terrorists disguised as soldiers were

walking around Nir Oz.

303.    Koren repeatedly tried to contact her beloved mother, Carol Siman Tov to no avail. Shortly after, Koren and Guil began hearing incessant gunfire accompanied by violent shouts in Arabic growing ever nearer. Eventually, the terrorists managed to break into the Hazoutte family home.

304.    Sensing imminent danger and terrified for their lives, Guil positioned himself at the door, guarding the handle. Koren stood beside him, her back against the wall, protecting their dog with one hand and shielding Y.H., B.H., A.H., and M.H. with the other.

305.    The terrorists shot twice at the saferoom's door, but due to the home's structure, the bullets ricocheted. The terrorists then decided to use the bathroom and eat from their fridge while the Hazoutte Family was locked inside the saferoom.

306.    When the IDF soldiers eventually arrived to rescue them from the safe room, the house was in total chaos, and the floor was covered with their belongings. Koren and Guil immediately told the soldiers to check on Yahonatan Siman Tov, Tamar Kedem Siman Tov, and their children.

307.    When the soldiers returned, they described what they had witnessed as "very bad" without elaborating. Koren, Guil, and their children were taken to an assembly point, where they saw other kibbutz members arriving covered with smoke, barefoot, in their pajamas and underwear, parched, and shock stricken.

308.    Koren, a certified nurse, treated wounded kibbutz members who kept pouring in with the little first aid she had.

309.    As time passed and they still hadn't seen Carol Siman Tov or the Siman Tov family arrive at the assembly point, Amit and Koren collapsed into each other's arms, overwhelmed with

concern and uncertainty.

### *The Vahaba Family*

310.    Plaintiff Amit Siman Tov Vahaba is the daughter of Carol Siman Tov and the sister of Yahonatan Siman Tov, Koren Siman Tov Hazoutte, and Ranae Butler. She is a citizen of the United States, resident of Israel, and was present on October 7, 2023, at Kibbutz Nir Oz when her family was brutally murdered by Hamas.

311.    Plaintiff Yishai Vahaba is the husband of Amit Siman Tov Vahaba, a citizen of the United States and resident of Israel. He was present on October 7, 2023, at Kibbutz Nir Oz when his family was brutally attacked by Hamas.

312.    Plaintiff Amit Siman Tov Vahaba also brings this claim as the legal guardian of her four minor children, G.V., N.O.V., N.E.V., and S.V., who are all citizens of the United States and residents of Israel.  They are also the children of Yishai Vahaba, and they were present on October 7, 2023, at Kibbutz Nir Oz when their family was brutally attacked by Hamas.

313.    Amit Siman Tov Vahaba, Yishai Vahaba, G.V., N.O.V., N.E.V., and S.V. are hereinafter collectively referred to as "The Vahaba Family."

314.    Amit and Yishai were awakened to the blaring sounds of rocket sirens and grabbed their minor children on their way to their saferoom.

315.    Shortly thereafter, Amit and Yishai received a bloodcurdling voice message from a friend on the kibbutz, informing them that terrorists had overrun it. Like Koren, Amit also tried, unsuccessfully, to reach her mother Carol.

316.    At approximately 9:00 a.m., the Vahaba Family heard the terrorists just outside their door, callously shouting in Arabic. Soon after, the power went out, leaving them petrified in the dark. The sound of their kitchen windows shattering was gut-wrenching, and they realized they

were now fighting for their lives.

317.    The terrorists kicked down the main door and tried to break into the Vahaba Family's saferoom. For 45 minutes, Yishai and Amit struggled with them over the saferoom door handle.

318.    Yahonatan Siman Tov, his wife Tamar Kedem Siman Tov, and their three young children lived in vicinity of the Vahaba family. Amit and Yishai knew, via WhatsApp messages, that terrorists had also reached the Siman Tov Family's house, and their inability to communicate with them left them paralyzed with fear and concern.

319.    At 11:00 a.m., a second group of terrorists entered the Vahaba family's home. The terrorists shot several times at the saferoom door, causing the metal door handle to heat up. The terrorist eventually set fire to the family's house, and the smell of gunpowder and thick smoke filled the air, leaving the Vahaba Family gasping for air.

320.    The heat was so intense that G.V., N.O.V., N.E.V., and S.V. could not bear it anymore. Desperate to save their children, but aware of the tremendous risk they were taking, Amit and Yishai opened a crack in the saferoom window and allowed the children to sit under it in turns.

321.    When Israeli security forces arrived at the Vahaba family's home at approximately 3:30 p.m., Amit and Yishai pleaded with them to go and rescue the Siman Tov Family, with whom they had lost contact in the morning.

322.    The Vahaba Family was evacuated to the assembly point, where they met other kibbutz members who had survived the massacre. Amit and Yishai were anxious to see Yahonatan Siman Tov, Tamar Kedem Siman Tov, and their three children. But as time passed, the horrifying heart-breaking realization gradually sank in—the entire Siman Tov Family had been wiped out by terrorists.

323.    Yishai went to Carol's home to check on her and returned with a devastated expression on his face. Amit asked if her beloved mother had been abducted to Gaza. She then saw tears fill Yishai's eyes, and he shook his head, signaling no.

324.    As a direct and foreseeable result of the October 7 Attack, Carol Siman Tov, Yahonatan Siman Tov, Arbel Siman Tov and Shahar Siman Tov suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, wrongful death, and economic loss, which the representatives of their Estates seek to recover damages in this action.

325.    Plaintiff Trudi Daub suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the attack on and the death of her family members Carol Siman Tov, Yahonatan Siman Tov, Tamar Kedem Siman Tov, Arbel Siman Tov, Shahar Siman Tov, and Omer Siman Tov.

326.    As a direct and foreseeable result of the October 7 Attack, Plaintiffs Larry Butler, Ram Butler, and Claris Butler, suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

327.    Plaintiff Ranae Butler suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the attack on and the death of her family members Carol Siman Tov and Yahonatan Siman Tov, Tamar Kedem Siman Tov, Arbel Siman Tov, Shahar Siman Tov, and Omer Siman Tov, and the attack on Koren Siman Tov Hazoutte, Amit Siman Tov Vahaba, Larry Butler, Shachar Butler, Ram Butler, and Claris Butler.

328.    As a direct and foreseeable result of the October 7 Attack, Shachar Butler suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

329.    Plaintiffs Ninna Butler, E.B., M.B., and Y.B. suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack in which

Shachar Butler sustained a gunshot wound in confrontations with Hamas terrorists.

330.    Plaintiff Koren Siman Tov Hazoutte suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the attack on, and the death of, her family members Carol Siman Tov and Yahonatan Siman Tov, Tamar Kedem Siman Tov, Arbel Siman Tov, Shahar Siman Tov, and Omer Siman Tov, and the attack on Amit Siman Tov Vahaba.

331.    Plaintiff Amit Siman Tov Vahaba suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the attack on, and the death of, her family members Carol Siman Tov and Yahonatan Siman Tov, Tamar Kedem Siman Tov, Arbel Siman Tov, Shahar Siman Tov, and Omer Siman Tov, and the attack on Koren Siman Tov Hazoutte.

332.    Plaintiffs Guil Hazoutte, Y.H., B.H., A.H., and M.H suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack.

333.    Plaintiffs Yishai Vahaba, G.V., N.O.V., N.E.V., and S.V. suffered several mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack.

**The Sherman Family**

334.    Plaintiff Arie Sherman is a citizen of the United States and a resident of Israel.

335.    Plaintiff Livnat Sherman, the wife of Arie Sherman, is a citizen and resident of Israel.

336.    Plaintiff K.A.S., the minor daughter of Arie Sherman and Livnat Sherman, is a citizen of the United States and a resident of Israel.

337.    Plaintiff G.S., minor child, the minor son of Arie Sherman, is a citizen of the United States and a resident of Israel.

338.    Plaintiff S.S., the minor daughter of Arie Sherman, is a citizen of the United States and a resident of Israel.

339.    Plaintiff Arie Sherman brings this action individually and as legal guardian of his three minor children, K.A.S., G.S., and S.S.

340.    Arie Sherman, Livnat Sherman, K.A.S., G.S., and S.S., are hereinafter referred to as "The Sherman Family."

341.    At approximately 6:30 a.m. on October 7, 2023, the Sherman Family awoke to loud explosions that affected the structural integrity of their home. Arie and Livnat Sherman grabbed K.A.S., who lay in bed with them, and frantically ran to their safe room. G.S., and S.S., quickly awoke and joined their parents and sibling in the safe room.

342.    Gunshots rang out near their home, and the Sherman Family embraced each other in fear for their lives. Realizing the severity of the situation, the minor children began trembling while their parents tried to comfort them.

343.    Terrorists appeared from outside the walls of the safe room and began to pry open the window. It was only secured by a locked, steel shutter, and the terrorists were only able to open a small crack in the window before leaving.

344.    The Sherman Family then heard gunshots piercing their home's sliding glass door. Hamas terrorists were heard shouting in Arabic outside the safe room, confirming the horrific reality that their home had been invaded.

345.    The terrorists again attempted to breach the safe room by opening the door, but Arie Sherman summoned all his strength to pull back the inside door handle. For a moment, the Sherman Family believed they had fooled the terrorists into believing the safe room was locked.

346.    Seconds later, the Sherman Family heard the whistle of a live grenade rolling on the floor, and an explosion blew open the safe room door. K.A.S. wailed, and Livnat attempted to hide K.A.S.'s small body with clothing. Arie Sherman stood at the door in a fighting stance, ready

to protect his family at all costs.

347.    Inexplicably, when the door to the safe room burst open, the Sherman Family was overcome with relief to discover that no one was outside the safe room. Arie hurriedly closed the door again.

348.    At one point, the family could hear voices nearby speaking in Arabic. Livnat believed the terrorists were using their home, or the area in its vicinity, as cover against the IDF, who eventually arrived on the kibbutz to fight back against the terrorists. The Sherman family remained in utter silence for hours.

349.    Livnat texted family members pleading for help. However, due to the vast number of Hamas terrorists who had invaded the area, no one could directly help.

350.    After hiding in their home for roughly eight hours, at approximately 2:30 p.m., the IDF arrived and evacuated the Sherman Family from their home to nearby Kibbutz Gvulot. Driving away from their kibbutz, they were horrified to see lifeless bodies lying on the road, as well as charred vehicles and tanks.

351.    For over two months after the events of October 7, the Sherman Family lived in a hotel near the Ein Gedi Nature Reserve in southern Israel.

352.    Living at the hotel was incredibly difficult for Livnat. Arie was also deeply depressed and Livnat felt all familial responsibilities fall onto her as she tried to navigate her own healing.

353.    Eventually, Arie and his family made the decision to travel from Israel to the United States. They stayed there for nine months, and the Sherman Family experienced emotional difficulty being so far from home. Arie and Livnat both suffered debilitating emotional trauma, which had a negative effect on their ability to parent their minor children.

354.    Arie continues to struggle in his daily life; he has difficulty focusing, suffers from high anxiety, anger management problems, and nightmares.

355.    The events of October 7 also affected K.A.S.'s emotional and physical development. Prior to October 7, Livnat was weaning K.A.S. from breastfeeding; this process was greatly disrupted on October 7, stunting K.A.S.'s eating development. G.S. and S.S. have also suffered from increased anxiety and fears of the outside world around them.

356.    Livnat also believes that K.A.S. absorbed much of the trauma experienced by her family on October 7, even though she was too young to fully grasp the situation. To assist her recovery, K.A.S. attends Chinese acupuncture as a form of body and mind healing.

357.    As a direct and foreseeable result of the October 7 Attack, Arie Sherman, Livnat Sherman, K.A.S., G.S., and S.S. suffered severe mental anguish and extreme emotional distress from the trauma that each of their family members endured.

**Raquele Natalie Sanadaji**

358.    Plaintiff Raquele Natalie Sanandaji is a citizen of the United States and resident of the State of New York.

359.    Raquele Natalie Sanandaji travelled to Israel in the Summer of 2023 to visit family and friends. She extended her trip into the Fall to celebrate the Jewish High Holidays while in Israel.

360.    Raquele Natalie had also heard about the NOVA Music Festival being held the weekend of October 7, 2023. She and her friends made plans to attend the festival, which was being held three miles from the Gaza Strip in the Negev desert. The festival was also being held on the sacred holiday of Simchat Torah in the Jewish calendar. Raquele Natalie was elated to be celebrating this momentous holiday, dancing to the music she loved with her close friends and

thousands of Israelis who shared the same passion.

361. Raquele Natalie and her friends arrived at the NOVA Music Festival at approximately 1:00 a.m. on Saturday, October 7. Upon arriving at the festival, Raquele Natalie was welcomed by a larger group who led her to their campsite, where she unpacked her things. Raquele Natalie and her friends then congregated with the thousands of other festivalgoers and danced freely throughout the night, never anticipating the terror and tragedy that would arrive in a few short hours. At approximately 3:30 a.m., Raquele Natalie retired to the campsite to get some rest; she and her friends planned to return to the party at sunrise.

362. At approximately 6:30 a.m., rockets started being fired and intercepted from Gaza into Israel, in very close vicinity to the festival grounds.

363. During this initial rocket attack, Raquele Natalie was asleep and was woken by a friend. While Raquele Natalie understood that the festival's proximity to Gaza added some security risks, her friend calmly explained that rocket attacks into Israel were normal during Jewish holidays, especially so close to Gaza, but it would eventually pass.

364. As Raquele Natalie counted, several dozen rockets continued to be fired, and she became increasingly wary of a full-scale attack on Israel. This was further exacerbated when festival organizers suddenly turned off the music and informed festivalgoers to pack their things and evacuate the festival grounds immediately.

365. Not yet understanding the terror ensuing around her, Raquele Natalie took her time to get ready in the portable bathrooms, assuming traffic would be very slow on the two-lane dirt road leading out. She and her group departed the area, and days later, she learned that the portable bathrooms had been shot up by terrorists just moments after she left.

366. Raquele Natalie and her friends anxiously began driving down a congested road

with thousands of others towards the exit, per security's directions. After roughly ten minutes of driving, further panic ensued when security began screaming for everyone to get out of their vehicles and run.

367.    Raquele Natalie was confused and did not understand why attendees were being directed to run. Moments later, she heard gunshots ring out; she quickly understood that there were terrorists on foot, shooting indiscriminately at the terrified festival goers.

368.    Not knowing what direction or area the terrorists were coming from, and without any other choice, Raquele Natalie and her friends exited their vehicle and began running in the direction of others.

369.    At this time, Raquele Natalie's mother, who lives in the United States and suffers from Multiple Sclerosis, telephoned her, as she knew Raquele Natalie was at a music festival and heard Israel was under attack. Knowing that stress can greatly exacerbate symptoms of Multiple Sclerosis, Raquele Natalie dishonestly told her that she was not in the area nor at the NOVA Festival. This was a very difficult decision, as Raquele Natalie knew she may not survive; she was choosing to lie to her mother in a moment of life and death. However, Raquele Natalie was in contact with other friends and informed them of her situation, bracing herself for her own impending fate.

370.    By approximately 9:00 a.m., Raquele Natalie and her friends had been running non-stop for two hours without direction, to evade being seen by terrorists. At one point, Raquele Natalie reunited with others she knew from the festival, who were hiding in a large ditch in the ground. The group urged Raquele Natalie and her friends to hide with them, stating they would not be noticed by the terrorists. Raquele Natalie considered them a group of sitting ducks with no chance at survival should terrorists arrive and begin shooting at them. She and her friends decided

to leave that group and again began haphazardly running to find a proper hiding spot from the terrorists. Raquele Natalie later learned that terrorists did indeed ambush the group in the ditch. None of them survived.

371.    Several minutes later, Raquele Natalie and her friends found a police officer, the first they had seen since the attacks started that day. The officer explained that terrorists had intercepted police radio signals, and he could not call for backup without compromising their location. The officer accompanied them until they encountered a large group of festivalgoers walking towards the town of Patish, which they learned had not been infiltrated by terrorists. At the suggestion of the officer, Raquele Natalie and her friends joined the group.

372.    Approximately thirty minutes later, Raquele Natalie and about ten other individuals stopped to rest for a moment by a small tree. The group caught their breath for roughly ten minutes, when they suddenly noticed a pickup truck in the distance, driving towards them. As videos of terrorists ravaging through Israel in pickup trucks were being circulated over Telegram and WhatsApp, the group realized they were in grave danger. They had two options: run and risk being chased by the terrorists or stay in their spot and hope they wouldn't be noticed.

373.    Understanding that they could not compete with terrorists in a moving vehicle and armed with weapons, Raquele Natalie and the group accepted that this could be their last moments alive. She knew that within minutes, the terrorists would arrive at their spot and kill them where they sat.

374.    As the pickup truck approached, a woman wearing a festival wristband could be seen signaling to them. Raquele Natalie realized that the pickup truck was coming to rescue them; she and the group climbed onto the back of the truck and were taken the rest of the way to Patish.

375.    The driver, Moshe Sati, took Raquele Natalie and the group to an auditorium where

many survivors were sheltering, and he drove back towards the festival to save others.

376.    By approximately 11:30 a.m., Raquele Natalie had miraculously made it out of the NOVA Festival. In Patish, she was fed and was later able to return home. Upon returning home, Raquele Natalie informed her mother that she had in fact been at the festival, directly in the line of fire.

377.    Since the events of the October 7 Attacks, Raquele Natalie Sanandaji has become a global voice and advocate, outlining the events of October 7, 2023, and recalling her own experience to audiences around the world.

378.    Before October 7, 2023, Raquele Natalie had not suffered from anxiety or panic attacks. Now something as simple as a loud noise on the street can trigger memories of machine guns and rocket sirens from that fateful day.

379.    Plaintiff Raquele Natalie Sanandaji brings this action individually.

380.    Plaintiff Dalia Yerushalmi brings this action individually. She is a citizen and a resident of the State of New York. She is the mother of Raquele Natalie Sanandaji.

381.    As a direct and foreseeable result of the October 7 Attack, Plaintiff Raquele Natalie Sanandaji experienced severe mental anguish and extreme emotional distress as she fled the scene of the NOVA Festival.

382.    Plaintiff Dalia Yerushalmi suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack, when her daughter was forced to flee invading, murderous terrorists at the NOVA Festival.

**The Leshem Family**

383.    Plaintiff Zion Leshem is a citizen of the United States and a resident of Israel.

384.    Plaintiff Rivka Leshem is a citizen and resident of Israel. She is the wife of Zion

Leshem.

385.    Plaintiff Zion Leshem brings this claim on behalf of his minor children, M.E.L., L.A.L., M.D.L., T.B.L., and T.N.L., as their legal guardian. All these children are citizens and residents of Israel.

386.    Plaintiff Yehuda Gur Aryeh Leshem is a citizen and resident of Israel. He is the son of Zion Leshem and Rivka Leshem.

387.    Plaintiff Chemda Rachel Leshem is a citizen and resident of Israel. She is the daughter of Zion Leshem and Rivka Leshem.

388.    Zion Leshem, Rivka Leshem, Yehuda Gur Aryeh Leshem, Chemda Rachel Leshem, M.E.L., L.A.L., M.D.L., T.B.L. and T.N.L., are hereinafter collectively referred to as "The Leshem Family."

389.    The weekend of October 7, 2023, was supposed to be a momentous time on Moshav Naveh, where the Leshem Family resided, with its residents celebrating the Jewish holiday of Simchat Torah – one of the most joyous holidays in the Jewish calendar. In the early hours of October 7, 2023, Zion Leshem arrived at the moshav synagogue, along with 150 other men from the community, for morning prayers. The rest of the Leshem Family remained at home and planned to meet Zion later in the day to celebrate the holiday. Shortly thereafter, incessant rocket sirens began blaring across the skies of Moshav Naveh.

390.    The Leshem Family did not have a safe room in their home; they were forced to seek shelter in an outdoor shelter, within a children's playground for over ten hours. They did not have access to electricity, cell-phone service, or any contact with the world outside of their community. The Leshem Family soon learned that a battle had taken place on the outskirts of Moshav Naveh between a Hamas terrorist battalion and Israeli soldiers. A map and other materials

would later be recovered from the terrorists, showing they had planned to hunt and murder the residents of Moshav Naveh.

391.    After hours of uncertainty, the Leshem Family were warned that terrorists could breach their moshav at any moment, and they needed to remain hidden.

392.    Eventually, security officials instructed the Leshem Family to evacuate the moshav and travel to Jerusalem. They packed for nine family members in a matter of minutes and for an unspecified amount of time. It would be two months before they were allowed to return to their home on the moshav.

393.    As regular roads were closed with lifeless bodies scattered everywhere, the Leshem Family had to use an alternative route which dangerously ran south along the Egyptian border. Mentally, Zion Leshem was in a state of near delirium; he was exhausted and even had trouble recalling the date. Being forced to drive a vehicle in this state, coupled with the sight of many lifeless bodies, will be etched in Zion and his family's minds forever. After a long five-hour drive, the Leshem Family reached Jerusalem, where they were housed in a hotel with thousands of other evacuees.

394.    Since the October 7 Attack, Zion could not resume his normal life. Instead, his main focus is to protect his wife, seven children, and community by raising money to purchase various types of equipment for the moshav including protective ammunition, computers, and communication technology. Zion now volunteers on the moshav security team. He is in training seven days a week. This has been his only job and occupation since the attacks. He sleeps with his M-16 Rifle next to him in the event an attack occurs in the middle of the night.

395.    Before October 7, Zion and the Leshem Family lived a calm and quiet life. The events of October 7, 2023, have shattered any sense of normalcy for his life and the lives of their

family, and their lives will never be the same.

396.    The stress and anxiety experienced by Zion on October 7 and the immediate days afterwards, was overwhelming. Zion has since been diagnosed with PTSD by a psychiatrist.

397.    Plaintiff Zvi Leshem is a citizen of the United States and resident of Israel. He is the father of Zion Leshem.

398.    Plaintiff Julie Leshem is a citizen of the United States and resident of Israel. She is the mother of Zion Leshem and wife of Zvi Leshem.

399.    As a direct and foreseeable result of the October 7 Attack, Plaintiffs Zion Leshem, Rivka Leshem, Yehuda Gur Aryeh Leshem, Chemda Rachel Leshem, M.E.L., L.A.L., M.D.L., T.B.L. and T.N.L., suffered severe mental anguish, extreme emotional distress, loss of consortium, loss of services, and economic damages.

400.    Plaintiffs Zvi Leshem and Julie Leshem suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack on the Leshem Family in Moshav Naveh.

### Dvir Ben Chaim

401.    Plaintiff Dvir Ben Chaim is a citizen of the United States and a resident of Israel.

402.    Plaintiff Dvir Ben Chaim holds the rank of Senior Sergeant Major in the IDF.

403.    As a foreseeable result of the October 7 Attack, Dvir Ben Chaim was deployed into Gaza on November 26, 2023. He and his team were on operational duty on December 4, 2023, in the Shuja'iyya neighborhood in Gaza.

404.    As part of his operational duty, Plaintiff Dvir and his team were riding in an armored personnel carrier (APC) when an anti-tank missile fired by Hamas members or affiliates hit the APC at close-range and a fire began to spread rapidly.

405.    Panic and chaos ensued, and Dvir was disoriented and felt intense heat from the blast on his upper body. He realized that his right arm was on fire, and he was bleeding profusely from shrapnel wounds.

406.    Once the team extinguished the fire, Dvir discovered that his teammate, Barak Elitzur was seriously injured. Despite his own serious injuries, Dvir cared for Barak, displaying deep concern and allegiance to his comrades.

407.    Dvir was airlifted from Gaza and transported to a hospital in Jerusalem, where he spent two weeks in the hospital and underwent multiple painful surgeries and treatments for his injuries.

408.    The night before the mission, Dvir and his team had received a donation of new fire-resistant uniforms, which were essential to saving Dvir's life. Without the uniform, he would likely have perished in the fire.

409.    Following his release from the hospital, Dvir has undergone months of rehabilitation and will continue to receive further surgeries in the foreseeable future as he has significant scarring all over his body.

410.    Prior to the October 7 Attack, Dvir was calm, patient, and easy-going. However, he is now irritable and impatient, which has significantly affected his relationships with loved ones.

411.    Dvir is subject to burdensome restrictions including non-exposure to the sun on his arm. This has a lasting impact on the quality of life in Israel, as the country experiences intense heat and sunlight for most of the year. Dvir must keep the injured areas on his body covered, even during Israel's blistering summer months.

412.    Plaintiff Dvir Ben Chaim bring this action individually, and as the co-legal guardian of his minor children, M.B.C. and A.B.C., both of whom are citizens and residents of Israel.

68

413.    Plaintiff Shachar Ben Chaim brings this action individually. She is a citizen of Israel and a resident of Israel. She is the wife of Dvir Ben Chaim. She also brings this action as the co-legal guardian of her minor children, M.B.C. and A.B.C., both of whom are citizens and residents of Israel.

414.    Plaintiff Yaron Ben Chaim brings this action individually. He is a citizen of the United States and a resident of Israel. He is the father of Dvir Ben Chaim.

415.    Plaintiff Orly Ben Chaim brings this action individually. She is a citizen and a resident of Israel. She is the mother of Dvir Ben Chaim.

416.    Plaintiff Oriya Ben Chaim brings this action individually. She is a citizen of the United States and a resident of Israel. She is the sister of Dvir Ben Chaim.

417.    Plaintiff Tal Ben Chaim brings this action individually. She is a citizen of the United States and a resident of Israel. She is the sister of Dvir Ben Chaim.

418.    Plaintiff Shilo Ben Chaim brings this action individually. He is a citizen of the United States and a resident of Israel. He is the brother of Dvir Ben Chaim.

419.    Plaintiff Roni Ben Chaim brings this action individually. She is a citizen of the United States and a resident of Israel. She is the sister of Dvir Ben Chaim.

420.    As a direct and foreseeable result of the October 7 Attack and the events that followed on December 4, 2023, Dvir Ben Chaim suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

421.    Plaintiffs Shachar Ben Chaim, Yaron Ben Chaim, Orly Ben Chaim, Oriya Ben Chaim, Tal Ben Chaim, Shilo Ben Chaim, Roni Ben Chaim, M.B.C., and A.B.C. suffered severe mental anguish and extreme emotional distress, as a direct and foreseeable result of the October 7 Attack and the subsequent December 4, 2023, attack in which Plaintiff Dvir Ben Chaim was

69

injured.

**Tali Gilberg**

422.    Plaintiff Tali Gilberg is a citizen of the United States and a resident of Israel.

423.    On the morning of October 7, 2023, Tali Gilberg had awoken at approximately 6:00 a.m. in her apartment on Kibbutz Erez, which is located less than one mile from the Gaza Strip.

424.    Approximately thirty minutes later, Tali began hearing rockets flying overhead, followed by red-alert sirens. Being in such proximity to Gaza, rocket attacks were somewhat routine in the area. However, by 6:50 a.m., Tali heard gunshots in the distance from her apartment.

425.    At approximately 7:00 a.m., Tali received messages from other kibbutz members informing residents to secure their homes and remain in their bomb shelters. Not yet understanding the extent of the attacks, she contacted a friend who was serving in the IDF stationed at the Erez Crossing. She confirmed to Tali that Hamas terrorists had infiltrated Israel and had reached the nearby city of Sderot.

426.    Tali was alone in her apartment, forced to remain in utter silence, while listening to the constant sound of RPG and small-arms fire in the distance. She soon met another resident of the apartment complex who remained with her in the bomb shelter for several hours. At approximately 11:00 a.m., some kibbutz members updated residents that the fighting had ended at the gates of the kibbutz, and there were no terrorists on the premises. Soon after, Tali felt it was safe to exit the safe room and remained in her apartment.

427.    At approximately 7:00 p.m., Tali learned that a resident of Kibbutz Erez as well as several other acquaintances had been viciously murdered that day by Hamas. Fearing for her own safety, she felt compelled to leave her home even though the IDF had not given residents permission to safely evacuate. She decided to drive north to the central city of Herzliya.

428.    Tali was anxious and helpless, realizing the grave risk of driving through the embattled area alone, after dark, with no protection. She frantically drove for over an hour, knowing that terrorists could be hiding all around her, waiting for the perfect opportunity to attack her. Eventually, she reached her friend's home in Herzliya.

429.    Tali is traumatized and haunted by the events of October 7, 2023. Despite having moved to Tel Aviv since the attack, she still struggles with psychological triggers, including the sounds of motorcycles, the sight of pickup trucks like the ones driven by terrorists on October 7, and the many hostage posters posted all over Israel.

430.    Tali has also been vocal in sharing her story since October 7, speaking with various international news organizations, and working with an Israeli non-profit group. While these experiences have been empowering for her, reliving the trauma of October 7 has adversely affected her mentally, and she no longer feels safe and secure in the country she calls home.

431.    As a direct and foreseeable result of the October 7 Attack, Plaintiff Tali Gilberg has suffered conscious pain, severe mental anguish, extreme emotional distress, loss of solatium, loss of services, and economic damages.

**The Shahar Family**

432.    Plaintiff Avraham Shahar is a citizen of the United States and a resident of Israel.

433.    Plaintiff Idit Shahar is a citizen and resident of Israel. She is the wife of Avraham Shahar.

434.    Plaintiffs Avraham Shahar and Idit Shahar bring this action individually and as legal guardians of their minor children, Z.S. and R.S., both of whom are citizens of the United States and residents of Israel.

435.    At approximately 6:30 a.m., on October 7, 2023, Avraham Shahar and his minor

child, Z.S., were training for the cycling segment of a triathlon in the vicinity of Kibbutz Kfar Aza, which is approximately three miles from the Israel-Gaza border.

436.     Avraham was supervising his minor child and another minor cyclist by following behind them in his vehicle.

437.     As they began their training, alarms began to sound causing the two minor children to seek protection on the ground outside Avraham's vehicle. Avraham quickly instructed the children to get into the car, and they drove away from the area.

438.     As they approached Kibbutz Mefalsim, approximately four miles from the Gaza Strip, Avraham noticed what he believed to be a group of IDF soldiers and proceeded to slow down. As they got closer, Avraham's son began screaming in terror as he realized that the group were terrorists in stolen uniforms.

439.     The terrorists suddenly unleashed a barrage of machine gunfire at the vehicle and a bullet pierced Avraham's right arm, just above his elbow. Despite the excruciating pain, Avraham focused on protecting the two children in his vehicle. As they attempted to navigate through the attack, Avraham's son was shot in his left shoulder and was in agonizing pain.

440.     Avraham and his son did their best to maintain their composure and try to help each other maneuver the car together, as Avraham was unable to do so independently. They managed to make a U-turn and speed away from the terrorists, back towards Kibbutz Kfar Aza.

441.     Near Kibbutz Kfar Aza, they stopped for medical help where the two gunshot wounds were treated.

442.     They later encountered another member of the cycling club, who drove them to a nearby city, Netivot. From there, they took an ambulance to Soroka Medical Center in Be'er Sheva.

443.     Avraham was eventually transferred to Wolfson Medical Center in central Israel,

where he stayed for approximately one month. Then, he began rehabilitation to regain the functionality of his arm. Avraham still does not have full functionality or movement of his right hand.

444.    Avraham's minor child was also transferred to Wolfson Medical Center, where he remained for approximately two weeks. Since being discharged, he has focused on his rehabilitation. A large, disfiguring scar remains on his shoulder.

445.    The other minor cyclist was also significantly injured in his face, and he lost vision in his right eye.

446.    On October 7, 2023, Idit Shahar was alone with her young daughter, R.S., at Kibbutz Or Ha Ner, where they were forced to shelter in the safe room of their home to hide from the attack occurring close to the Kibbutz. Since that fateful day, Idit Shahar has left her job to care for her traumatized family members.

447.    Yarden Shahar brings this action individually. Yarden Shahar is a citizen of the United States and a resident of Israel. She is the daughter of Avraham Shahar and Idit Shahar. Although she was in San Diego, California, at the time of the attacks, she suffered trauma and fear for her family as she followed the horrors unfold upon her family.

448.    As a direct and foreseeable result of the October 7 Attack, Plaintiff Avraham Shahar and his son, Plaintiff Z.S., experienced conscious pain and suffering, severe mental anguish, loss of solatium, loss of services, and economic loss based on the gunshot wounds they endured.

449.    As a direct and foreseeable result of the October 7 Attack, Plaintiff R.S. experienced severe mental anguish and extreme emotional distress as Hamas terrorists attacked the area in the vicinity of her kibbutz and placed her in grave danger in the family's safe room.

450.    Plaintiffs Idit Shahar and Yarden Shahar suffered severe mental anguish and

extreme emotional distress as a direct and foreseeable result of the October 7 Attack on their family members.

**The Lamdan Family**

451.    Plaintiff Yosef Lamdan is a citizen of the United States and a resident of Israel.

452.    Plaintiff Maya Lamdan is the daughter of Yosef Lamdan, and is a citizen of the United States, and a resident of Israel.

453.    Plaintiff Sylvia Arad is a citizen of the United States, and a resident of Israel. She is the mother of Yosef Lamdan and the grandmother of Maya Lamdan.

*Yosef Lamdan*

454.    On the morning of October 7, 2023, at approximately 6:15 a.m., Yosef Lamdan and his wife, Einav Vered, were training with his triathlon team in the vicinity of Kibbutz Sa'ad, approximately three miles from the Israel-Gaza border. Yosef is the team's coach, and on that fateful morning, he was leading 24 participants, including twelve women and five children. While the team rode their bicycles ahead, Yosef followed along in his car to ensure their safety.

455.    Within minutes of beginning their ride, the group could hear a barrage of machine-gun fire close to their location. There was no proper shelter near them, so the team positioned itself on a partly covered area on the road, waiting for the attack to stop. At this point, Yosef bravely left the group to drive one parent, their child, and another participant to their car close by. He decided to return to the group to help lead them to safety.

456.    Eventually, Yosef was able to locate a bomb shelter nearby and he bravely transported team members by car to the shelter, prioritizing women and children. As the team reached the shelter, a vehicle carrying terrorists stormed it and began shooting at the group with machine guns. Yosef instinctively hurried the group to protection and was the last person to enter

the tightly spaced shelter, putting his team's safety before himself.

457.    While running for cover from the gunfire, Yosef fell and injured his ankle. Nonetheless, his focus remained on leading his team out of the crossfire to safety.

458.    The team began to realize the severity of the attacks as they met people fleeing from the nearby NOVA Music Festival.  Some party-goers managed to evacuate the festival carrying the dead bodies of murdered attendees. Yosef assisted in transferring the injured and dead bodies from vehicles to arriving ambulances as well as the bomb shelter. He also coordinated the evacuation of his team out of the area.

459.    Yosef has since returned to his home on Kibbutz Mefalsim. His family has not yet joined him at their home; it is still too emotionally difficult for them to return. As a result of his injuries on October 7, 2023, Yosef has difficulty walking normally, and he can no longer physically participate in team practice, which has affected his position as team leader and coach. This has greatly affected his quality of life, and he also struggles with performing daily functions and is currently undergoing physical therapy.

460.    Prior to October 7, Yosef lived an active lifestyle, which was an important outlet for stress relief, and his inability to live an active lifestyle has impaired his mental health.

461.    Since October 7, Yosef has not been able to be as supportive of his family as he would like. He has continued to act as an emotional crutch for the triathlon team members and other survivors, which has taken much of his time away from his family, all the while living with his own trauma. Often, his daughter Maya will only see her father when they meet at funerals. Yosef now lives a very secluded life, which further exacerbates his mental and physical difficulties.

### *Maya Lamdan*

462.    On the morning of October 7, 2023, Maya Lamdan was staying on Kibbutz Nahal

Oz, a short distance from her home on Kibbutz Mefalsim. At approximately 6:20 a.m., Maya Lamdan was suddenly woken by sirens and she and her friend immediately sought refuge in her friend's safe room.

463.    While the sirens only lasted for 10 minutes, it felt like hours and Maya knew this was not a normal attack. At approximately 7:00 a.m., nearly 30 terrorists descended upon Kibbutz Mefalsim.

464.    Maya and her friend remained in the safe room for close to twelve hours. At approximately 5:00 p.m., the power went out in their safe room, leaving them in total darkness. Maya and her friend decided to go to another friend's house nearby who had electricity. That was when Maya discovered the scale of the massacres within the kibbutz.

465.    While the kibbutz security team was able to ward off some of the terrorists, Maya learned that several civilians were murdered and taken hostage, just steps away from them. Horrible devastation further settled in when she saw a video posted of a very close friend being kidnapped by terrorists.

466.    After remaining on the kibbutz until the early hours of October 9, Maya and her friend made the difficult decision to leave and drive two hours north to Caesarea to stay with family friends. They left the kibbutz with just the clothes on their back, navigating through dark roads littered with dead bodies and overturned cars. The sound of nearby gunfire in the background was audible.

467.    The trauma Maya felt on October 7 continues to haunt her to this day. She struggles with continual flashbacks, sleepless nights, nightmares, and panic attacks.

468.    Maya has not felt safe in Israel since the attack and has relocated several times over the past year. As part of her efforts to heal from the trauma she had experienced, Maya

traveled to, and lived in, Thailand for a time. However, the nightmares and anxiety persisted during her time there.

469.    Maya has since returned to Israel and currently lives in Tel Aviv. However, every day is a continual battle, and she cannot be gainfully employed at the moment.

470.    The events of October 7 have also deeply affected Maya's relationship with her father, Yosef Lamdan. Yosef Lamdan has continued supporting his team throughout the year by organizing events and visiting survivors in the hospital. She is very empathetic and proud of her father's efforts on and after October 7, but  it is apparent to her that a part of her father's spirit has not yet returned.

### *Sylvia Arad*

471.    On the morning of October 7, 2023,  Sylvia Arad was at her home, where she lived alone, on Kibbutz Mefalsim.

472.    At approximately 6:30 a.m., red alert sirens began, which were not uncommon on Mefalsim due to its proximity to the Israel-Gaza border. Syvia Arad remained in her bedroom, which also serves as a safe room, waiting for the sirens to cease.

473.    Sylvia was horrified to hear a barrage of machine-gun fire within proximity to her home. She knew this was not a typical rocket attack from Gaza, and a serious situation was unfolding in Israel.

474.    At this point, Sylvia was consumed with anxiety and unease, which was further intensified when the power in her house went out. Sylvia Arad had not yet learned that dozens of terrorists had infiltrated Kibbutz Mefalsim and were hunting down its residents.

475.    The hours continued to pass into the night, and Sylvia remained alone, hiding in her safe room. She was in contact with her granddaughter, Maya Lamdan, at nearby Kibbutz

Nahal Oz, who planned to leave by car that night. However, Sylvia's car battery had died the day before, and she was effectively stranded on the terrorist infested kibbutz.

476.    On October 8, 2023, another resident on Kibbutz Mefalsim telephoned Sylvia and invited her to leave the kibbutz with her and her son. Sylvia fearfully left her home with a few items to meet her ride. This was incredibly nerve-wracking, as it was the first time Sylvia had left her home in over 24 hours, and the threat of terrorists still loomed within the kibbutz.

477.    Sylvia was able to evacuate Kibbutz Mefalsim, and she later arrived in Ramat Hasharon in central Israel, where she stayed at a friend's home for more than a month.

478.    Following the October 7 Attack, Sylvia travelled to the United States and stayed there until March 2024, as she was not emotionally ready to return to Israel. When she returned, she stayed in a hotel in the city of Herzliya with other Kibbutz Mefalsim residents who had not yet returned home.

479.    Sylvia Arad has since returned to her home, while members of her family have still refused to come back since October 7. She lives an isolated life on the kibbutz, constantly reminded of death and destruction.

480.    The trauma endured by Sylvia on October 7, 2023, is everlasting. It manifests itself in various ways, including a physical tremor in her right hand, which intensifies when she is experiencing stress and anxiety. Immediately after the attack on Kibbutz Mefalsim, Sylvia became physically ill, and she believes the trauma she has experienced has compromised her body's immune system. She also now has nightmares and trouble sleeping.

481.    As she has struggled to heal from the events of October 7, Sylvia was further devastated to learn that her brother, who lived in the United States, was terminally ill and eventually passed away. This further exacerbated the emotional trauma she has lived with since October 7,

2023.

482.    Plaintiff Einav Vered brings this action individually. She is a citizen and resident of Israel. She is the wife of Yosef Lamdan.

483.    Plaintiff Tom Lamdan brings this action individually. He is a citizen of the United States and a resident of Israel. He is the son of Yosef Lamdan, the brother of Maya Lamdan, and the grandson of Sylvia Arad.

484.    Plaintiff Guy Lamdan brings this action individually. He is a citizen of the United States and a resident of Israel. He is the son of Yosef Lamdan, the brother of Maya Lamdan, and the grandson of Sylvia Arad.

485.    As a direct and foreseeable result of the October 7 Attack, Plaintiffs Yosef Lamdan, Maya Lamdan, and Sylvia Arad suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

486.    Plaintiffs Einav Vered, Tom Lamdan, and Guy Lamdan suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack on their family members.

### *Jonathan Stern*

487.    Jonathan Stern is a citizen of the United States and a resident of Israel.

488.    Jonathan Stern holds the rank of First Sergeant Major in the IDF and is a reservist in the Givati Brigade's Reconnaissance Battalion.

489.    As a foreseeable result of the attacks by Hamas in Israel on October 7, 2023, Jonathan Stern was deployed into Gaza on October 28, 2023.

490.    On the evening of November 11, 2023, Jonathan's team was assigned a mission to clear an UNRWA school, where large amounts of Hamas weapons, ammunition, laptops, and other

equipment were reportedly being held.

491.    Jonathan and his team were conducting their mission near the UNRWA school when a tank shell fired by Hamas members or affiliates exploded at the team's location. Jonathan's body was jolted by the intense blast, and a hard object punctured his face with strong force. He was in excruciating pain and gushing blood through his mouth. The force of the blast caused his front tooth to tear away, striking the nerve around it as well.

492.    One of the team's security officers is a dentist by profession; he recognized the danger of the situation and ordered Jonathan's evacuation from Gaza to save his life from serious infection. Jonathan was immediately taken to the hospital, and after only one day of recovery, reentered Gaza to continue operational duty with his unit.

493.    On November 16, 2023, Jonathan and his team were on a mission to secure the perimeter of a newly discovered Hamas tunnel. The team hurried through the dense and confined area, when an RPG fired by a member or affiliate of Hamas struck an apartment building next to them. There was a large explosion, and the area filled with dust and smoke. Before Jonathan or his team could react, a second explosion occurred, and the intense blast threw several soldiers to the ground.

494.    Jonathan could barely see through the dense clouds of smoke and dust. Chaos ensued and several soldiers were screaming in pain and agony. Jonathan realized his combat partner, Dvir, had severely injured his arm, leg, and several ribs, and blood was gushing through his uniform. The team managed to stabilize Dvir, and he was safely evacuated by helicopter. However, this event left a lasting effect on Jonathan.

495.    Amid the chaos, Jonathan's team was cornered by Hamas gunmen. Twelve RPGs were fired at Jonathan and his team, trapping them, along with several other soldiers, and leaving

them in dire need of medical attention. Death seemed imminent as the team was trapped for thirty grueling minutes before other IDF battalions arrived to rescue and evacuate them from Gaza.

496.   Footage of Jonathan and his team being attacked from a comrade's Go-Pro was later uncovered and presented on one of Israel's major news channels.  Jonathan could only bear to watch seconds of the footage before he began to panic and hyperventilate in his home, eventually collapsing. Jonathan is constantly triggered by the sights and sounds of combat which cause him debilitating anxiety, including loud booms or the sound of a person screaming. Moreover, Jonathan has developed a strong sense of survivor's guilt, as his friends and comrades were left with debilitating permanent injuries from which they will suffer the rest of their lives.

497.   Jonathan still cannot bring himself to listen to the screams of his comrades in the footage from the incident, particularly Dvir, and will live with these horrific memories for the rest of his life.

498.   The events of October 7, 2023, and his subsequent time in reserve duty have affected Jonathan's relationships with others. He finds himself gravitating to individuals with similar experiences from the conflict, and he finds it harder to connect with others who are far removed. Jonathan has become more irritable and impatient, especially around his family. He has also found it difficult to develop romantic relationships, as he is consumed by trauma, which has made it difficult for him to care for others.

499.   October 7 and the events which followed have impeded Jonathan's ability to pursue higher education and maintain employment. Jonathan studies economics and business administration, but because of the conflict, he has missed an entire year of school and is behind on final exams. Professionally, his business has also been adversely affected.

500.   As a direct and foreseeable result of the October 7 Attack and the events that

followed up to and including November 16, 2023, Plaintiff Jonathan Stern has suffered conscious pain, severe mental anguish, extreme emotional distress, loss of solatium, loss of services, and economic damages.

**The Rubin Family**

501.    Amichay Rubin was a citizen of the United States and a resident of Israel when he was murdered by Hamas. He was 23 years old.

502.    Amichay Rubin was serving in the Golani Brigade in the IDF.

503.    On October 7, 2023, Amichay Rubin and his fellow soldiers were stationed at a small outpost along the Gaza border, near Kibbutz Kissufim.

504.    In the early morning hours of Simchat Torah–a sacred holiday on the Jewish calendar–rocket sirens erupted in a deafening cry, piercing the once tranquil skies, as barrages of mortar shells and projectiles rained down, unleashing chaos and terror on Southern Israel.

505.    Bewildered by the unexpected and incessant wailing of the rocket sirens, Amichay and his comrades followed protocol and rushed to the outpost's cafeteria, which also served as a bomb shelter.

506.    Amichay, armed with his Negev machine gun, and his fellow soldiers began hearing gunshots and violent screams in Arabic growing closer. Only then did Amichay and his comrades realize that dozens of Hamas terrorists had breached the Gaza border and infiltrated the outpost where they were stationed.

507.    For 30 minutes, Hamas terrorists relentlessly attempted to break into the cafeteria with machine guns, grenades, and other explosive devices. After a rocket-propelled grenade managed to knock down the front door to the cafeteria, Amichay and his commanding officer were forced to fight and defend their unarmed fellow soldiers by opening fire on the onslaught of

terrorists outside.

508.    Amichay and his commander managed to eliminate numerous terrorists and prevent them from entering the cafeteria. They waged a four-hour gunfight with the Hamas terrorists and successfully shielded their comrades from complete annihilation. During the siege, Amichay was shot by Hamas terrorists in the hand and leg.

509.    Amichay continued to fight fiercely until another bullet struck him in the head, causing him to collapse from his injuries.

510.    Because of the sustained chaos and brutality surrounding the attack, six hours passed before Israeli rescue teams managed to evacuate Amichay to a Jerusalem hospital, where medical teams fought for two days to save his life.

511.    Amichay was eventually declared brain dead, and his family made the noble decision to donate his organs, thereby saving the lives of five individuals.

512.    Amichay Rubin and his commander, along with two other soldiers, were killed, and several others were wounded while battling Hamas terrorists at the small outpost near Kibbutz Kissufim.

513.    Plaintiff Yishai Rubin is a citizen of the United States and a resident of Israel. He brings this action individually as the surviving father of Amichay Rubin, and as the heir-at-law for the Estate of Amichay Rubin.

514.    Plaintiff Batya Rubin is a citizen and a resident of Israel. She brings this action individually as the surviving mother of Amichay Rubin, and as the heir-at-law for the Estate of Amichay Rubin.

515.    Plaintiff David Rubin is a citizen of the United States and a resident of Israel. He brings this action individually as the surviving brother of Amichay Rubin.

516.    Plaintiff Yedidya Rubin is a citizen of the United States and a resident of Israel. He brings this action individually as the surviving brother of Amichay Rubin.

517.    Plaintiff Oz Rubin is a citizen of the United States and a resident of Israel. He brings this action individually as the surviving brother of Amichay Rubin.

518.    Plaintiff Eitan Rubin is a citizen of the United States and a resident of Israel. He brings this action individually as the surviving brother of Amichay Rubin.

519.    Plaintiff Yair Rubin is a citizen of the United States and a resident of Israel. He brings this action individually as the surviving brother of Amichay Rubin.

520.    Plaintiff Odeya Ben Shimol is a citizen of the United States and a resident of Israel. She brings this action individually as the surviving sister of Amichay Rubin.

521.    Plaintiff Amiya Tifferet Gamla is a citizen of the United States and a resident of Israel. She brings this action individually as the surviving sister of Amichay Rubin.

522.    Since Amichay Rubin perished, the lives of his family members have drastically changed forever. Stricken by grief and sorrow, Plaintiff Batya Rubin finds herself struggling to focus on even the simplest of tasks, her mind clouded and distracted by loss and pain. Her ability to work full-time has been severely compromised, and she fights daily to maintain a routine while caring for the remaining members of her family, who are all grappling with the emotional toll of their devastating loss.

523.    Plaintiff Yishai Rubin's ability to carry out his work duties has also been severely affected. Once a sharp and proactive manager, he is now forced to invest every ounce of his remaining energy just to meet expectations, leaving him drained and exhausted at the end of each day.

524.    As a direct and foreseeable result of the October 7 Attack, Amichay Rubin

experienced conscious pain and suffering, extreme mental anguish, wrongful death, and economic loss.

525.    Plaintiffs Yishai Rubin, Batya Rubin, David Rubin, Yedidya Rubin, Oz Rubin, Eitan Rubin, Yair Rubin, Odeya Ben Shimol, and Amiya Tifferet Gamla have each experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack and the death of their family member Amichay Rubin.

**<u>The Berkowitz Family</u>**

526.    Eyal Berkowitz was a citizen of the United States and a resident of Israel when he was murdered by Hamas. He was 28 years old.

527.    Eyal Berkowitz was serving in the elite Maglan commando unit in the IDF.

528.    In the aftermath of the October 7 Attack, and as a foreseeable consequence of that attack, Eyal, a newlywed and promising medical student, was called up for reserve duty. Without hesitation, driven by his dedication to his comrades and his reeling country, he left everything behind and rushed to the frontlines to join the fight against Hamas terrorists in Gaza.

529.    On December 7, 2023, Eyal and his fellow soldiers set out on a mission to retrieve the bodies of two Israeli hostages who, in an act of savagery, had been abducted during the October 7 Attack. These hostages were violently hauled into the Gaza Strip and were ultimately executed by Hamas terrorists.

530.    Eyal and his comrades were on their way to the Jabaliya area in the Gaza Strip, where intelligence indicated that the massacred bodies of the Israeli hostages were being held. As Eyal's convoy was advancing, a roadside explosive, planted by Hamas, was detonated. Eyal was killed on the spot and several of his fellow soldiers were critically wounded.

531.    Eyal is survived by a mother, a father, five siblings, and a wife.

532.    Plaintiff Michal Berkowitz brings this claim individually and as the heir- at-law for the Estate of Eyal Berkowitz.  She is a citizen and resident of Israel. She is the surviving wife of Eyal Berkowitz.

533.    Plaintiff Shmaya Berkowitz brings this claim individually.  He is a citizen and a resident of Israel. He is the surviving father or Eyal Berkowitz.

534.    Plaintiff Rivka Berkowitz brings this claim individually.  She is a citizen of the United States and a resident of Israel. She is the surviving mother of Eyal Berkowitz.

535.    Plaintiff Erez Berkowitz brings this claim individually.  He is a citizen of the United States and a resident of Israel.  He is a surviving brother of Eyal Berkowitz.

536.    Plaintiff Tzur Berkowitz brings this claim individually.  He is a citizen of the United States and a resident of Israel.  He is a surviving brother of Eyal Berkowitz.

537.    Plaintiff Tamar Berkowitz brings this claim individually. She is a citizen of the United States and a resident of Israel. She is a surviving sister of Eyal Berkowitz.

538.    Plaintiff Einav Berkowitz brings this claim individually.  She is a citizen of the United States and a resident of Israel. She is a surviving sister of Eyal Berkowitz.

539.    Plaintiff Reut Berkowitz brings this claim individually.  She is a citizen of the United States and a resident of Israel. She is a surviving sister of Eyal Berkowitz.

540.    The death of Eyal Berkowitz has had a devastating effect on his family. Plaintiff Michal Berkowitz is grief-stricken by the loss of her husband. As a certified nurse, her ability to work and concentrate has been severely compromised, and the painful absence of Eyal Berkowitz always accompanies her. Since the death of her beloved husband, Michal Berkowitz has been experiencing insomnia, mood swings, and exhaustion. At times, she struggles with daily tasks, like merely getting out of bed.

541.     As a direct and foreseeable result of the October 7 Attack, Eyal Berkowitz experienced conscious pain and suffering, extreme mental anguish, wrongful death, and economic loss.

542.     Plaintiffs Shmaya Berkowitz, Rivka Berkowitz, Erez Berkowitz, Tzur Berkowitz, Tamar Berkowitz, Reut Berkowitz, Einav Berkowitz, and Michal Berkowitz have each experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack and the death of their family member Eyal Berkowitz.

### The Bareli Family

543.     Amit Bareli is a citizen of the United States and a resident of Israel.

544.     Amit Bareli was a reservist in the IDF.

545.     On October 7, 2023, at approximately 7:30 a.m., Amit Bareli turned on his phone to find it flooded with missed calls and frantic messages. Something terribly wrong was unfolding at the Gaza border, and he had been urgently called up for reserve duty.

546.     At approximately 5 p.m., Amit Bareli and his team arrived outside Kibbutz Kissufim, a tight-knit agricultural community along the Gaza border. Reality quickly set in.

547.     The scene was utter chaos.  Amit Bareli watched in horror as injured civilians and soldiers alike sought help from anyone who was able. Missiles were constantly fired overhead, sending everyone scrambling for cover.

548.     Amit Bareli and his team were tasked with securing the area and rescuing civilians trapped in their homes. Tragically, they found mostly dead bodies.

549.     Despite the unimaginable sights of terror, Amit Bareli and his team spent the next two days loading the mangled bodies into military hummers and searching the area for any terrorists still hiding among the wreckage.

550.    As a foreseeable consequence of the October 7 Attack, Amit Bareli went straight from fighting terrorists in Kibbutz Kissufim to fighting terrorists in Gaza, where he was deployed for the next six months. Risking his life daily, he felt extremely fragile and constantly under threat.

551.    A glimmer of hope amid the chaos came on March 28, 2024; as Amit Bareli prepared to get a few hours of sleep after a long day of fighting, he found a moment to call his wife, Zee Chana Joshua. She had life-changing news - she was pregnant with their first child.

552.    For a moment, the death and destruction surrounding Amit Bareli faded and his heart filled with joy and hope. He pushed away the thought of the gut-wrenching possibility that he may never meet his child.

553.    The next morning, on March 29, 2024, Amit Bareli awoke and began preparing for another day of combat with his team. They didn't notice Hamas gunmen watching them from the neighboring complex.

554.    A split second later, those gunmen fired an RPG at the structure where Amit Bareli and his team had been staying. The RPG blasted through the structure's window, instantly knocking Amit Bareli unconscious.

555.    When Amit Bareli slowly regained consciousness, everything was foggy. Laying on his side with his head spinning and ears ringing, he struggled to make sense of his surroundings. The room was ablaze and everything around him was grey with ash. In his half-conscious state, he summoned the strength to pull himself up and distance himself from the flames.

556.    Still disoriented, Amit Bareli saw his friends lying injured in pools of blood on the floor, screaming in agony. Overwhelmed by excruciating pain, Amit Bareli realized he had a severe stomach injury.

557.    Slowly, he lifted his shirt to find a massive bulge in his abdomen and a gaping,

bloody hole in his side. The sight of his severe injury coupled with the extreme pain almost sent Amit Bareli unconscious once again.

558.    Six pieces of scorching shrapnel had seared through Amit Bareli's body — two in his knee, one is his thigh, one in his arm, and one in his stomach. The piece lodged in his stomach severed his large intestine, causing severe internal bleeding. He was immediately evacuated and airlifted to a hospital for emergency surgery.

559.    As he fought to live, Amit Bareli prayed he would get to see his wife and future child, and prayed that his friends, who he last saw lying in pools of their own blood, would survive. He would later learn that one of his team members was immediately killed in the blast, and another did not survive his injuries.

560.    As Amit Bareli was wheeled into the operating room, Zee Chana Joshua burst through the door. The joy of parenthood she and Amit Bareli had just shared was replaced by all-consuming doom. They had a few fleeting seconds to speak before the operating room doors closed.

561.    To save his life, doctors removed eight inches of Amit Bareli's large intestine, along with the shrapnel lodged in his stomach. The shrapnel in his knee and arm, however, were too deeply embedded for doctors to safely remove.

562.    In the weeks following his surgery and due to his severe injuries, Amit Bareli could neither sit up in bed nor eat solid food, leaving him completely dependent on others for care. To date, he still has stomach pain and struggles to get out of bed.

563.    With shrapnel now permanently lodged in his knee, Amit Bareli will never be able to move freely again. He must now live with debilitating pain as the shrapnel presses into his muscles and bone.

564.    Amit Bareli experiences paranoia when he is in public or in crowds, and shakes uncontrollably while sleeping, among other symptoms.

565.    Amit Bareli still grapples with the loss of two of his team members. He can barely accept the painful reality that they have perished.

566.    Zee Chana Joshua brings this action individually. She is a citizen of the United States and a resident of Israel. She is the wife of Amit Bareli.

567.    Bezalel Bareli brings this action individually. He is a citizen of the United States and a resident of Israel. He is the father of Amit Bareli.

568.    Davira Bareli brings this action individually. She is a citizen of the United States and a resident of Israel. She is the mother of Amit Bareli.

569.    As a direct and foreseeable result of the October 7 Attack, Amit Bareli suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

570.    Zee Chana Joshua, Bezalel Bareli, and Davira Bareli suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack and the subsequent injury of their family member Amit Bareli.

**The Amar Family**

571.    Shai Amar is a citizen of the United States and a resident of Israel.

572.    Natalia Amar is the sister of Shai Amar.  Natalia Amar is a citizen of the United States and a resident of Israel.

573.    Shirley Amar is the mother of Shai Amar and Natalia Amar. Shirley Amar is a citizen of the United States and a resident of the State of Florida. Although she was in the United States at the time of the attacks, she suffered trauma and fear for her family as she followed the horrors unfolding upon her family.

574.    On the evening of October 6, 2023, Shai Amar and a group of ten close friends ventured from Moshav Amioz to the city of Be'er Sheva, about 30 miles away, to celebrate a friend's birthday. The group considered continuing their festivities at the NOVA Music Festival that was starting that night, but most decided against it. One member of the group, a young man named Dan, decided to head over to the festival.

575.    Around 6:00 a.m., Shai Amar returned to his apartment in Moshav Amioz and crashed into his bed from exhaustion, still dressed in his party clothes. The joyous memories of dancing and singing with his friends still flashed in his mind as he drifted into a short slumber.

576.    Approximately 30 minutes later, the piercing wail of rocket sirens jolted him awake. His heart pounded in his chest as he leapt to his feet and sprinted to the nearest safe room at his grandmother's nearby house. He arrived at the safe room and joined his grandmother, sister, Natalia Amar, and six cousins just as explosions from rockets shook the ground. Shai Amar stood as his senses were startlingly overcome by gunfire ripping through the air.

577.    Panic consumed his family.  Shai Amar quickly grabbed his phone to call his mother but was stopped by the numerous message notifications from friends, frantically declaring that they were under attack. He proceeded to call his mother, knowing that a catastrophe was unfolding.

578.    Through the phone, Shirley Amar heard the sirens and explosions. She was all too familiar with those sounds because she too had lived on the moshav before moving to the United States. A sense of dread loomed over Shirley Amar as she realized she could not protect her children. The weight of helplessness overtook her and panic set in.

579.    Shirley Amar turned on the television, desperate for information, but the news was scarce. On social media, she could only find posts, videos, and images from friends in real time. She watched as the horror unfolded, powerless to stop it.

580. As the terrorists infiltrated Moshav Amioz, they were met by the community's security team. In an instant, a ferocious exchange of gunfire erupted. The deafening sounds of explosions and relentless gunshots filled the air and reverberated through the walls of the safe room. Trapped in the darkness of the shelter, Shai Amar and his family prayed desperately that the bullets would not reach them.

581. Shai Amar continued to monitor his phone as terrorists uploaded videos across social media, depicting the murder, mutilation of bodies, sexual violence, kidnapping, and destruction that was ensuing across the Gaza Envelope. The sounds in each video mirrored the sounds that he heard just outside his shelter. Shai and Natalia Amar then realized that their lives were in grave danger.

582. Convinced their end was imminent, Shai Amar and Natalia Amar made one final, heart-wrenching call to Shirley Amar, believing it would be their last chance to speak with their mother. They told her they loved her, finding fleeting solace in speaking those words one last time. Their voices cracked under the weight of emotion, struggling to bring comfort to Shirley Amar, who could do nothing but listen helplessly from afar.

583. Fear gripped Shai Amar as he scanned the cramped, suffocating safe room, frantically searching for anything to protect his family. All he could find was a small knife and a can of pepper spray. The sounds of violence outside never stopped.

584. While they waited for more than 24 harrowing hours to be rescued by security forces, Shai Amar could not stop thinking back to the early morning hours of that day, when he was still with his friends, celebrating life, dancing and singing. Finally, in the morning hours of October 8, 2023, the IDF arrived and rescued Shai Amar, Natalia Amar, and their family.

585. Shai Amar and Natalia Amar were taken to Kibbutz Lotan, a safer place in the south.

All the residents of Moshav Amioz lost everything. Their community was reduced to ruins, and they were all displaced.

586.    Moshav Amioz had been a place of life and community. Its residents took pride in their shared experiences and the bond of living so close to the Gaza border. But on October 7, 2023, that pride was shattered. None of the residents have been able to return to their homes. They are only left with the perpetual sorrow and ache of everything lost.

587.    Shai Amar eventually learned that his friend, Dan, who continued celebrating at the NOVA Music Festival, was murdered there by Hamas terrorists, along with many other friends, including Natalia Amar's friend, Dudi. Shai Amar constantly replays the decision to abstain from the NOVA Music Festival in his head, wondering what would have happened if he had gone.

588.    Shai Amar's life is forever changed by the attacks of October 7, 2023. He struggles to find meaning and purpose in his life, plagued by the immense loss of friends and the displacement of his community at the hands of Hamas terrorists. He is riddled with survivor's guilt and spends his time visiting lost friends' graves and speaking with other survivors. Shai Amar has not been able to return to any semblance of normalcy since the attacks.

589.    Natalia Amar's life has changed drastically since October 7, 2023. Once a vibrant, social woman, she now struggles to leave her apartment. Natalia Amar has not been able to hold a job due to her extreme mental distress.

590.    Shirley Amar continues to struggle with the terror she experienced on October 7, 2023, while her children were subjected to the threat of death for 30 agonizing hours. She is tormented by the thoughts of Moshav Amioz, empty and desecrated. Her fond memories of walking the fields with her friends are now replaced with the devastating massacre of that day. Shirley Amar struggles to eat and barely leaves her house. She has not returned to work since the

attacks and still avoids leaving her home. Loud noises, or helicopters flying above, triggers her emotions and thoughts of October 7, 2023.

591.    As a direct and foreseeable result of the October 7 Attack, Shai Amar and Natalia Amar suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

592.    Shirley Amar experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack on her family members.

**The Shani Family**

593.    Ori Mordechay Shani was a citizen of the United States and a resident of Israel when he was murdered by Hamas. He was 22 years old.

594.    Ori Mordechay Shani was serving as a Captain in the IDF.

595.    On October 7, 2023, Ori Mordechay Shani was stationed at the Kissufim Outpost near the border fence between Gaza and Kibbutz Kissufim, along with five other soldiers.

596.    At approximately 6:30 a.m., dozens of Hamas terrorists ripped through the border fence and stormed through the gaping barrier with machine guns and other weapons. In that moment, Ori Mordechay and his team became the first line of defense against the unprecedented, barbaric massacre that would soon ensue.

597.    Ori Mordechay and his team battled tirelessly to fend off the terrorists for three hours, but they were far outnumbered and quickly ran out of ammunition.

598.    Utterly overwhelmed and in desperate need of more ammunition, Ori Mordechay and his team realized their only hope was to retreat from the border fence and navigate back to their nearby military base near Kibbutz Kissufim, where they could gather more weapons and reinforcements.

599.    Ori Mordechay and his team arrived at their military base at approximately 4:00 p.m. An hour later, after Ori Mordechay and his team had replenished their ammunition and set back out to battle, terrorists fired a barrage of mortars directly at them. Ori Mordechay shouted to his team members to take cover, but it was too late.

600.    One of the mortar shells directly struck Ori Mordechay and one of his comrades. After nearly nine and a half hours of fighting for their lives and defending their country against Hamas' cross-border attack targeting civilians, they were both killed instantly.

601.    Miryam Shani is a citizen and resident of Israel. She brings this action individually and as legal guardian of R.S., minor child (also a citizen and resident of Israel), as the surviving wife of Ori Mordechay, and as the heir-at-law for the Estate of Ori Mordechay Shani.

602.    Shulamit Shani is a citizen of the United States and a resident of Israel. She brings this action individually as the surviving mother of Ori Mordechay Shani.

603.    Yehoshua Shani is a citizen and resident of Israel. He brings this action individually as the surviving father of Ori Mordechay Shani.

604.    Yishai Shani is a citizen of the United States and a resident of Israel. He brings this action individually as the surviving brother of Ori Mordechay Shani.

605.    Zofiya Zaguri is a citizen of the United States and a resident of Israel. She brings this action individually as the surviving sister of Ori Mordechay Shani.

606.    Nava Rotshten is a citizen of Israel and a resident of Israel. She brings this action individually as the surviving sister of Ori Mordechay Shani.

607.    Malachi Shani is a citizen of the United States and a resident of Israel. He brings this action individually as the surviving brother of Ori Mordechay Shani.

608.    Elisha Shani is a citizen of the United States and a resident of Israel. He brings this

action individually as the surviving brother of Ori Mordechay Shani.

609.    Rinat Bat Zion Goldshtain is a citizen of the United States and a resident of Israel. She brings this action individually as the surviving sister of Ori Mordechay Shani.

610.    Ori Mordechay Shani's murder has shattered his entire family.  Shulamit Shani now walks through life with a profound emptiness and suffers mentally, knowing she will never see her son again.

611.    Once a joyful individual, Miryam Shani now carries her grief everywhere she goes and struggles to raise R.S., a minor child, all by herself. She now lives off on a single income and frequently relies on her parents to get through the day and care for her child.

612.    As a direct and foreseeable result of the October 7 Attack, Ori Mordechay Shani suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, wrongful death, and economic loss.

613.    Shulamit Shani, Yehoshua Shani, Yishai Shani, Zofiya Zaguri, Nava Rotshten, Malachi Shani, Elisha Shani, Rinat Bat Zion Goldshtain, Miryam Shani, and R.S.,  a minor child, suffered severe mental anguish and extreme emotional distress, loss of solatium, loss of services, and economic loss as a direct and foreseeable result of the October 7 Attack on and the death of their family member Ori Mordechay Shani.

**The Lavi and Barak Families**

693.    Mor Levzelter Lavi is a citizen of the United States and a resident of Israel. He brings this case individually.

694.    Mor Levzelter Lavi was traveling in Northern Israel when his mother and his brother were present at Kibbutz Kerem Shalom when they were attacked by Hamas on October 7, 2023.

695.    At approximately 6:30 a.m., Mor Levzelter Lavi's mother was home alone when rocket alarms started blaring through the kibbutz. Wasting no time as missiles fired overhead, she rushed to the safe room. Suddenly, she heard gunfire and threatening voices in Arabic just outside her window.

696.    Nearby in the kibbutz, Mor Levzelter Lavi's brother had just returned home from a birthday party in Be'er Sheva when the rocket alarms started blaring. Terrified by the thought of being alone during the attack, he ran to his friend's apartment next door and joined him and his girlfriend in their safe room.

697.    At approximately 7:00 a.m., Mor Levzelter Lavi was shaken awake by a barrage of calls from his friends and family back in Kibbutz Kerem Shalom. His heart sank and his head spun as his loved ones detailed the horrors that were unfolding there. He could not bear the thought of being away from his family while their lives hung in the balance.

698.    Desperate to return to his family, Mor Levzelter began driving south around noon. As more details emerged about the extent of the terrorist infiltration, Mor Levzelter came to the gut-wrenching realization that he would not be able to save his family.

699.    Mor Levzelter drove to Kibbutz Ein Hashofet, a community in Northern Israel and gathering point for civilians displaced by the Hamas attacks. He met other displaced civilians from Kibbutz Nahal Oz, a community that was also under attack by Hamas. Anguished by the fear of losing their family and friends, they all sat glued to their TVs and their phones, waiting for any sign of hope.

700.    Meanwhile, Mor Levzelter's mother's heart pounded as the grenades and gunfire exploded all around her home. Her mind began to race with panic as she pictured her son, Mor Levzelter's brother, alone in his apartment nearby on the kibbutz. Unable to reach him, she was

consumed by the fear that they would not survive the massacre.

701.    Mor Levzelter's mother was no stranger to tragedy. Her brother was murdered in a terror attack and her sister had been killed in a car accident. She trembled at the thought that her life would end in a similar fate as her beloved family members.

702.    Mor Levzelter's mother's terror turned into overwhelming guilt as she feared her mother would soon lose a third child. She questioned whether her mother could survive that pain for a third time.

703.    At the same time, Mor Levzelter's  brother feared for his mother. The thought of her sitting defenseless in her home terrified him. He briefly thought of leaving the safety of his shelter to join her – but as horrifying news of terrorists hunting civilians in the streets came in, he knew he had to stay put if he wanted to survive.

704.    Mor Levzelter's mother and brother remained in the confines of their safe rooms for over 24 agonizing hours as explosions from grenades and gunfire blasted outside. They sat defenseless, ravaged by the fear of what the terrorists could be doing to their family and bracing for their imminent deaths.

705.    Mor Levzelter frantically monitored reports about what was unfolding in Southern Israel, desperate to understand what was happening to his family and his beloved home.

706.    On the evening of October 8, 2023, Mor Levzelter's mother and brother were finally evacuated from their safe rooms. This would be the last time they set foot in her home. They emerged from hiding exhausted, emotionally devastated, and horrified by the terror they had endured.

707.    With his home in Kibbutz Kerem Shalom in ruins, Mor Levzelter was airlifted to a temporary residence near Eilat alongside other displaced civilians from Kibbutz Kerem Shalom.

He then relocated to the small village of Ashalim in southern Israel, where he was forced to start his life anew. He has yet to return home.

708.    Mor Levzelter Lavi continues to grieve as he mourns the loss of several close community members who were brutally murdered by Hamas on October 7, 2023. Some of his close friends are still held hostage in Gaza, and he struggles to focus on his personal responsibilities knowing his friends remain in captivity.

709.    With the infrastructure of the kibbutz community destroyed, the responsibility now falls on individuals like Mor Levzelter to keep the community afloat.  Mor Levzelter now manages the education system for Kerem Shalom's displaced children.

710.    Mor Levzelter Lavi continues to struggle with the loss of life. Amid such extreme uncertainty, he suffers from severe mental distress and from persistent anxiety-induced pain in his muscles surrounding his lungs, neck, and back, and struggles with shortness of breath.

711.    Golan Barak is a citizen of the United States and a resident of the State of Pennsylvania. He is the brother of Mor Levzelter Lavi's mother.

712.    Mor Levzelter Lavi and Golan Barak each suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack on their family members.

**The Aharoni Family**

634.    Shanee Aharoni is a citizen of the United States and a resident of Israel.

635.    Shanee Aharoni was eager to celebrate her birthday with her friends on the weekend of October 7, 2023. She made plans to meet up with them as soon as she finished her shift working as a cashier at the NOVA Music Festival in southern Israel.

636.    On October 6, 2023, at approximately 9:00 p.m., Shanee Aharoni arrived for her

shift. She was scheduled to work until 6:00 a.m. the next morning. When 6:00 a.m. rolled around, her boss asked her to stay an extra hour. That extra hour would change the course of her life forever.

637.    At approximately 6:30 a.m., a massive barrage of rockets streaked through the sky over the NOVA Festival complex.  Shanee Aharoni gathered her friends and other partygoers into her ticket booth and tried to keep everyone calm, including herself.

638.    After nearly 40 terrifying minutes huddled in the booth, Shanee heard gunfire and screams echoing from the festival crowds.

639.    Shanee desperately struggled to make sense of the chaos unfolding around her. Armed terrorists fired into crowds of young partygoers, bodies falling to the ground in every direction.  Shanee watched, paralyzed in horror, as one of the terrorists shot her friend in the leg.

640.    Shanee quickly snapped out of her panicked daze. She didn't know how many terrorists there were or how many people had already been shot – she just knew she had to escape.

641.    Shanee, along with her friend Carmel and her boyfriend, ran to the parking lot, hoping to drive to safety. However, they soon realized that they were boxed in as all the cars were stuck in a massive traffic jam. They would later discover that the traffic jam was also a product of the Hamas attack, as terrorists murdered partygoers in their cars all along the highway.

642.    With no other way to escape, Shanee and her friends started to run. As they sprinted for their lives, Shanee realized that terrorists were descending on parachutes, raining bullets on the crowd before continuing their carnage on foot.

643.    Echoes of blood-curdling screams and gunfire drowned out all of Shanee's thoughts as she raced through the desert terrain as fast as she could.  She witnessed fellow partygoers gunned down beside her, people tripping over the lifeless bodies as they desperately tried to escape.

644.    Shanee Aharoni and her friends finally arrived at an area where they could hide.

Scanning the landscape, now full of dead bodies, they located a public bomb shelter with roughly 30 people packed inside. A suspicious man was ushering them into the shelter – but Shanee's \ instincts kicked in. They continued past and hid beneath a few cars instead.

645.    Her decision saved their lives. Soon after, Shanee watched in horror as that same suspicious man threw grenades into the shelter, murdering everyone inside.

646.    Shanee got out from underneath the cars and started to run again. They came across an abandoned car with a set of car keys. With no time to spare, they jumped in and drove off as fast as they could.

647.    As they sped away from the NOVA Festival grounds, Shanee fought to keep her composure. They weaved through roads lined with lifeless bodies and abandoned vehicles, praying with each turn that they didn't run into the terrorists' hands.

648.    At approximately 2:00 p.m., Shanee made it to her mother's house in central Israel. She was alive, but her life would never be the same.

649.    Hamas terrorists murdered approximately 20 of Shanee Aharoni's friends that day. What was supposed to be a celebration of her birthday turned into a massacre of her closest friends, and a trauma that would scar her for the rest of her life.

650.    In the weeks following the attack, Shanee's mental state quickly deteriorated. For the first two weeks, she barely uttered a single word.

651.    Once a motivated, independent young woman working in the high-tech sector, Shanee can no longer hold down a job and she lives alone in her apartment. She has lost a significant amount of weight as she has struggled to eat. She began to self-isolate, unable to socialize or leave her home. She cries constantly and has frequent outbursts of anger.

652.    The continuous blaring of rocket sirens in central Israel triggered Shanee's trauma

response. As a result, as of September 28, 2024, she left Israel and moved in with her sister in the United States.

653.    Shanee Aharoni continues to suffer from extreme physical and mental side effects. She experiences frequent stress-vomiting spells and can barely sleep through the night without waking from traumatizing night terrors. She is unable to partake in any social situations, or even neutral situations where other people are present.

654.    Galit Aharoni is a citizen of the United States and a resident of Israel. She brings this action individually. She is the mother of Shanee Aharoni.

655.    Yaniv Aharoni is a citizen of the United States and a resident of Israel. He brings this action individually. He is the father of Shanee Aharoni.

656.    Roy Aharoni is a citizen of the United States and a resident of Israel. He brings this action individually. He is the brother of Shanee Aharoni.

657.    Etay Aharoni is a citizen of the United States and a resident of Israel. He brings this action individually. He is the brother of Shanee Aharoni.

658.    Galit Aharoni experienced severe emotional distress on October 7, 2023, fearing for her daughter's life.  Since October 7, 2023, her life has revolved around helping her daughter through her trauma. She will soon be relocating to the United States to help support Shanee.

659.    As a direct and foreseeable result of the October 7 Attack, Shanee Aharoni suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

660.    Galit Aharoni, Yaniv Aharoni, Roy Aharoni, and Etay Aharoni suffered severe mental anguish and extreme emotional distress, loss of solatium, loss of services, and economic loss as a direct and foreseeable result of the October 7 Attack on their family member Shanee Aharoni.

**The Haines Family**

661.    Plaintiff Eden Haines is a citizen of the United States and a resident of Israel.

662.    Eden served as a non-combat air control operator in the IDF at the time of the October 7 Attack.

663.    On that ominous day, at approximately 6:30 a.m., Eden and her fellow soldiers at Re'im Base in Southern Israel were abruptly jolted awake by the deafening sound of rockets fired from the Gaza Strip, their sense of calm violently shattered. They followed protocol and rushed to the nearest bomb shelter, where they received the terrifying information that scores of Hamas terrorists had breached the base.

664.    The brutal assault was launched on the Jewish holiday of Simchat Torah, a time when many soldiers were on leave, leaving only a minimal number of soldiers to secure the base. Ultimately, 19 IDF soldiers were slaughtered at Re'im Base by the overwhelming onslaught of at least 120 Hamas terrorists.

665.    At the time of the October 7 Attack, the emergency squad on Re'im Base consisted of nothing more than a commander and four non-combat soldiers.

666.    Eden and her fellow soldiers tried to shut all the doors to the bomb shelter. Having no weapons or other means to defend themselves, they turned off the lights and hid from the heavily armed Hamas terrorists.

667.    For the next 10 excruciating hours, Eden and her fellow soldiers would endure the extreme trauma of being surrounded by Hamas terrorists.  She heard several of the terrorists yelling in Arabic, and the sound of rockets and machine guns blaring through the air. At one point, one of the bomb shelter's doors flew open on the impact of a nearby blast, and shrapnel pierced through the wall.

668.    The intense fighting at Re'im Base went on for hours before the terrorists were subdued. Eden could hear the menacing sounds of gunshots outside the safe room, getting ever closer.

669.    At approximately 4:30 p.m., security forces finally arrived to rescue Eden and her fellow soldiers. Amid the chaotic fighting, the troops were initially unable to locate them. Eden knew she had no choice but to act when she stepped outside the safe room into the mayhem, bravely trying to guide the forces.

670.    When she stepped outside the safe room, Eden witnessed the gruesome sight of the devastation caused by the terrorists' invasion. A wave of shock washed over her. She was left appalled, unable to process the full extent of what had happened. She saw lifeless bodies lying on the ground and scenes of violence that haunt her to this day.

671.    Israeli army forces finally located Eden and her fellow soldiers, pulling them from the bomb shelter as intense fighting raged around them, with the base still infested with terrorists.

672.    Eden and her fellow soldiers were taken to an area of the base that had, by that point, been cleared of terrorists. Despite the chaos and horror, and without hesitation, Eden immediately took on her military duties as an air control operator, replacing a fellow soldier who had just completed a 10-hour shift.

673.    Eden's air control skills were essential during the attack, with helicopters constantly flying in to bring reinforcements and evacuating the wounded. Despite the traumatizing ordeal she had endured just several hours earlier, she tirelessly continued to perform her military duties alongside her fellow soldiers.

674.    Eden's base was fully cleared of terrorists by approximately 7:00 p.m. on October 7, 2023, when she was still on shift. Eden remained on base until October 10, 2023, while

performing her military duties and doing everything she could to assist as many people as possible.

675.    During that time, IDF soldiers and civilians continued reporting drone threats and requesting help.  Eden felt morally and humanely obligated to address reports and calls for help – even when she was unable to assist – simply because she understood that people were in dire distress and needed support.

676.    Eden is devastated and overwhelmed by what she has experienced during the October 7 rampage. She now feels distant from her inner circle, including her immediate family. She is currently trying to cope with the life-changing ordeal she experienced on the day of the attack and in the days that followed.

677.    Eden's ability to work has also been severely compromised as she struggles to interact with others and build trust-based relationships.

678.    Eden's inability to assist her fellow soldiers while she was confined to the safe room took a terrible toll on her. It took months before she could sleep through the night, and she still occasionally experiences nightmares and crying spells. Mental images from that day, alongside a sense of anxiety and despair, constantly accompany her, and her anxiety is triggered by crowded spaces and exposure to loud noises.

679.    As a direct and foreseeable result of the October 7 Attack, Plaintiff Eden Haines has suffered severe mental anguish, extreme emotional distress, loss of consortium, loss of services, and economic damages.

680.    Plaintiff Deena Goldfeld brings this action individually. She is a citizen of the United States and a resident of Israel. She is the mother of Eden Haines.

681.    Plaintiff Michael Haines brings this action individually. He is a citizen of the United States and a resident of Israel. He is the father of Eden Haines.

682.    Plaintiff Yoel Avraham Haines brings this action individually.  He is a citizen of the United States and a resident of Israel. He is the brother of Eden Haines.

683.    Plaintiffs Deena Goldfeld, Michael Haines, and Yoel Avraham Haines each experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack on their family member Eden Haines.

**The Kava Family**

684.    Matan Kava is a citizen of the United States and a resident of Israel.

685.    Matan Kava holds the rank of Senior Sergeant Major in the IDF and serves as a reservist in Battalion 697 of the 551 Unit.

686.    As a foreseeable consequence of the October 7 Attack, Matan Kava was deployed to Gaza on October 27, 2023. On December 20, 2023, Matan and his team were operating in Beit Hanoun, a neighborhood in northeast Gaza near the border with Israeli kibbutzim. This area, evacuated of civilians, had been a base of operations for Hamas militants who launched their attacks on October 7.

687.    At approximately 6:00 a.m., during a mission to search for potential threats, a member of Matan's team spotted a suspicious individual slipping into a building across the street. Knowing that civilians would not approach IDF forces that closely and that the humanitarian zone was far away, it quickly became obvious that this was a Hamas operative attempting to execute an assault.

688.    Responding quickly, the team rushed to the building to neutralize the threat before an attack could occur. As they prepared to enter, Matan's commander ordered him to throw a hand grenade to clear the way. Under intense pressure and focused on executing the order quickly, Matan inadvertently threw the grenade to the side of the door, causing it to roll back in their direction.

689.    In that instant, time seemed to freeze as Matan's life flashed before his eyes, watching the grenade roll back toward him. He ran for cover but was unable to fully escape the explosion. Shrapnel from the grenade tore into his leg, causing a deep and excruciating wound. The searing pain forced him to clutch his leg tightly as blood poured from the injury. Alongside a teammate who sustained a shrapnel wound to the neck, Matan experienced unbearable pain while desperately praying for his teammate's safety, terrified by the thought he would not survive. Both were swiftly evacuated to Beilinson Medical Center in Israel for treatment.

690.    At the hospital, doctors treated Matan's leg and administered antibiotics. However, days later, his wound became infected, worsening his pain and prolonging his recovery. To combat the infection, his father—a podiatrist—had to undertake a grueling and agonizing treatment process: involving repeatedly reopening the wound to stimulate bleeding and carefully closing it gradually over time. Matan endured this painful process for about a month, which left him unable to perform basic physical tasks like walking properly which disrupted his ability to reintegrate into normal life.

691.    In addition to his physical injuries, the experiences since October 7, 2023, have left lasting psychological scars on Matan. The memory of the grenade nearly taking his life and the guilt of injuring a teammate—who now suffers a permanent neck injury from a lodged shrapnel fragment, millimeters away from catastrophic consequences—continue to weigh heavily on him. These haunting memories add to his ongoing struggle to navigate daily life.

692.    Albert Kava is U.S. citizen and a resident of Israel. He brings this claim individually as the father of Matan Kava.

693.    Beth Kava is U.S. citizen and a resident of Israel. She brings this claim individually as the mother of Matan Kava.

694.    Zvi Kava is U.S. citizen and a resident of Israel. He brings this claim individually as the brother of Matan Kava.

695.    Yael Kava is U.S. citizen and a resident of Israel. She brings this claim individually as the sister of Matan Kava.

696.    Deena Kava is U.S. citizen and a resident of Israel. She brings this claim individually as the sister of Matan Kava.

697.    As a direct and foreseeable result of the October 7 Attack and the events that followed on December 20, 2023, Matan Kava suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

698.    Albert Kava, Beth Kava, Zvi Kava, Yael Kava, and Deena Kava experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack and the subsequent December 20, 2023, attack in which Matan Kava was injured.

**The Elitzur Family**

699.    Plaintiff Barak Elitzur is a citizen of the United States and a resident of Israel.

700.    Plaintiff Barak Elitzur was a paratrooper in the IDF. His brigade was one of the first military forces to enter Gaza as a foreseeable consequence of the October 7 Attack.

701.    Barak and his team were stationed in Gaza's Shuja'iyya neighborhood, a central and highly populated area in the enclave controlled by Hamas.

702.    On December 4, 2023, Barak and his team were on operational duty, riding in an armored personnel carrier (APC) used to transport soldiers deployed in the Gaza Strip.

703.    As the team was preparing to exit the APC, an anti-tank missile fired at close range by members or affiliates of Hamas blasted through the vehicle and exploded, causing a fire

to quickly spread inside the vehicle. The team began to flee in disarray through the vehicle's hatch.

704.    Before Barak could react, his entire body caught on fire, and he screamed in agony for his team to help him. Because no one responded, he assumed that his team had been killed outside the APC by terrorists. Barak realized that these might be his final moments alive.

705.    Barak desperately reached out and located the emergency exit handle in the APC and faced a choice between dying from the fire or exiting the APC to be ambushed by Hamas. He grabbed the exit handle and burst out of the APC.

706.    To his relief, no terrorists were outside the vehicle, and Barak instinctively began rolling on the ground to extinguish the fire, covering his burning body with sand. He was able to put out the fire, but his hands were severely burned, and he was unable to operate his weapon. He was bleeding heavily and was in excruciating pain.

707.    The night before this mission, Barak and his team had received a donation of fire-resistant uniforms; these uniforms helped save his life.

708.    Eventually, Barak was located by his team, evacuated out of Gaza, and picked up by an ambulance. The 20-minute ambulance ride felt like hours and Barak was overcome with emotion, believing he would never see his wife and son again.

709.    Barak was airlifted to a hospital in Jerusalem where he was diagnosed with serious third-degree burns and hospitalized for three and a half weeks. He underwent daily treatments to clean and re-bandage his burns. The pain was unbearable during these treatments, bringing him to tears despite being administered pain medication. He has since received four further surgeries to treat scarring.

710.    Following his stay in the hospital, Barak was taken to Hadassah Hospital in Jerusalem, where he received rehabilitation for three months. Barak has suffered from severe pain and has large scars on his body. As part of the healing process, he must apply silicone cream to his scars and wears pressure and silicone bandages.

711.    Barak is also subject to burdensome restrictions, including non-exposure to the sun. This has greatly affected his quality of life, as Israel is subject to intense heat and sunlight for most of the year. Barak must wear long-sleeved shirts, even in the hot summer months, and must constantly apply sunscreen lotion.

712.    Barak is currently undergoing physiotherapy and hydrotherapy to improve body mobility and prevent future complications. While these treatments are often very painful, they are necessary to maintain what is left of Barak's normal mobility.

713.    Barak Elitzur brings this action individually, and as the co-legal guardian of his minor child M.E., who is a citizen and resident of Israel.

714.    Plaintiff Rivka Tamar Elitzur is a citizen of the United States and a resident of Israel. She brings this action individually, and as the co-legal guardian of minor child, M.E. She is the wife of Barak Elitzur.

715.    Plaintiff Shai Elitzur is a citizen of Israel and a resident of Israel. He brings this claim individually as the father of Plaintiff Barak Elitzur.

716.    Plaintiff Rivka Ahuva Elitzur is a citizen of the United States and a resident of Israel. She brings this claim individually as the mother of Plaintiff Barak Elitzur.

717.    Plaintiff Daniel Menachem Elitzur is a citizen of the United States and a resident of Israel. He brings this claim individually as the brother of Plaintiff Barak Elitzur.

718.    As a direct and foreseeable result of the October 7 Attack and the events that followed on December 4, 2023, Barak Elitzur suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

719.    Rivka Tamar Elitzur, M.E., Shai Elitzur, Rivka Ahuva Elitzur, and Daniel Menachem Elitzur suffered severe mental anguish and extreme emotional distress, as a direct and foreseeable result of the October 7 Attack and the subsequent December 4, 2023, attack in which Plaintiff Barak Elitzur was injured.

### The Spiegelman Family

720.    Plaintiff Shmuel Spiegelman is a citizen of the United States and a resident of Israel.

721.    Shmuel Spiegelman was a reservist in the IDF. As a foreseeable consequence of the October 7 Attack, his brigade was one of the first military forces to enter Gaza.

722.    On October 7, 2023, Shmuel was urgently called up to reserve duty. With little information about the horrors unfolding, he hugged his wife and son and set out for the Shizafon military base in southern Israel.

723.    Upon his arrival, military officials briefed Shmuel on the ongoing Hamas massacre of Israeli communities along the Gaza envelope. They assigned him to the 198th Battalion, one of the first teams to enter Gaza as part of Israel's defensive.

724.    After three weeks of intense training, Shmuel and his team set out into Hamas-controlled Gaza. Their mission was to capture Hamas strongholds in Jabalia, a city in Northern Gaza.

725.    After reaching Jabalia, on the morning of November 8, 2023, Shmuel and his team began preparing for a long day of battle. At approximately 10 a.m., one of his teammates spotted a Hamas gunman lurking in the building across from their position.

726.    As the team quickly filled into the alley beside the building, Shmuel and his combat partner provided cover in the back.

727.    Suddenly, Shmuel heard a massive explosion, and the air immediately filled with suffocating smoke. A Hamas operative had thrown a grenade at Shmuel and his team from the second floor of the building.

728.    As Shmuel retreated with his team members, he heard his company commander screaming out for help from the fog of the explosion. The commander had been critically wounded in the explosion along with approximately five other soldiers from the unit.

729.    Shmuel and his other team members sprinted back to their original position to grab the medic who immediately rushed out to begin treating the wounded soldiers.

730.    Forced into a leadership role, Shmuel quickly reorganized the team. Under heavy fire, Shmuel led his team back out into the alley to fend off the gunmen while the medic treated the wounded team members in a small hidden storage area in the alley.

731.    Shmuel and his team later located the wounded team members being treated in the hidden storage room. When they arrived, they found that the medic had been shot – twice in the chest, once in the arm and once in the leg.

732.    Now forced to act as both an interim medic and company commander, Shmuel led his team in simultaneously fighting Hamas and treating their fellow wounded soldiers.

733.    Shmuel survived physically unscathed, and he and his team were able to evacuate the wounded soldiers. The team quickly attempted to reposition to continue with their mission. But barely ten minutes later, they were hit with a barrage of gunfire.

734.    Shmuel suddenly felt a searing pain in his hand – he was one of four soldiers hit by the gunfire.

735.    With blood gushing from his hand, Shmuel was evacuated to an Israeli hospital, where he underwent two surgeries. One of the four injured soldiers was pronounced dead shortly after their arrival.

736.    The bullet had torn multiple tendons in Shmuel's hand, fractured his scaphoid bone, and caused significant nerve damage.

737.    To this day, Shmuel continues to experience limited mobility, pain, and nerve sensitivity in his hand. This injury prevents him from engaging in countless aspects of his daily life – from playing with his young children to playing sports that he once loved.

738.    On top of his physical injuries, Shmuel continues to suffer mentally following his near-death experience and traumatic attempt to rescue his fellow soldiers. These physical and emotional injuries have also negatively impacted Shmuel's career, as he has been unable to return to work.

739.    Plaintiff Shmuel Spiegelman brings this action individually, and as the co-legal guardian of I.S. and N.S., his minor children. I.S. is a citizen of the United States and a resident of Israel. N.S. is a citizen and resident of Israel.

740.    Plaintiff Yonina Spiegelman brings this action individually, and as the co-legal guardian of her minor child I.S. She is a citizen of the United States and a resident of Israel. She is the wife of Shmuel Spiegelman.

741.    Plaintiff Chana Spiegelman brings this action individually. She is a citizen of the United States and a resident of Israel. She is the mother of Shmuel Spiegelman.

742.    Plaintiff Asher Spiegelman brings this action individually. He is a citizen of the United States and a resident of Israel. He is the father of Shmuel Spiegelman.

743.    Plaintiff Amitai Spiegelman brings this action individually. He is a citizen of the

United States and a resident of Israel. He is a brother of Shmuel Spiegelman.

744.    Plaintiff Tamar Spiegelman brings this action individually. She is a citizen of the United States and a resident of Israel. She is a sister of Shmuel Spiegelman.

745.    Plaintiff Nachshon Spiegelman brings this claim individually. He is a citizen of the United States and a resident of Israel. He is a brother of Shmuel Spiegelman.

746.    Plaintiff Avigayil Spiegelman brings this claim individually. She is a citizen of the United States and a resident of Israel. She is a sister of Shmuel Spiegelman.

747.    Plaintiff Ayelet Shitrit Spiegelman brings this claim individually. She is a citizen of the United States and a resident of Israel. She is a sister of Shmuel Spiegelman.

748.    As a direct and foreseeable result of the October 7 Attack, Plaintiff Shmuel Spiegelman suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

749.    Plaintiffs Yonina Spiegelman, I.S., N.S., Chana Spiegelman, Asher Spiegelman, Amitai Spiegelman, Tamar Spiegelman, Nachshon Spiegelman, Avigayil Spiegelman, and Ayelet Shitrit Spiegelman suffered severe mental anguish, extreme emotional distress, loss of solatium, loss of services, and economic loss as a direct and foreseeable result of the October 7 Attack on their family member Shmuel Spiegelman.

### The Lilintal-Huri Family

750.    Plaintiff Moshe Yehuda Lilintal is a citizen of the United States and a resident of Israel.

751.    Plaintiff Esther Pearl Lilintal is a citizen of the United States and a resident of Israel. She is the wife of Moshe Yehuda Lilintal.

752.    Plaintiff Elia Natan Lilintal is a citizen of the United States and a resident of Israel.

He is the son of Moshe Yehuda Lilintal and Esther Pearl Lilintal.

753.    Plaintiff Yaakov Lilintal is a citizen of the United States and a resident of Israel. He is the son of Moshe Yehuda Lilintal and Esther Pearl Lilintal. He brings this action individually and as co-legal guardian of his minor children T.L., N.R.L., S.L., and E.S.L., citizens and residents of Israel.

754.    Plaintiff Chana Lilintal is a citizen and resident of Israel. She is the wife of Yaakov Lilintal. She brings this action individually and as co-legal guardian of her minor children T.L., N.R.L., S.L., and E.S.L., citizens and residents of Israel.

755.    Plaintiff Yeshayahu Lilintal is a citizen of the United States and a resident of Israel. He is the son of Moshe Yehuda Lilintal and Esther Pearl Lilintal. He brings this action individually and as co-legal guardian of his minor children Y.M.L., T.L., and S.L., citizens and residents of Israel.

756.    Plaintiff Tamar Lilintal is a citizen and resident of Israel. She is the wife of Yeshayahu Lilintal. She brings this action individually and as co-legal guardian of her minor children Y.M.L., T.L., and S.L., citizens and residents of Israel.

757.    Plaintiff Daniel Lilintal is a citizen of the United States and a resident of Israel. He is the son of Moshe Yehuda Lilintal and Esther Pearl Lilintal. He brings this action individually and as co-legal guardian of his minor children, J.M.L. and A.L., citizens and residents of Israel.

758.    Plaintiff Gal Lilintal is a citizen and resident of Israel. She is the wife of Daniel Lilintal. She brings this action individually and as co-legal guardian of her minor children, J.M.L. and A.L, citizens and residents of Israel.

759.    Plaintiff Chaim Tuvia Lilintal is a citizen of the United States and a resident of Israel. He is the son of Moshe Yehuda Lilintal and Esther Pearl Lilintal. He brings this action

individually and as co-legal guardian of his minor child M.L., a citizen and resident of Israel.

760.    Plaintiff Talya Lilintal is a citizen and resident of Israel. She is the wife of Chaim Tuvia Lilintal. She brings this action individually and as co-legal guardian of her minor child M.L., citizen and resident of Israel.

761.    Plaintiff Chana Lilintal Huri is a citizen of the United States and a resident of Israel. She is the daughter of Moshe Yehuda Lilintal and Esther Pearl Lilintal.

762.    Plaintiff Evyatar Saadya Shalom Huri is a citizen and resident of Israel. He is the husband of Chana Lilintal Huri.

763.    Moshe Yehuda Lilintal, Esther Pearl Lilintal, Elia Natan Lilintal, Yaakov Lilintal, Chana Lilintal, T.L., N.R.L., S.L., E.S.L., Yeshayahu Lilintal, Tamar Lilintal, Y.M.L., T.L., S.L., Daniel Lilintal, Gal Lilintal, J.M.L., A.L., Chaim Tuvia Lilintal, Talya Lilintal, M.L., Chana Lilintal Huri, and Evyatar Saadya Shalom Huri are hereinafter collectively referred to as "The Lilintal Family."

764.    On October 7, 2023, the members of the Lilintal Family were ruthlessly attacked by Hamas in different locations along the Gaza border.

### Lilintal Family in Moshav Naveh

765.    Plaintiffs Esther Pearl Lilintal, Moshe Yehuda Lilintal, Chana Lilintal Huri, and Evyatar Saadya Shalom Huri live on Moshav Naveh, a small agricultural community in Southern Israel. On October 7, 2023, Yeshayahu Lilintal, Tamar Lilintal, Y.M.L., T.L., S.L., Daniel Lilintal, Gal Lilintal, J.M.L., and A.L. were visiting for the Jewish holiday of Simchat Torah.

766.    Esther's love for hosting was shared by her children. Nearby, Chana and Evyatar were delighted to host Evyatar's parents and sister in their cozy trailer home.

767.    On October 7, 2023, at approximately 6:30 a.m., Esther was shaken awake by the

sounds of sirens and missiles exploding overhead. Living near the Gaza border, she was no stranger to rocket attacks, but this time the volume and magnitude of the explosions were extremely unusual. She felt a pit form in her stomach.

768.     Esther and Moshe hurriedly gathered all nine of their visiting family members from their respective rooms and ran to the shelter. Chana and Evyatar joined them shortly after, along with Evyatar's parents and sister.

769.     Sounds of explosions and gunfire erupted outside. Terror swept over the family as they squeezed together in the tiny safe room. Between the 16 family members, there was barely room to breathe.

770.     Still struggling to grasp the reality of their situation, the family soon learned that the terrorists had infiltrated Moshav Naveh's neighboring communities. The adults in the room were forced to hide their own horror to calm the frantic children.

771.     It was close to 15 petrifying hours before the Lilintal family members in Moshav Naveh finally received word that their family members in neighboring communities were safe. After approximately 36 hours, Yeshayahu, Tamar, Daniel, Gal, and their children were evacuated, accompanied by military convoys.

772.     On Monday, Esther, Moshe, Chana, and Evyatar were evacuated via military convoys to a hotel in Jerusalem, where they remained until November of 2023.

773.     Since October 7, life has not been the same for Yeshayahu, Tamar, and their children. Their 3-year-old daughter, T.L., who was toilet trained before the October 7 Attack, is now back in diapers and has developed a disabling stutter. All their children are still unable to sleep through the night. Chana is haunted by the horrors of that day regularly. She experiences extreme anxiety in crowded areas – her heart begins pounding and she often feels like she is going to faint.

774.    Chana and her husband no longer sleep in their bedroom – they now sleep in their safe room every night, desperate for a sense of security.

775.    Esther continues to struggle with disrupted sleep, extreme fatigue, and lack of motivation, which impacts her work. She and her husband, Moshe, socialize far less than they used to, and they rarely leave their immediate community.

### Chaim Tuvia Lilintal and Family in Kibbutz Kerem Shalom

776.    Chaim Tuvia Lilintal, Talya Lilintal, and M.L. lived in Kerem Shalom.  Chaim invited his friends to stay with him and his family for the Simchat Torah holiday.

777.    At approximately 6:30 a.m., Chaim jerked out of bed to the sound of piercing sirens. Within seconds of rushing his family and friends into a safe room, gunfire rang out from directly outside the house.

778.    Cautiously, Chaim peered out the safe room window. To his horror, he watched as a barrage of terrorists gunned down the soldiers guarding the gate of their kibbutz community.

779.    Suddenly, Chaim's phone rang. It was a member of the kibbutz security team. The wife of one of the kibbutz security team members had been left alone in her home, completely defenseless. They were desperately searching for someone to save her.

780.    While his heart pounded, Chaim swallowed his fear, grabbed his pistol, and set out with his friend to rescue the woman. Miraculously, he reached her and brought her back to his safe room. The woman stayed with them for the entire duration of the attack.

781.    On Saturday morning, as the fighting raged on in the kibbutz, Chaim decided it was time to take action to protect his family and community. He reached out to the kibbutz security team and asked to join them. He fought alongside the security team for the rest of the day as they defended the kibbutz community.

782.    Against all odds, Chaim survived and so did his family, friends, and the woman he had rescued. They were finally reunited the next day, on Sunday evening. The relief and jubilance of knowing that their family was still intact was fleeting, as they took in the destruction around them.

783.    Chaim, Talya, M.L., and their friends were evacuated, but Chaim had more work to do. While Talya and M.L. moved in with their friends in Be'er Sheva, Chaim returned to the kibbutz to continue defending what was left of their community. The family was soon reunited— this time in attendance of several funerals in Jerusalem for their friends who did not make it out alive.

### *Yaakov Lilintal and Family in Kibbutz Kerem Shalom*

784.    Yaakov Lilintal, Chana Lilintal, and their children lived in Kibbutz Kerem Shalom. Like his mother, sister, and brother, Yaakov was overjoyed to host family for Simchat Torah. They were joined by Chana's parents, grandmother, and brother. It was a full house, packed with excitement and anticipation for the holiday.

785.    At approximately 6:30 a.m., the whole family jolted awake to several blaring rocket alert sirens. Yaakov's stomach churned as he hurried his family into their safe room. Suddenly, the sounds of sirens were met with sounds of explosions and a barrage of gunfire.

786.    Chana's family began to panic. With little information about what was happening outside, Yaakov and Chana quieted their own fears and desperately tried to calm their family and young children.

787.    With no clear picture of the threat outside and with his family's lives on the line, Yaakov called the kibbutz security coordinator. The coordinator told him to remain in the safe room with his family for the time being, and that they may ask him to join the emergency response team if they could get him proper gear.

788.    Later on Saturday evening, Yaakov received a call from the kibbutz coordinator. He shared devastating news – several members of the emergency response team had been murdered and injured, and families were being massacred by terrorists in their homes.

789.    The coordinator begged Yaakov to help one particular family. Terrorists had broken into their home and attacked the father, critically injuring him. The kibbutz team was able to evacuate the father to a hospital, but the rest of the family needed a place to stay.

790.    Yaakov did not hesitate to take in the family. Altogether, 17 of them packed into the tiny safe room. By that time, there was no more electricity or cell service. Petrified, they remained in the shelter as the violence raged overnight and into Sunday morning.

791.    By the evening of October 8, they were finally given clearance to evacuate. Yaakov and his family quickly packed up their belongings and rushed to their cars, where they were escorted out of the area by the military. Yaakov braced for the possibility that they would never see their home again.

792.    Yaakov and his family initially moved in with Chana's parents in Jerusalem before relocating to a hotel in Eilat with other displaced families.

793.    Life in the hotel was extremely difficult. As a family of six in a small room, there was no privacy and no sense of routine. Their lives had been completely disrupted.

794.    During their time in the hotel, Yaakov's children began suffering from trauma related symptoms. Previously confident, they grew extremely wary of strangers and were unable to separate from their parents. They struggled with severe insomnia, which in turn kept Yaakov and Chana awake at night. They constantly feared that terrorists were hiding under their beds or in their rooms. The suffering escalated to the point that Yaakov's son told him that he wanted to die.

795.    This unbearable hotel life dragged on for three months. Yaakov and his family then

relocated to Kibbutz Ashalim, alongside other displaced families.

796.    The family decided to move back to Kibbutz Kerem Shalom, but when they returned, they found that most of the kibbutz remained in shambles. With their house still uninhabitable, they moved into a different home.

797.    Yaakov and Chana continue to grapple with the murder of several of their close friends. Their grief is overwhelming at times.

798.    T.L., N.R.L., S.L., and E.S.L. continue to suffer from the same severe insomnia, fear of strangers, and loud noises as they did during their time in the hotel.

799.    The temperament of T.L. has changed dramatically. Previously an easygoing child, he is now socially withdrawn, aggressive, and volatile, often lashing out at his siblings.

800.    The trauma of this experience is deeply ingrained in the children's development. The first words of two-year-old S.L. included the terms "terrorist," "hostage," and "alarm." Hearing these words from her toddler's mouth has shattered Chana's heart.

801.    Chana struggles to find any motivation these days. Managing her children's trauma on top of her own has emotionally devastated her. She feels as if her entire family and community life fell apart overnight.

802.    Yaakov Lilintal, Chana Lilintal Bialiastoki, T.L., N.R.L., S.L., and E.S.L. all continue to experience extreme mental suffering.

### Elia Natan Lilintal in Kibbutz Sufa

803.    In the early morning hours of October 7, 2023, Elia Natan Lilintal and his girlfriend returned home to Kibbutz Sufa, a tight-knit agricultural community near the Gaza border. They had spent the night ringing in the Simchat Torah holiday with Elia Natan Lilintal's parents in Moshav Naveh, and were just getting to sleep at approximately 4:30 a.m.

804.    Two hours later, they were startled awake by wailing sirens warning of incoming rockets. As the security coordinator of the kibbutz, Elia immediately sent a message to kibbutz residents instructing them to take shelter and ran to his safe room with his girlfriend.

805.    At approximately 6:45 a.m., Elia received a call from the operations room of the Amitai battalion of the IDF, with whom he was in frequent contact as security coordinator for the nearby kibbutz. They said terrorists had infiltrated Kibbutz Sufa. Elia's heart started to pound, but he didn't have time to panic – he needed to keep a clear head to protect his community.

806.    At approximately 6:55 a.m., gunfire erupted outside of Elia's home. He urgently called the IDF company commander for information, but no one picked up.

807.    When Elia finally got in touch with the battalion's operations officer, his fears were confirmed – the company commander was injured, the medic was injured, and all of the troops were already overwhelmed. No one was coming to help Kibbutz Sufa. His final words to Elia were "Good luck."

808.    Elia understood he had to take matters into his own hands if he wanted to survive. He held his panicking girlfriend and told her to remain in the safe room and gave her a walkie talkie so that she could communicate with him.

809.    With only his standard-issue firearm and under precarious cover of his bathroom window, Elia desperately tried to fend off the infiltrating terrorists as they ravaged through the kibbutz, attempting to break into his and his neighbor's homes. He engaged in two intense firefights, narrowly surviving them both.

810.    Trembling after two near-death experiences, Elia had no choice but to press on. Quickly, Elia gathered four members of the rapid response team. Together, they pushed their horror aside to protect their community.

811.    Suddenly, Elia spotted approximately 20 Hamas terrorists attempting to infiltrate the kibbutz fence. He and his team dove for cover beneath some bushes and started firing at the incoming terrorists to stop the invasion.

812.    Elia realized that the bushes left them too exposed. He sprinted towards a large concrete enclosure for cover, but the terrorists spotted him.

813.    The terrorists threw three grenades directly at Elia. As he closed his eyes and braced for his death, the grenade exploded just far enough away.

814.    Moments later, Elia watched in horror as Hamas terrorists gunned down his friend in plain sight. Choking back tears, he desperately tried to refocus on his remaining three teammates.

815.    The battle between Elia and his three remaining team members against swathes of incoming Hamas terrorists raged on until approximately 1:30 p.m., when six IDF soldiers arrived and took over their positions. By approximately 2:00 p.m., the IDF had arrived in full force, and by 6:00 p.m., the kibbutz had been secured. For the first time in over 12 hours, Elia could breathe.

816.    In the following days, Elia and the remaining Kibbutz Sufa residents were evacuated to Eilat and then moved into temporary housing in Ofakim shortly after. Elia desperately wants to move back home – but to this day, he has not been able to.

817.    Since the attack, Elia is not the same. He still has not fully regained his hearing following the grenade explosion. He now barely leaves his home and has lost the drive and ambition that were once central to his personality.

818.    As a direct and foreseeable result of the October 7 Attack, the Lilintal Family (Plaintiffs Moshe Yehuda Lilintal, Esther Pearl Lilintal, Elia Natan Lilintal, Yaakov Lilintal, Chana Lilintal, T.L., N.R.L., S.L., E.S.L., Yeshayahu Lilintal, Tamar Lilintal, Y.M.L., T.L., S.L., Daniel

Lilintal, Gal Lilintal, J.M.L., A.L., Chaim Tuvia Lilintal, Talya Lilintal, M.L., Chana Lilintal Huri, and Evyatar Saadya Shalom Huri) suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

819.    Plaintiff Rachel Gur brings this action individually. She is a citizen of the United States and a resident of Israel. She is the daughter of Moshe Yehuda Lilintal and Esther Pearl Lilintal.

820.    Plaintiff Yoseph Lilintal brings this action individually. He is a citizen of the United States and a resident of Israel. He is the son of Moshe Yehuda Lilintal and Esther Pearl Lilintal.

821.    Plaintiffs Rachel Gur and Yoseph Lilintal each suffered severe mental anguish, extreme emotional distress, loss of solatium, loss of services, and economic loss as a direct and foreseeable result of the October 7 Attack on their family members.

**The Lahav Family**

822.    Plaintiff Lotus Lahav is a citizen of the United States and a resident of Israel.

823.    Plaintiff Irit Lahav is the mother of Plaintiff Lotus Lahav, a citizen of Israel, and a resident of Israel.

824.    On the morning of October 7, 2023, at approximately 6:35 a.m., Plaintiffs Lotus Lahav and Irit Lahav were fast asleep in their home in Kibbutz Nir Oz when they were jolted awake by the sound of incoming rockets and sirens.

825.    Irit rushed to the family's safe room and frantically yelled for Lotus to join her. Lotus quickly grabbed the family dog and Irit's cell phone and ran to join her mother. Immediately after they closed the door to their safe room, they heard gunshots outside their window.

826.    Panicked by this development, Lotus and Irit immediately locked the safe room windows and turned off all the lights—but there was no lock to secure the safe-room door.

827.    Forced to find a solution with their lives on the line, Irit frantically messaged her brother and sister for help. Her brother responded with a picture of his safe-room door secured with two broomsticks, but Lotus and Irit had no broomsticks.

828.    Hysteria began to creep into the mother and daughter.

829.    Irit located a vacuum cleaner hose, a boat oar, and a leather strap. Using ingenuity, she knotted the leather strap and strategically placed the oar and vacuum hose by the door to create a makeshift lock that she prayed would keep her and her daughter alive.

830.    As they hid, Lotus and Irit heard gunshots, grenades, and RPGs, and learned that those sounds were coming from Hamas militants who had infiltrated Kibbutz Nir Oz.

831.    At approximately 9:30 a.m., they heard male voices shouting in Arabic and a barrage of gunfire towards the house. Moments later, terrorists burst through the back door of their home.

832.    Lotus and Irit sat in horrified silence as they listened to the sounds of the terrorists destroying their home, hearts pounding as the gunshots and crashing grew closer. Within minutes, the terrorists discovered the safe room.

833.    The terrorists started shouting and beating on the door, pushing Irit's makeshift lock to the brink.

834.    Believing they were going to die, Lotus and Irit held each other close, said their goodbyes, and braced for their deaths.

835.    Remarkably, Irit's lock withstood nearly ten minutes of terrorists clawing at the door. Finally, the terrorists gave up and moved on to a neighboring home.

836.    Approximately forty-five minutes later, the terrorists returned. Lotus and Irit held their breath in their safe room, their lives flashing before their eyes as terrorists burst back into the

house, shouting and shooting indiscriminately. The terrorists made their way back to the safe-room door, attempting to pry it open, but they were unsuccessful once again.

837.    The terrorists attempted to breach the safe-room door on five separate occasions that day, causing what felt like a never-ending cycle of terror for Lotus and Irit. With each pound on the door, the women prepared for their imminent deaths.

838.    For nearly 12 hours, Lotus and Irit hid in the safe room in complete silence and utter darkness as the sounds of terrorists decimating their community echoed around them.

839.    At approximately 6 p.m., they heard a Hebrew-speaking man identify himself as an IDF soldier. As they cautiously emerged from the safe room, they found their home completely destroyed.

840.    The IDF soldier promptly escorted them to a safer location on the kibbutz along with other survivors. The brief sense of relief they felt from their rescue was quickly replaced by agonizing grief. As they walked through the ashes of their close-knit kibbutz community, the ruthless devastation by the brutal Hamas attack was overwhelming.  It was clear that their kibbutz would never be the same.

841.    On October 8, 2023, after a sleepless night in the community kindergarten that was being used as shelter, Lotus and Irit were finally allowed to return home. IDF soldiers escorted them through the ruins of their beloved community, guarding them closely as they cautiously navigated around unexploded grenades.

842.    When they arrived, Lotus barely recognized her home. Everything was in disarray: all the windows were shattered, and their belongings were ransacked and stolen. The terrorists had even raided Irit's jewelry collection – stealing over 30 years' worth of carefully curated pieces, among scores of other valuables.

126

843.    Lotus and Irit only had five minutes to gather their belongings and leave their lifelong home. Lotus froze—she could barely bring herself to touch anything, knowing that her possessions had been touched by the same hands that murdered her friends and neighbors.

844.    With their allotted five minutes quickly ending, Lotus dug through the debris searching for her phone, wallet, and ID, only to realize that all three had been stolen by the terrorists. When she left, she took only one pair of pants, one T-shirt, and her toothbrush.

845.    The horrors of that day continue to traumatize Plaintiffs Lotus and Irit Lahav. Lotus has difficulty functioning in her daily life due to her mental suffering. Her life will never be the same. Irit has suffered from extreme insomnia, anxiety, crying spells, hyperawareness, anger, and a constant general sense of unease—all of which rendered her unable to return to work until January 1, 2024. The terrorists not only destroyed her home but shattered her sense of peace and security.

846.    Plaintiff Ivonei Da Silva Daniel brings this action individually.  He is a citizen and resident of Brazil.  He is the father of Lotus Lahav.

847.    As a direct and foreseeable result of the October 7 Attack, Plaintiffs Lotus and Irit Lahav have suffered severe mental anguish, extreme emotional distress, loss of consortium, loss of services, and economic damages.

848.    Plaintiff Ivonei Da Silva Daniel has experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack on his daughter.

**The Abrams Family**

849.    Plaintiff Efraim Abrams is a citizen of the United States and a resident of Israel.

850.    Efraim Abrams was an active-duty commander and combat engineer in the IDF. His brigade was one of the first military forces to enter Gaza.

851.    On October 7, 2023, Efraim was at his apartment in Jerusalem, preparing for the Jewish holiday of Simchat Torah. At approximately 8:00 a.m., he received a call from his commanding officer. His heart dropped immediately; his commander never called him on a Saturday. Efraim knew something must be terribly wrong.

852.    The commanding officer explained that terrorists had infiltrated the Gaza border and were firing rockets into Israeli territory. Efraim's heart sank deeper. Within moments of hanging up the call, rockets flew over his home miles away in Jerusalem, which was a rare occurrence in central Israel. At that moment, Efraim understood that his life would never be the same.

853.    Efraim's first task was to get a bus to pick up all the soldiers in his battalion that lived in his district. Driving on Shabbat, which is forbidden according to Jewish tradition that he upholds, was unusual, so it was unnerving for him.

854.    At approximately 10:00 a.m., Efraim received a series of phone calls directing him to report to his base in the Golan Heights, where he would gather his team's equipment before entering Gaza. He quieted his nerves and snapped into commander mode. Within 48 hours, Efraim and his battalion had packed all their materials and set out for the Gaza border.

855.    While on the bus ride south, Efraim looked around at his fellow soldiers, all of whom were in their late teens and early 20s. His stomach churned knowing that some of them would not make it out alive. He was right – to date, Efraim has lost over 40 friends from the ensuing conflict. The memories of his friends' final moments of calm continue to haunt him.

856.    When Efraim arrived at the Gaza border, he was immediately struck by a deeply pungent, rotten smell. He learned that it was the smell of the decaying bodies of the victims from the kibbutzim. That nauseating smell has lingered in his senses and tormented him ever since.

857.    Efraim began conducting missions in Gaza two weeks later, and as a commander, he was responsible for several extremely dangerous missions. Every day, he fought for his life, uncertain whether his next breath would be his last.

858.    On March 6, 2024, after nearly six grueling months of fighting, one of the battalion's armored excavators—a machine used to locate Hamas tunnels—broke down. Efraim knew that if they abandoned the armored excavator, the Hamas terrorists would hijack it, destroy it, and use it for parts to enhance their efforts against Israeli troops. He could not bear that possibility, so Efraim and his team had no choice but to haul the vehicle out of Gaza themselves.

859.    Towing the excavator without proper equipment caused significant injury to Efraim's body. As they maneuvered through Hamas-controlled territory, the excavator continuously crashed into his body at full speed for nearly three miles.  Efraim pushed through the excruciating pain to get his team out of Gaza.

860.    They finally arrived back on base the following day.  Efraim's back and neurological system were badly injured.  Several doctors and specialists on base were able to treat him a few days later, but the damage was far too severe to return to combat.  Efraim spent the next month in excruciating pain, attending intensive physical therapy sessions that failed to provide any relief.

861.    Efraim's physical injuries extend beyond his spine and include his brain. After further medical inspection, a neurologist diagnosed him with a traumatic brain injury from whiplash and from being in such close proximity to numerous explosions. As a result, Efraim experiences ongoing memory issues, cognitive processing problems, and struggles with slurring words or even forgetting entire sentences. Efraim was also diagnosed with herniated and torn discs, as well as tissue damage in his neck and upper back.

862.    An ear specialist assessed that the proximity to explosions and gunfire for such an extended period caused permanent hearing sensitivity and ear pressure pain for Efraim, compounding his physical torment.

863.    The list of Efraim's diagnoses continues to grow as he continues to see specialists today for ongoing injuries stemming from his service in Gaza.

864.    In addition to his numerous severe physical injuries, Efraim continues to endure extreme mental and emotional suffering because of the October 7 Attack and its aftermath, and he no longer feels like himself.

865.    Efraim's constant physical agony has rendered him unable to work, and psychologically, he continues to struggle with the emotional aftermath of the attack. Between his physical and psychological injuries, he spends five days a week in rehabilitation. He feels as if his life ended on October 7, 2023.

866.    Plaintiff David Abrams brings this action individually. He is a citizen of the United States and a resident of the State of New York. He is the father of Efraim Abrams.

867.    Plaintiff Arlene Abrams brings this action individually. She is a citizen of the United States and a resident of the State of New York. She is the mother of Efraim Abrams.

868.    Plaintiff Rachel Levy brings this action individually. She is a citizen of the United States and a resident of the State of New Jersey. She is the sister of Efraim Abrams.

869.    As a direct and foreseeable result of the October 7 attack, Plaintiff Efraim Abrams suffered conscious pain, extreme mental anguish, extreme emotional distress, loss of consortium, loss of services, and economic loss.

870.    Plaintiffs David Abrams, Arlene Abrams, and Rachel Levy have experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October

7 Attack and the subsequent injuries inflicted upon their family member Efraim Abrams.

**The Dan Family**

871.    Carmela Dan was a citizen of the United States and a resident of Israel when she was murdered by Hamas. She was murdered ten days before she turned 80 years old.

872.    Believing that Carmela had been taken hostage, her family celebrated her birthday and called for her release, together with the release of four other members of her family, including three minors, her grandchildren.

873.    On the morning of October 7, 2023, at approximately 6:30 a.m., Carmela and her minor granddaughter, N.D., were awakened by the blaring sound of rocket sirens in Kibbutz Nir Oz. Carmela's 12-year-old granddaughter, N.D., who had insisted on spending the night with her grandmother, had been diagnosed with autism. The two shared a very special bond and a close relationship, with N.D. often visiting her grandmother and staying overnight.

874.    The previous evening, the entire family was celebrating Simchat Torah at Galit Dan's new home in Kissufim. Galit had left Nir Oz only a month or two earlier. Galit is the younger of Carmela's daughters. After the holiday dinner, N.D. insisted on sleeping over at Carmela's house, and Hadas Kalderson, Carmela's eldest daughter, drove Carmela and N.D. to Carmela's home in Nir Oz.

875.    Hadas's two minor children were spending the holiday with their father, Ofer Kalderon, in Nir Oz. Her son Rotem was staying in his own apartment at Nir Oz, and her eldest daughter, Gaia, was staying in Tel Aviv.

876.    They all went to sleep in their respective homes.

877.    In the early morning of October 7, Galit Dan was at home in Kibbutz Kissufim with her youngest daughter and her partner when the sirens began wailing. They immediately ran to their safe room.

878.    At 6:30 a.m., sirens also went off in Nir Oz. Carmela and N.D. began hearing a barrage of gunfire from outside the house. Horrified and frightened, Carmela texted Galit that terrorists had entered her home and were ravaging and looting it.

879.    N.D. wrote her mother and told her she heard a loud "boom" and that she was terrified. There is an audio recording N.D. sent her mother Galit, who was horrified to hear what was happening.

880.    Until noon, Carmela Dan was alive and communicated by WhatsApp messages with her children.

881.    The terrorists were in Carmela's house for many hours. They entered several times, only looting at first. Carmela wrote on WhatsApp that she could hear her house being raided; she also heard large explosions.

882.    At that time, the electricity was cut off in Kibbutz Kissufim, and there was sparse cellphone reception. Galit spent 22 hours in her safe room in Kibbutz Kissufim before being rescued by security forces.

883.    When the IDF arrived at Kibbutz Nir Oz, Carmela and N.D. were reported missing.

884.    Initially, Carmela and N.D. were believed to have been taken hostage into Gaza. Galit clung to the hope that they were both still alive. On October 16, 2023, she appeared on TV to plead for their release and, looking straight to the camera, sent them a heart-breaking message, promising them "Ima [mother], [N.D], I love you, we are fighting for you, please be well."

885. On October 18, 2023, while Galit was evacuated to a hotel near the Dead Sea, Israeli officers arrived to inform her of the devastating news - the bodies of Carmela and N.D. had been identified. They were found dead in Carmela's safe room, embraced. They were inseparable in death, as in life.

886. Hadas Kalderon is Carmela's eldest daughter. She was home alone in Kibbutz Nir Oz at the time of the October 7 Attack and spent eight hours trapped in her safe room without any food or water. She held the handle of her safe room shut, severely bruising her wrist. Hadas was alone, with only a handle between her and murderous terrorists who penetrated her home several times, attempting to forcefully open the door, without success.

887. Hadas's two minor children, S.K. and E.K, spent the night between October 6 and 7 at their father's house. Ofer and Hadas Kalderon had been living separately in Nir Oz for two years before the October 7 Attack.

888. Hadas and Ofer were in contact during the attack. Ofer told Hadas they left the safe room because they had no choice, and that they were hiding in the bushes. Hadas urged Ofer to go back to the safe room with the kids. Infamously, there is a video made by the terrorists themselves, with one of them impersonating a freelance journalist and E.K is seen being taken away by the attackers. In the video, the terrorists grab the arms of the helpless 12-year-old.

889. Hours later, after being rescued by Israeli security forces, did Hadas and Rotem realize, to their horror, that Ofer, S.K., and E.K. had been taken hostage by Hamas. The video of E.K. had been posted on social media mere hours after the attack.

890. Hadas immediately began waging a public fight to secure the release of her two children and their father from Hamas captivity. S.K. and E.K. were released in the first hostage

release on November 27, 2023. Their father, Ofer, remained in Hamas captivity for 484 days and was finally released on February 1, 2025.

891.    Dor Dan is Carmela's youngest child. At the time of the attack, Dor was at his home in Harish with his family.

892.    For 11 long days, he did not know if his mother was dead or alive, captive in Gaza with his niece, or dead somewhere in the kibbutz. On October 18, 2023, Dor was informed that they had both been murdered. The circumstances of how exactly they died or where they were found was only revealed months later as Galit tracked and found the officer who rescued their bodies from the debris of Carmela's house.

893.    Galit, an educator, is teaching again. She moved to a new house near Karmei Gat. Her youngest daughter's new school dedicated a library to N.D., who was an avid Harry Potter fan. The family continues to struggle with the loss of her child, an older sister to T.D.

894.    Hadas spent 50 days fighting for her children's release, and hundreds more for their father's release. She was first evacuated from Nir Oz to Eilat and then relocated to Tel Aviv until her children were released. She even missed the funeral for her own mother and beloved niece as she exhausted her efforts to get her daughter, her son, and their father freed.

895.    Rotem, who survived cancer several years before the attack, was with Hadas often in Tel Aviv. After E.K. and S.K. were finally released, Hadas moved back to Eilat in an attempt to rehabilitate in a new location. With Ofer still in captivity, they could not, and Hadas moved again with her children and the Nir Oz community to Karmei Gat. She continued to fight for Ofer's release until he was finally able to embrace their four children.

896.    Plaintiff Hadas Kalderon brings this action individually and as an heir-at-law for the Estate of Carmela Dan. She is a citizen and resident of Israel. She is a surviving daughter of Carmela Dan.

897.    Plaintiff Galit Dan brings this action individually and as an heir-at-law for the Estate of Carmela Dan. She is a citizen and resident of Israel. She is a surviving daughter of Carmela Dan.

898.    Plaintiff Dor Dan brings this action individually and as an heir-at-law for the Estate of Carmela Dan. He is a citizen and resident of Israel. He is the surviving son of Carmela Dan.

899.    As a direct and foreseeable result of the October 7 Attack, the Estate of Carmela Dan, a U.S. citizen, experienced conscious pain, suffering, and economic loss.

900.    As a direct and foreseeable result of the October 7 Attack and the death of their mother Carmela Dan, Plaintiffs Hadas Kalderon, Galit Dan, and Dor Dan have each experienced severe mental anguish and extreme emotional distress, and economic loss.

## DEFENDANTS

901.    Defendant UNRWA is affiliated with, but distinct from, the UN.  A UN General Assembly resolution first established it in December 1949 as a temporary "programme," but the General Assembly has periodically renewed its mandate since then.  It has an office in Manhattan on East 44th Street, and full-time New York-based staff working in that office.  It works with Palestinian populations in both Gaza and several areas outside Gaza, including Jordan, Lebanon, Syria, and the West Bank, and no claim is made against it herein regarding any of its activities in those other areas except insofar as they relate causally to its actions in Gaza.

902.    Defendant Phillipe Lazzarini is believed to be a citizen of Switzerland.  He has served as Commissioner-General of UNRWA (the agency's most senior position) since March 2020.  As Commissioner-General, he (and his predecessors) had final overall responsibility for setting policy, overseeing operations, and fundraising.

903.    Defendant Pierre Krähenbühl is also believed to be a citizen of Switzerland.  He served as Commissioner-General of UNRWA from 2014 until he resigned in November 2019 amid controversy over alleged mismanagement, corruption, and abuse of authority.

904.    Defendant Filippo Grandi is believed to be a citizen of Italy.  He served as Commissioner-General of UNRWA from 2010 to 2014.

905.    Defendant Leni Stenseth is believed to be a citizen of Norway.  She served as Deputy Commissioner-General of UNRWA from June 2020 until in or about June 2023.  In that role, she (like her predecessors) was the agency's second-most-senior leader[2] and worked directly with the Commissioner-General in providing strategic direction and operational leadership for the agency, sharing overall responsibility for setting policy, overseeing operations, and fundraising.

---

[2] Following Ms. Stenseth's tenure, the Deputy Commissioner-General role was in late 2023 divided between two separate individuals.

906.    Defendant Sandra Mitchell is believed to be a citizen of the United States.  She served as Deputy Commissioner-General of UNRWA from late 2014 (after previously working at other roles at UNRWA) until her resignation in July 2019 amid the same controversy that subsequently led to Mr. Krähenbühl's resignation.

907.    Defendant Margot Ellis is believed to be a citizen of the United States.  She served as Deputy Commissioner-General of UNRWA from 2010 until 2014.

908.    Defendant Greta Gunnarsdottir is believed to be a citizen of Iceland.  She presently serves as Director of UNRWA's "Representative Office" in New York and has held that position since early 2020.  In that capacity, she is part of the agency's senior leadership team; she also oversees and directs all of UNRWA's New York-based staff, whose relevant actions are detailed below.

909.    During their respective time in UNRWA's senior management, each of the Individual Defendants directed, ratified, and/or otherwise facilitated the wrongful policies and actions of UNRWA complained of herein.

910.    Claims are asserted against certain Individual Defendants who are no longer affiliated with UNRWA for their acts or omissions during their tenure with UNRWA, but not for any act or omission following their departure from UNRWA's employment.  Plaintiffs reserve the right to name additional individuals as defendants as their investigation continues.

## BACKGROUND ON GAZA, HAMAS AND UNRWA

911.    In order to provide the relevant background context and understand the significance of the assistance Defendants provided to Hamas following its 2007 violent seizure of de facto power in Gaza, below is a brief description of the relevant pre-2007 histories of Gaza, Hamas, and UNRWA.

**Background on Gaza and Takeover by Hamas**

912.    The current border between Israel and Gaza was originally part of the so-called "Green Line," reflecting the 1949 armistice agreements that brought an end to the first Arab-Israeli War.  Gaza was outside the Israeli-controlled territory, and from 1949 until the Six-Day War in 1967, Gaza was controlled by the government of Egypt.  UNRWA began working in Gaza almost immediately after its formation and has continued working in Gaza since 1949.

913.    Egypt's defeat in the Six-Day War led to Israeli control and administration of all of Gaza from 1967 until 1994.  Following the Camp David agreements of 1978, Israel withdrew from Egyptian territory in the Sinai that it had controlled since 1967.  Still, Egypt did not at that time or thereafter seek to resume control or administration of Gaza.  UNRWA continued to work in Gaza throughout this period.

914.    Following the Oslo Accords of 1993, day-to-day control and administration of much, but not all, of Gaza was turned over by Israel to the Palestinian Authority, with Israel continuing on-the-ground control and administration of certain areas of Gaza until 2005.  UNRWA continued to work in Gaza throughout this period.

915.    In 2005, Israel withdrew its remaining ground forces and administrative personnel from Gaza, and all Israeli settlers in Gaza were compelled to withdraw by the Israeli government if they did not leave voluntarily.  A subsequent period of political instability led to a violent civil war in Gaza, which resulted in Hamas becoming the de facto rulers of Gaza by no later than June 2007, after killing, expelling, or otherwise neutralizing its political rivals from the Palestinian Authority and other Palestinian factions, most notably including Fatah, which remains politically dominant in the West Bank.  UNRWA has continued to work in Gaza since the Hamas takeover and thereafter began to aid and abet Hamas' terrorist actions, as set forth in greater detail below.

**Background Regarding Hamas**

916.    From its foundation in 1987 and through the present day, the explicit political goal of Hamas has been to eliminate the State of Israel and create a fundamentalist, radical, jihad-centered, Islamic theocracy that governs Gaza, the West Bank, and all of Israel.

917.    Various other Palestinian groups claim to support either a two-state solution or a "one-state solution" in which all that territory is controlled by a single multi-religious multi-ethnic society with equal civil rights for all. Hamas, by contrast, explicitly rejects that view, and instead claimed from its founding that "[t]here is no solution to the Palestinian problem except by Jihad," by which it means a genocidal war of ethnic cleansing against the entire current Jewish population of Israel.

918.    Hamas' founding charter asserts that, among many other incendiary claims:

- "Israel will exist and will continue to exist until Islam will obliterate it, just as it [Islam] obliterated others before it."

- "The day the enemies usurp part of Muslim land [meant to include all the current territory of Israel], Jihad becomes the individual duty of every Muslim. In the face of the Jews' usurpation, it is compulsory that the banner of Jihad be raised."

919.    Senior Hamas figures have further expounded this specific vision of Jihad (a concept which may mean different things to different Muslims) by public statements such as "Allah gathered the Jews in Palestine not for them to have a homeland, but with the intent that it will become their mass grave."

920.    Hamas' specific version and vision of Islam, not universally shared with other Muslims, is of a death-cult society, seeking not only the elimination of Israel, but universal conversion of all societies to its violent, Jihadi culture, where the death for the sake of Allah is its

highest value. Its slogan, as set forth in the charter, is: "Allah is its target, the Prophet is its model, the Koran its constitution: Jihad is its path and death for the sake of Allah is the loftiest of its wishes."

921.    Indeed, radical Islamic groups with the same ideology as Hamas have frequently been banned in other Arab and Muslim countries and have frequently engaged in terrorist acts in such countries, including the assassination of Arab and Muslim political figures perceived as insufficiently radical.

922.    Hamas has been consistently committed to terror and human rights violations in its actions, not merely in its rhetoric. For this reason, the United States Government designated Hamas as a Specially Designated Terrorist in 1995 under E.O. 12947, a Foreign Terrorist Organization in 1997 under 8 U.S.C. § 1189, and a Specially Designated Global Terrorist in 2001 under E.O. 13224. Hamas has remained designated to this day. These designations of Hamas were public events, well known to the entire international community, including Defendants. In addition, numerous Hamas leaders and fundraisers have been designated by the United States Government as Specially Designated Nationals whose assets have been frozen because of their activities for Hamas. Similar designations of Hamas have been made by, among others, the European Union, Canada, Australia, New Zealand, and the United Kingdom.

923.    In both word and deed, Hamas has consistently made it clear that it does not consider itself obligated to conform to the minimum norms imposed by the law of nations on all states and other armed groups, including the prohibitions against deliberate targeting of civilians, mass murder of civilians, mass rape, hostage-taking, torture, crimes against humanity, and genocide.

924.    After the Oslo Accords, as traditional Palestinian political groups with their own histories of violence began to contemplate negotiated solutions, Hamas, which had explicitly rejected and denounced the Oslo Accords, gained increased support from extremists unwilling to consider such alternatives.

925.    After 2007, Hamas exploited its de facto control of Gaza both to use it as a staging ground for cross-border terrorist attacks targeting Israeli civilians and to slowly but continuously build up an infrastructure of facilities and personnel that would enable larger-scale terror attacks to be launched in the future, predictably culminating in the October 7 Attack.

926.    Hamas also had a track record before the October 7 Attack of taking and holding Israeli civilians hostage in Gaza, including, for example, the kidnappings of Avera Mengistu (an immigrant from Ethiopia who was held hostage from 2014 until 2025) and of Hisham al-Sayed (a member of Israel's Bedouin Arab community who was held hostage from 2015 until 2025).

927.    Hamas permits designated Foreign Terrorist Organization Palestinian Islamic Jihad ("PIJ"), to operate from Gaza with some autonomy and coordinates with PIJ regarding terrorist attacks against Israeli civilians.  PIJ likewise benefits from the material support provided by UNRWA to Hamas.

928.    UNRWA and its senior leadership are not the only third parties who have helped Hamas build the terror infrastructure in Gaza that was predictably and foreseeably used to launch the October 7 Attack.  Hamas has received very substantial material support from the current regime governing Iran, a notorious state sponsor of terrorism.  Hamas has also coordinated its strategy and tactics with other Iranian-backed terror groups in the region, including but not limited to Hezbollah in Lebanon and the Houthi faction in Yemen, which both have a history of

perpetrating terrorist attacks against American and other Western civilian targets as well as Israeli civilian targets.

929.    The Defendants were able to, and did, provide substantial material assistance in Gaza to Hamas of a different nature and kind than outside backers like the Iranian government. They could operate openly on the ground in Gaza where others could not and could exploit their claimed "international civil servant" status to impede preemptive security measures aimed at protecting Israeli civilians from future terror attacks.  UNRWA's staff, facilities, and ability to truck into Gaza hundreds of millions of dollars per year in the form of U.S. dollars formed a potent pillar of Hamas' capacity to undertake the October 7 Attack.

930.    The Defendants were all aware of Hamas' continuing track record of genocidal terror attacks against civilians, both before and after its takeover of Gaza.  The following is a partial list of mass-murder attacks perpetrated by Hamas before it was in control of Gaza, all of which were extensively reported by the New York Times and/or other print media available in New York, and all major television media:

  a. August 31, 2004, 16 killed, 100 wounded, double suicide bombings on two buses;

  b. March 14, 2004, 10 killed, 16 wounded, double suicide bombings;

  c. September 9, 2003, 7 killed, 50 wounded, suicide bombing at Café Hillel;

  d. August 19, 2003, 22 killed, 135 wounded, suicide bombing on a bus;

  e. August 4, 2002, 9 killed, 38 wounded, suicide bombing on a bus;

  f. June 18, 2002, 19 killed, 74 wounded, suicide bombing on a bus;

  g. May 19, 2002, 3 killed, 59 wounded, suicide bombing in an outdoor market;

h.  May 7, 2002, 16 killed, 55 wounded, at a pool hall;

i.  April 10, 2002, 8 killed, 22 wounded, suicide bombing at Kibbutz Yagur;

j.  March 31, 2002, 14 killed, 40 wounded, suicide bombing at a restaurant;

k.  March 27, 2002, 22 killed, 140 wounded, hotel Passover seder suicide bombing;

l.  March 9, 2002, 11 killed, 54 wounded, suicide bombing at a café;

m.  December 2, 2001, 15 killed, 46 wounded, suicide bombing on a bus;

n.  September 9, 2001, 3 killed, 90 wounded, suicide bombing at a train station;

o.  August 9, 2001, 15 killed, more than 130 wounded, suicide bombing at a pizzeria;

p.  June 1, 2001, 21 killed, 120 wounded, all teenagers, suicide bombing of a discotheque;

q.  May 18, 2001, 5 killed, more than 100 wounded, suicide bombing at a shopping mall;

r.  April 22, 2001, 1 killed, 60 wounded, suicide bombing at a bus stop;

s.  March 27, 2001, 28 wounded, suicide bomber;

t.  March 4, 2001, 3 killed, more than 65 wounded, suicide bombing;

u.  February 14, 2001; 8 killed, 21 wounded, bus driver plowed into a crowd;

v.  January 1, 2001, more than 50 wounded, a car bomb;

w.  October 29, 1998, 1 killed, 8 wounded, suicide bomber attacks a school bus;

143

x.  October 19, 1998, 59 wounded, grenades thrown in a central bus station;

y.  August 20, 1998, 14 wounded, bomb detonated in garbage dumpster;

z.  September 4, 1997, 4 killed, 181 wounded, 3 suicide bombers at a shopping mall;

aa. July 30, 1997, 3 killed, 178 wounded, 2 suicide bombers at an outdoor market;

bb. March 21, 1997, 3 killed, 48 wounded, bomb detonated at a restaurant;

cc. March 3, 1996, 19 killed, 6 wounded, suicide bombing on a bus;

dd. February 25, 1996, 26 killed, 80 wounded, 2 suicide bombs on buses;

ee. July 24, 1995, 6 killed, 31 wounded, suicide bombing on a bus;

ff.  April 9, 1995, 8 killed, 50 wounded, 2 suicide bombers;

gg. December 25, 1994, 13 wounded, suicide bombing at a bus stop;

hh. October 19, 1994, 22 killed, 56 wounded, suicide bombing on a bus;

ii.  October 9, 1994, 2 killed, 14 wounded, suicide bombing on a bus;

jj.  April 13, 1994, 5 killed, suicide bombing;

kk. April 6, 1994, 8 killed, car bomb detonated next to a public bus.

931.    It is a matter of common knowledge that numerous U.S. citizens reside in Israel and/or may be visiting Israel at any given moment.    It was thus predictable and almost statistically inevitable that the victims of any sufficiently large Hamas attack on civilians in Israel would include U.S. citizens.    Most U.S. citizens who reside in Israel, as well as many who visit, are

Jewish, and are thus intentional rather than incidental targets of Hamas' campaign of terror and genocide.

932.    After Hamas' takeover of Gaza, Hamas shifted its emphasis to cross-border mortar and rocket attacks, since it now had control of territory from which to launch such attacks. Hundreds and sometimes thousands of rockets were fired into Israel per year, with no attempt to focus on military targets.  Due to Israel's "Iron Dome" anti-missile defenses, and poor targeting technology used by Hamas, most of these rockets were either intercepted or crashed harmlessly in empty fields.  However, a significant minority of these rockets killed or wounded civilians throughout the decade-plus before the October 7 Attack.  While many of these attacks attracted less worldwide media coverage, Defendants were necessarily aware of them because of their own professional need to keep abreast of developments in Gaza, and because these attacks often led to retaliatory or preemptive military actions by Israel that UNRWA needed to consider.  These attacks include:

a.    November 12, 2018: a mortar attack on a bus, critically wounding a 19-year old;

b.    August 8, 2018: a rocket attack on Sderot injuring two;

c.    July 14, 2018: a rocket attack of Sderot injuring three;

d.    May 29, 2018: a mortar attack wounding five;

e.    August 26, 2014: a rocket attack killing two in Eshkol, together with multiple injuries in Eshkol and Ashdod from other rockets fired the previous day;

f.     August 22, 2014: a mortar attack that killed a four-year-old in Sha'ar Hanegev; and

g.    July 28, 2014: a mortar attack that killed four in Eshkol.

933.    Finally, attacks against Israeli civilians mounted by Hamas from Gaza in recent years before the October 7 Attack include:

a.    Barrages of hundreds of rockets launched from Gaza on May 4 and 5, 2019, killing three civilians in Ashkelon;

b.    Barrages adding up to over 4,000 rockets launched from Gaza on May 10-20, 2021, killing ten civilians in multiple locations;

c.    Barrages adding up to approximately 1,500 rockets launched from Gaza on May 10-13, 2023, killing two civilians in Israel, one of whom was a Palestinian laborer from Gaza who was working in Israel.

934.    The common thread in all these Hamas terror attacks, over a period of three decades, is the deliberate targeting of civilians for death.

935.    Hamas was consistently clear in the years prior to the October 7 Attack of its intention to further escalate the scale and scope of these terror attacks, saying for example:

• May 2019: a future confrontation will be much more damaging to Israel than what had occurred in 2014.

• June 2021: the next battle against Israel will change the face of the Middle East.

• September 2021: "the battle for the liberation and the return to Palestine has become closer now than ever before."

• December 2021: operations like that which murdered civilian Yehuda Dimentmen was "the means of liberation for our people" and would deter others "occupying" territory claimed by Palestinians.

• August 2023: "Israel would be under an unprecedented destruction in its entire history … an all-out war is inevitable."

146

- September 2023: that there was a "need to unify efforts [with other radical factions] and escalate operations against Israel."

**Background regarding UNRWA**

936. As of the October 7 Attack, UNRWA provided education, health care (including mental health care), relief and social services, emergency assistance, and microcredit to approximately 5 million Palestinians located in Gaza, the West Bank, Jordan, Lebanon, and Syria. It employed a staff of over 30,000 people; in contrast the Office of the United Nations High Commissioner for Refugees (UNHCR) has fewer than 20,000 employees to serve a much larger population of almost 30 million refugees around the world.

937. In Gaza alone, UNRWA operated 183 schools, staffed by over 9,400 employees and serving almost 287,000 students. It provided primary and secondary education to over half of the students in Gaza.

938. Numerous UNRWA facilities (educational, medical, administrative, etc.) in Gaza were converted to active terrorist/military bases, a cynical violation of international humanitarian law, by storing weapons and building underground tunnels and attack shafts. According to numerous press reports, the IDF uncovered assault rifles, ammunition, grenades and missiles, hidden in, and underneath, UNRWA institutions on many occasions prior to the October 7 Attack.

939. UNRWA systematically and deliberately aided and abetted Hamas and its goals, by providing material support to Hamas as follows:

a. Converting UNRWA schools, medical clinics, warehouses and offices into military storage and deployment bases, including the storage and guarding over weapons, ammunition, explosives, and other military supplies, to be used by terrorists as prepositioning for immediate firing;

147

b. Facilitating the construction of underground bunkers, attack tunnels, prison cells to hold hostages, and command and control centers, for Hamas and PIJ;

c. Facilitating and concealing the placement of batteries of rocket launching platforms and rockets on and/or adjacent to UNRWA schools and medical facilities, in violation of international humanitarian laws, and, despite knowing of Hamas' use of UNRWA premises, consistently taking the position with Israel that UNRWA premises were inviolate, thus making them safe havens for terrorists and their material in advance of the October 7 Attack.

d. Knowingly employing or paying "phantom" salaries to Hamas terrorists, including senior Hamas members and Hamas commanders, as part of its staff.

e. Infusing Hamas with over one billion dollars in cash, and subsidizing Hamas with hundreds of millions of dollars in currency conversion fees. United States currency in the form of cash was needed for Hamas to obtain on the illegal arms black market the vast amounts of weapons, explosives, and ammunition required to launch the October 7 Attack and other terrorist attacks.

f. Instructing and preparing children to die as martyrs for the cause of eliminating the Jewish people, by using Hamas-approved textbooks and curriculum for instruction at all UNRWA schools located in Gaza, without any modifications to remove incitement of genocide and antisemitism, and by employing teachers who are members of Hamas and allowing Hamas recruitment activities at UNRWA schools.

940.    Each of the Individual Defendants, during their respective employment with UNRWA, directed and approved of these acts and omissions by UNRWA, while aware of Hamas'

intention to use its terror infrastructure to commit genocide, terrorism, and other crimes against humanity against Israeli and American civilians.

**UNRWA'S SUBSTANTIAL ASSISTANCE TO HAMAS**

**A. UNRWA facilitated construction of Hamas command and control centers, attack tunnels, underground bunkers, weapons manufacturing facilities, and prison cells under UNRWA headquarters, UNRWA schools, medical clinics, and offices.**

941.    UNRWA Headquarters in Gaza City provided power and cover to a Hamas strategic command war room and strategic tunnel located directly underneath the building. This Hamas complex with rows of computer servers functioned as an important communications center and was the central intelligence hub from which Hamas directed the October 7 Attack and thousands of rocket attacks.

942.    Before, during, and after the October 7 Attack, UNRWA's server room sat directly above the underground Hamas central intelligence war room and supplied Hamas terrorist infrastructure with power through electric cables running down to and into the floor. The underground network also passed beneath a nearby UNRWA school. The tunnel was located at a depth of 18 meters, had a length of 700 meters, and contained several side doors. In offices within UNRWA headquarters itself, the personal effects of senior Hamas military commanders and many weapons were found, including guns, ammunition, grenades, and explosives. In the offices of UNRWA officials, intelligence tools and documents were found that confirmed Hamas terrorists also used the very same offices.

943.    UNRWA previously admitted the discovery of underground tunnels in its facilities in, among other contexts, statements issued in December 2022, June 2021, October 2017, and June

2017, in each case after the investigation described below about Hamas' use of UNRWA facilities in the 2014-15 timeframe became public.

944.    On June 9, 2017, UNRWA Spokesperson Christopher Gunness reported the exposure of a tunnel running under two of its schools in the al-Maghazi refugee camp in the central Gaza Strip, namely the Maghazi Elementary Boys A&B School and the Maghazi Preparatory Boys School.

945.    On October 15, 2017, UNRWA admitted the existence of a tunnel underneath the UNRWA boys' middle school in Beit Hanoun in the northern Gaza Strip.

946.    On June 10, 2021, UNRWA admitted the existence of another Hamas tunnel under UNRWA's Zaitoun Preparatory Boys' School in Gaza City's Rimal neighborhood, after a rocket struck the courtyard.

947.    In 2022, the IDF also revealed an underground tunnel of Hamas in the Tufah neighborhood in Gaza city, in the close vicinity of UNRWA's "Daraj" elementary school.

948.    On December 1, 2022, UNRWA admitted the presence of a tunnel underneath another one of its schools in Gaza.

949.    In general, UNRWA claimed to be surprised whenever, repeatedly, such use of its facilities by Hamas was discovered by third parties but never took meaningful steps to prevent the next incident it could then pretend to be surprised by.

950.    On November 8, 2023, the IDF located and destroyed over 100 Hamas military fighting tunnels adjacent to UNRWA schools in northern Gaza.

951.    According to Israeli authorities, over thirty additional UNRWA facilities in Gaza, including UNRWA's headquarters complex, have recently been found to contain terror infrastructures such as tunnel shafts and weapons.

952.    Matthias Schmale, UNRWA's former Gaza director, admitted in an interview with NPR in 2021 that many individuals informed him about the pervasive presence of tunnels in or under UNRWA schools and offices.  Indeed, Schmale was forced out of his UNRWA job for being unwilling to parrot Hamas' propaganda, and Defendant Stenseth, as UNRWA Deputy Commissioner General, subsequently apologized for Schmale's statements.

953.    The existence and the construction of the tunnels was public knowledge since at least 2014.  Reports about tunnels were published by Hamas media outlets, and Hamas officials openly boosted about the importance of the tunnels, particularly considering the deaths of many Hamas activists in collapses.  Hamas officials warned repeatedly that the movement is continuing to excavate tunnels, even during periods of calm, in preparation for the next conflict with Israel.

954.    Hamas publicly announced the exact function of these attack tunnels, for example on January 29, 2016, when Hamas leader Ismail Haniyeh stated, "Gaza has constructed twice as many tunnels as there were in Vietnam. The Al-Qassam Brigades have dug tunnels around Gaza in order to defend the people and liberate Al-Aqsa and the holy places… This weapon, the weapon of tunnels, played a prominent role in achieving our victory.  …  East of Gaza [under the border and into Israeli territory], there are heroes underground, digging through rock and constructing tunnels. West of Gaza, there are heroes who test-fire rockets every day – All these [activities] are preparations – underground in the tunnels, in the air by means of missiles, at sea, and everywhere. This constant preparation is for the sake of Palestine, for Jerusalem and Al-Aqsa, and for the Al-Quds Intifada".

### B. Defendants knew that UNRWA permitted constructing weapons storage and deployment centers in its headquarters, schools, medical clinics, offices, warehouses, and other facilities.

955.    In 2014, a United Nations Headquarters Board of Inquiry investigated multiple incidents where weapons had been placed within UNRWA schools and where UNRWA facilities were used as terrorist firing platforms for launching rocket and mortar attacks.  On April 27, 2015, the Secretary General of the United Nations reported on the results of that inquiry to the Security Council, including that:

    a.  On July 16, 2014, weaponry was discovered in the UNRWA Gaza Beach Elementary Co-educational "B" School. This school is in the heart of the Beach refugee camp, amid a densely populated area of Gaza City. Four other UNRWA schools and an UNRWA health center are located on the opposite side of the street. Two UNRWA school attendants were looking after the school prior to and on the day of the incident. Five guards hired as part of the UNRWA Job Creation Program were also assigned to the school. In addition, the school principal inspected all the classrooms on some days. On July 16, 2015, a 120 mm mortar tube, a mortar bipod, and twenty 120 mm mortar-round containers with ammunition were discovered under a blanket in a corner of a locked classroom. On the afternoon of July 17, UNRWA admitted in a press release that a cache of approximately 20 rockets had been found hidden in a school. A UN Board of Inquiry confirmed in April 2015 that "a Palestinian armed group" (a term used as euphemism for Hamas to conceal or obfuscate Hamas' widespread use of UNRWA facilities) had used the school premises to hide the weaponry.

b.  On July 22, 2014, weaponry was discovered in the UNRWA Jabalia Elementary "C" and Ayyobiya Boys School. The Board was informed that the area was known to be used by armed groups as a site for firing weapons and that it had been targeted by IDF in past conflicts. On July 22, 2014, UNRWA officials saw an object at the premises that seemed to be a weapon, covered with a piece of cloth, in an area under the cover of some trees behind the toilet block and near the boundary wall separating the school from the open area behind it. Though the UN Board of Inquiry was unable to confirm with certainty what type of weapon might have been hidden at the school, it concluded that it was highly likely that "a Palestinian armed group" [Hamas] used the premises to hide weapons. On the evening of July 22, UNRWA issued a press release stating that rockets had been found hidden in a vacant school in Gaza. The Government of Israel showed the Board a video, which the Board concluded was authentic, showing the launching of a projectile from within the school premises on July 14. The Israeli Government also provided a document to the Board that was said to identify the places close to the school from which rockets had been launched, together with the dates of those launches. The Board concluded that it was highly likely that "an unidentified Palestinian armed group" [Hamas] could have used the school premises to launch attacks on or around July 14.

c.  On July 29, 2014, weaponry was discovered in the UNRWA Nuseirat Preparatory Co-educational "B" School. This school is in a semi-rural area, northwest of the Nuseirat camp, south of Gaza city. On July 29, a 120 mm mortar tube, a 120 mm mortar bipod, and three 120 mm mortar containers were

found, covered by a blanket, behind a locked internal gate leading to a stairwell. In the evening, UNRWA issued a press release reporting that rockets had been found in an UNRWA school. On August 17, a 120 mm mortar tube, a 120 mm mortar bipod, and twenty 120 mm mortar containers were found in a small room under a stairwell. Water, lubricant oil bottles, and boards for beds were also found as well as a blackboard with Arabic writing, seemingly depicting military operations. At the rear of the school, a mortar base plate was found embedded in the sand. The items were photographed. The mortar cases, mortar tube, bipod, and base plate were removed from the school, and it was rendered safe. The UN Board of Inquiry found that the presence of weapons and other evidence found in the school indicated that the premises could have been used for an unknown period by members of "a Palestinian armed group" [Hamas] and that it was likely that such a group may have fired the mortar from within the premises of the school.

d. Hamas exploited, with UNRWA's knowledge and consent, the safe havens provided by UNRWA facilities for storing weapons and firing at Israeli population centers.

956.    The Board of Inquiry report made several recommendations for UNRWA management to employ. Defendants did not take any appropriate corrective action following this inquiry, thus revealing the systematic employment of UNRWA facilities to support Hamas. Each of the Defendants was on notice of this United Nations inquiry and they continued to pursue and fund the policies which allowed this activity to occur.

957.    Because UNRWA has consistently taken the position that its facilities are inviolate under international law, it has provided the terrorists using its facilities with a haven – a place to prepare and launch attacks on innocent civilians, including the October 7 Attack. Essentially, UNRWA protected the Hamas facilities and weapons from discovery and from being dismantled by the IDF.

### C.    Defendants knew that UNRWA permitted installation of rocket launching platforms and terrorist firing positions within and/or adjacent to UNRWA schools, medical clinics, and offices.

958.    In 2007, the Israeli Air Force delivered to UNRWA a video showing a three-man terrorist squad firing mortar shells from Gaza. The squad was situated near the central building in an UNRWA educational compound in Beit Hanoun in the northern Gaza Strip. The video shows the operatives setting up their firing position and firing mortar shells close to the building. After firing the mortar shells, they took cover inside the UNRWA building.  There were multiple similar incidents documented in 2014.

959.    On December 14, 2022, the IDF published proof of a Hamas rocket launch site adjacent to UNRWA's Mo'ath Bin Jabal School in the Shejaiya neighborhood of Gaza City.  Prior to May 2021, the school's principal, Mehammed Abu Oun, maintained contact with Jalal Abu Aoun, a commander in the Hamas rocket division, who operated this launching site.

### D.    UNRWA continues to provide material assistance to Hamas despite public concern and objections from within the UN system.

960.    The military/terrorist use of UNRWA facilities by Hamas and other terrorist organizations was widely exposed during the 2014 conflict between Hamas and the IDF.  The April 27, 2015, letter from the Secretary General of the United Nations to the President of the Security Council, stated, inter alia:

"In my capacity as the Chief Administrative Officer of the Organization, I decided to establish a United Nations Headquarters board of inquiry to review and investigate…incidents …in which the presence of weapons was reported at [UNRWA] premises. My aim in taking this step was to develop a clear record of the facts of those serious incidents and their causes and to determine the persons or entities to which they might be attributable. That would make it possible for me, *inter alia*, to identify any gaps that there might have been in the Organization's procedures and to take any measures and put in place any arrangements that might be needed, with a view to preventing a recurrence of such incidents in the future…"

961.    The Board made the following findings:

a.    That even though security of UNRWA premises is a matter of "paramount importance that needs to be addressed seriously," 897 of the 1034 guards providing security for all UNRWA facilities in Gaza were recruited from local workers, with no prior security training, and were given only "minimal training."

b.    "In relying upon the Job Creation Programme, UNRWA was entrusting one of the most dangerous and fundamental functions to low-paid individuals with no training in security and no expectation of continued employment. The Board considered that a task bearing such a high level of responsibility requires specialized and properly trained individuals."

c.    "The guards worked only afternoons and evenings and no guards were on duty in the mornings."

d. "UNRWA has no standard operating procedures articulating the duty of all staff members to report security incidents and the modalities for doing so. Witnesses informed the Board that there was no list of staff who should be informed of incidents, no lists of actions to be taken in the event of specific situations and no central mechanism for keeping a log of all events. As such, the transmission of information and the assignment of required actions were somewhat ad hoc, negatively affecting the ability of UNRWA to establish facts and account for actions taken and to be taken."

e. "The Board further found that UNRWA did not have a policy or standard operating procedures to address situations involving the unauthorized presence of weapons on UNRWA premises. After the disappearance of weapons from UNRWA Jabalia Elementary 'C' and Ayyobiya Boys School on July 22, 2014, United Nations Headquarters suggested a procedure to be followed. Those suggestions have yet to be 'operationalized' through the issuance of detailed standard operating procedures."

f. "The Board also noted that there was no reference document setting out security levels, standards for the identification and evaluation of security risks and mitigation measures that need to be in place for UNRWA premises, including its schools."

g. "The Board concluded that, during the conflict, UNRWA was operating in Gaza with an understaffed Safety and Security Division, which struggled to secure hundreds of premises with unskilled personnel. The Board considered that priority."

157

h. "The Board also considered that, as a matter of priority, UNRWA should reconsider its security approach in relation to its schools and other installations, both in the context of emergency situations and during normal operations, and revisit its school inspection systems, including during emergencies."

962.    UNRWA and the Individual Defendants responsible did not address any of the serious problems highlighted in this report or the take the necessary recommendations identified to solve them.

### E. UNRWA staff are and were members of Hamas and participated in the October 7 Attack.

963.    Well over 300 UNRWA staff personally participated in the October 7 Attack and/or subsequently imprisoned and/or tortured hostages taken back to Gaza after that attack. Some examples of UNRWA staff who participated in the Attack include:

a.    UNRWA school counselor Mousa Subhi Musa El Qidra was deputy to the Qassam Brigades' Khan Younis Brigade Commander Mohammad Sinwar (the brother of Hamas leader Yahya Sinwar). They operated from the Qadsia compound in Khan Younis, which served under El Qidra's supervision as the primary training facility for Hamas to train terrorists to carry out the October 7 Attack. The compound contained models simulating entrance gates to Israeli kibbutzim, military bases, and IDF armored vehicles. On October 7, Mousa and his son abducted a woman from Israel.

b.    Ala Abd al-Hamid Qassem Jouda, who worked for the agency as an Arabic Religion teacher at an elementary school, was also a company commander in the Qassam Brigades' Nuseirat Battalion. This battalion led the horrendous rampage in the Israeli border Kibbutz Be'eri, one tenth of whose residents were

killed, including Plaintiff Estate of Dror Kaplun. The chilling aftermath of the Be'eri attack exposed a scene of merciless brutality, with approximately 80% of the recovered bodies showing signs of torture, with many torture victims also having been systematically raped. Some bodies were found decapitated, or burnt to death with their hands bound together, and entire families were butchered. This orchestrated onslaught resulted in the ruthless murder of over 130 community members, with 28 kidnapped to Gaza, leaving behind a legacy of terror that devastated the kibbutz. Jouda was arrested in Israeli territory.

c.  UNRWA social worker Faisal Ali Mussalem al-Naami was a combatant in the same Qassam Brigades' Nuseirat Battalion that attacked Be'eri. He was filmed abducting the corpse of a 21-year-old Israeli civilian, Yonatan Samerano, who had fled to Be'eri from the NOVA music festival to seek safety. Al-Naami also coordinated the movements of pick-up trucks used by the raiders and of weapons supplies. Al-Naami was killed in an IDF airstrike on November 17, 2023.

d.  UNRWA elementary school teacher Ibrahim Atiya Mohammad Abu Ghafra (cell commander in the Qassam Brigades' Nuseirat Battalion) participated in an attack on Reim, a district where a kibbutz was attacked and the site of the NOVA music festival where more than 360 revelers were murdered.

e.  Three UNRWA employees, UNRWA school attendant Shadi Mohammad Jamal Razak Darabiah (operative in the Qassam Brigades' East Jabalia Battalion), UNRWA Arabic teacher Mohammad Tawfiq Ibrahim El Ghafari (Squad commander in the Qassam Brigades' Nuseirat Battalion), and UNRWA

teacher Ali Isa Hamuda Matar (platoon commander in the Qassam Brigades' Nuseirat Battalion) all received a text calling them to report to the meeting point prior to the infiltration so as to arm themselves; they also received there logistical preparations.

f.  UNRWA Deputy School Principal Abd Al-Rahman Atiya Salem Abu Awad (platoon commander in the Al Qassam Brigades' Nuseirat Battalion) was updated about the infiltration in real time, was instructed to follow the events over the PTT radio and make sure the other relevant operatives do the same.

g.  The manager of a shop in an UNRWA school set up an operations room for the Palestinian Islamic Jihad on October 8, the day after the attack.

h.  Amer Yaser Nazmi Sada, a 24-year-old graduate of an UNRWA school participated in the October 7 Attack. His UNRWA diploma was found in a vehicle of one of the terrorists in Israel in the aftermath of October 7.

i.  UNWRA School Counselor Baker Mahmoud Abdallah Darwish (operative in Hamas' military intelligence unit) and UNWRA clerk Mohammad Nasser al-Din Mohammad Abu Naama were in Israeli territory on October 7. Abu Naama was killed in an IDF airstrike on October 11, 2023.

j.  UNWRA health center clerk Ghassan Nabil Mohammad Sh'hadda El Jabari (an operative in the Qassam Brigades' al-Furkan Battalion) arrived at a hospital with a gunshot wound on October 7 and turned off his cellphone.

k.  UNRWA elementary school teacher Mamdouh Hussein Ahmad al-Qak (an operative in the PIJ Rafah Brigades) took part in the October 7 Attack and was revealed speaking on the phone as follows: "I'm inside, I'm inside with the

Jews!" Asked by the other side, "How will you get home?", he replied with a laugh: "When I die."

l.   Teachers and other educational staff of UNRWA have been reported praising Hamas's terrorism on social media, referring to it as an "unforgettable glorious morning" and a "splendid sight."

**F.   UNRWA Staff held and tortured hostages taken in the October 7 Attack.**

964.   UNRWA teachers locked up at least two Israeli hostages in their homes in Gaza and tortured the victims there. One of the hostages, who was released from Gaza in November 2023, revealed that he was held for nearly 50 days in an attic by a teacher from UNRWA. The hostage also said that the teacher who held him captive was a father of 10 children. He was barely provided with food or medical attention and was locked away by the teacher himself.

965.   UNRWA elementary school teacher Yusef Zidan Salimam Al-Khuajri (combatant in the Qassam Brigades' Central Camps Brigades) took part in the October 7 Attack and was revealed speaking on the phone roughly seven hours after Hamas began invading Israel, bragging about the female captive that he captured. The Arabic term "sabaya" that he used to refer to the Israeli woman, is a term that describes the enslavement of women and children as the property of a Muslim man and is the same word as ISIS uses to refer to Yazidi women captured and used as sex slaves.

966.   UNRWA math teacher Rami Mohammad Ramadan Sabbah was involved in receiving hostages on October 7 and holding them captive. He was also seen photographing an elderly female hostage held by two terrorists on a motorcycle.

**G.   UNRWA knowingly employed Hamas members as UNRWA management and staff.**

161

967.    UNRWA does not treat Hamas and PIJ as terrorist organizations, despite their formal designation as such by the United States, United Kingdom, Australia, Canada, the European Union, and numerous other nations.

968.    Responding to the revelation of UNRWA staff's participation in the October 7 Attack, UNRWA posted a report to its official website entitled, "Why Donors Should Not Suspend Aid to UNRWA." In this report, they argued that "Hamas' deep roots in Gaza could make it difficult or impossible for the agency to insulate itself from all indirect links with the militant group." It also argued that UNRWA's "ubiquity throughout Gaza, combined with the degree to which Hamas is embedded in the local population, makes it difficult for UNRWA to guarantee that its safeguards against staff misconduct or aid diversion are infallible." Considering the facts alleged herein, these are not defenses but rather admissions that UNRWA knew of the risks and deliberately failed to take action to mitigate them.

969.    UNRWA's leaders say the agency strives to ensure its 13,000 employees in Gaza uphold standards of neutrality, regularly training its staff to stay above politics and investigating those who do not. In practice, Defendants not only turned a blind eye, but covered up the widespread integration of Hamas leaders and terrorists throughout UNRWA's Gaza operations, only acting in response to unfavorable publicity.  "What we want to make sure is that our staff does not have a *public* political function, because that would be completely incompatible with the function of a civil servant," Defendant UNRWA Commissioner General Lazzarini said (emphasis added) in an interview with the New York Times.  But, Mr. Lazzarini admitted, "Our employees are part of the social fabric of Gaza and its ecosystem. And as part of the social fabric in Gaza, you have also Hamas."

970.    The problem is not that UNRWA failed to screen out 100% of terror-linked employees; it is that the Defendants failed to address the pervasive presence of Hamas operatives within their organization.  Defendants only episodically reacted when third parties called attention to deviations from their supposed neutrality policy.  According to a New York Times investigative report, UNRWA "has variously responded to tips [about Hamas-linked employees] from Israel, the United States and its own networks…Rather than addressing such issues in a systematic process, they dealt with them in a piecemeal way mostly in private, working with officials … in New York."

971.    In fact, UNRWA's auditors in their official reports to UNRWA management highlighted UNRWA's deficiencies with respect to the "lack of documentation and verification on the recruitment process." For example, in UNRWA's 2019 Financial Report and audited financial statements, the Board of Auditors reported that "the Board considers that there are concerns regarding the transparency of the recruitment and selection process, owing to such deficiencies with respect to checks and records for such relevant documents as the recruitment and selection report, as well as academic and professional qualifications, which provide traceability for the evaluation of candidates or the justification for hiring employees."

972.    UNRWA falsely asserts that it maintains strict staff conduct policies to ensure that its members are not affiliated with any other groups.  In 2021, however, UNRWA spokeswoman Tamara Alrifai admitted that the organization acts only when its employees are found to hold a political position with Hamas, and added, "after that, I don't know where the line is drawn."

973.    UNRWA directors have met in person with senior Hamas leaders at least once annually. This includes meetings with now deceased head of Hamas, Yahya Sinwar, the mastermind of the October 7 Attack, who was indicted in this District in 2024 for felonies related

to the October 7 Attack. Sinwar himself was designated by the United States State Department as a Specially Designated Global Terrorist pursuant to Executive Order 13224. These voluntary annual meetings contradict UNRWA's spin that they are merely unable to avoid certain "indirect" links to Hamas.

974.    In a 2004 interview, then UNRWA Commissioner-General Peter Hansen encapsulated the governing attitude at UNRWA, stating, "I am sure that there are Hamas members on the UNRWA payroll, and I don't see that as a crime."

### H. Defendants knew that senior Hamas operatives held influential positions in UNRWA.

975.    Senior Hamas military operatives held influential positions within UNRWA in Gaza for years. The following are examples:

    a.    Member of Hamas' Leadership in Gaza and long-time senior Hamas member Suhail Ahmed Hassan al-Hindi served as the Chairman of the UNRWA Staff Union in the Gaza Strip and principal of the UNRWA Palestine Boys' Elementary School. In 1981, al-Hindi initially joined the Muslim Brotherhood and was involved in student politics in Ramallah. In 1984, he obtained a diploma from the Teachers' Institute affiliated with UNRWA in Ramallah. In 1987, after the founding of Hamas, he assumed an active role in the movement's activities and was repeatedly detained by Israeli authorities. While working with UNRWA schools, he was a member of Hamas' Leadership in Gaza between 2006 and 2021; the head of Hamas' administrative body for Gaza's northern region between 2012-2015; and head of the Return Marches and Breaking the Siege Committee in the Hamas' Leadership in Gaza in 2018. The Return Marches, where hundreds of Hamas activists charged forward to the

border wall, were the dry runs for the Hamas infiltration on October 7. All this time, since 1988, al-Hindi worked as a teacher in UNRWA schools, and between 2006-2016 he served as a director for UNRWA schools. Between 2000 and 2016, he held senior positions in the UNRWA staff union, including President. In 2017, al-Hindi was finally suspended by UNRWA after the agency was forcibly confronted with al-Hindi's re-election to Hamas' Leadership in Gaza, or what the movement purports to be its "Political Bureau." This was not a surprise; UNRWA's management had been fully aware for years that Suhail al-Hindi was a senior Hamas activist, an elected member of multiple Hamas bodies, and that he condoned jihad against Israel and suicide attacks carried out by Hamas. UNRWA spokesperson, Chris Gunness, admitted knowledge of al-Hindi's senior role in Hamas leadership in a published article on January 27, 2009. Despite this knowledge, UNRWA management continued to employ al-Hindi until 2017.

b.   Another member of Hamas' Leadership in Gaza and long-time Hamas member, Muhammad al-Jamassi, was chairman of the board of directors in the UNRWA engineering department for refugee camps in the central Gaza Strip. In February 2017, al-Jamassi reportedly assumed a role in Hamas' Leadership in Gaza. Jamassi had been involved with Hamas since 2007.

c.   Jawad Abu Shamala, Hamas's Minister of Economy, was a longtime former UNRWA teacher, killed by the IDF on October 10, 2023. He was responsible for financially planning the funding of the October 7 Attack.

d.  PIJ member Awad al-Qiq, an UNRWA science teacher and school headmaster in Rafah with an eight-year tenure, was - at the same time - leading a rocket engineering squad for the PIJ. Following his death in an Israeli airstrike in May 2008, Islamic Jihad hailed Al-Qiq as a martyr destined for 'paradise.' The terrorist organization prominently displayed a poster at the entrance of the UNRWA school where he taught, lauding Al-Qiq's involvement in terrorist activities.

e.  Issa Abd al-Hadi al-Batran, a graduate and longtime teacher in UNRWA schools was Hamas's senior rocket-maker. Al-Batran graduated from UNRWA's elementary and middle schools in al-Bureij and UNRWA's Gaza Training Center. For years, al-Batran worked as a teacher in UNRWA's schools in the central district of the Gaza Strip. He joined Hamas in 1989 and by the beginning of the 1990s was recruited to the al-Qassam Brigades. He participated in attacks against IDF forces without being a lawful combatant, participated in digging tunnels, took part in producing, and placed, explosive charges, bombs, rockets, and other military equipment needed. Al-Batran also founded the media office of al-Qassam Brigades in al-Bureij refugee camp. Despite this publicly known information, especially in the Gaza Strip, UNRWA took no action against al-Batran even after he had been the target of four failed assassination attempts, clearly exposing his connection to terrorist activity. John Ging, UNRWA Director of Operations in Gaza, was notified as early as December 2008 that Issa al-Batran was an active operative of al-Qassam Brigades, and still, UNRWA took no action. All that time, al-Batran continued to work as a teacher

in an UNRWA school in al-Bureij refugee camp. He was finally dismissed by UNRWA in 2009, months after being seriously wounded while assembling a bomb for the Izz al-Din al-Qassam Brigades where he served as a weapons expert, manufacturing explosives, IEDs and rockets, as well as excavation tools to build Hamas's tunnel network. He was killed in an Israeli air strike on July 31, 2010.

    f.    Hamas leader Ismail Haniyeh was a teacher in UNRWA schools.

    g.    At least eighteen school principals in Gaza are still members of Hamas' military wing.

976.    UNRWA's willingness to employ senior Hamas military operatives was not limited to Gaza. For example, Fateh Sherif Abu el-Amin served as the principal of an UNRWA school in Lebanon while he also served as a senior Hamas commander tasked with coordinating Hamas activities with those of Hezbollah in Lebanon. In addition to being an UNRWA school principal and Hamas commander, Abu el-Amin was the head of the UNRWA Lebanese teacher's union.

### I.  UNRWA paid its Gaza staff in a fashion calculated to further enrich Hamas.

977.    Gaza does not have a currency of its own but uses the Israeli shekel for ordinary local transactions. Large local employers pay their employees in shekels. Unlike the way UNRWA historically pays its staff elsewhere, Defendants chose not to pay its staff in Gaza in local currency, even though it was logistically feasible, more efficient and safer to do so. Instead, Defendants shipped in tens of millions of cash U.S. dollars each month, knowingly providing Hamas with physical access to U.S. currency. Had Defendants disclosed to their United States regulated banks (such as JP Morgan) that they intended to structure cash payments to their Gaza

employees on this scale to benefit Hamas, no bank would have allowed the transfers necessary to effectuate this scheme.

978.    UNRWA, in coordination with Hamas, paid its Gaza local staff in U.S. dollars and did so in cash.  Because U.S. dollars are not commonly accepted by merchants in Gaza for the staff's necessary routine purchases of groceries and other necessities, especially in large denominations, this compelled the staff to go to local, Hamas-licensed moneychangers to exchange their cash dollars for shekels.  Hamas directly controlled most of the Gaza moneychangers, and those are that are not actually run by Hamas were required by Hamas to pay Hamas a share of the fees they earn (often as much as 22%) for such exchange transactions, thus ensuring that a predictable percentage of UNRWA's payroll subsidized Hamas.  Hamas used the moneychangers to finance its military activities, and there are multiple examples in recent years of Hamas using currency exchange facilities in Gaza to finance its military activities.  (*See* for example the designation of Buy Cash Money and Exchange Company by the U.S. Treasury Department's Office of Foreign Assets Control as a "monetary intermediation" for Hamas).   In addition to these profits, Hamas desperately needed the U.S. currency itself.  U.S. dollars in cash form were vital to Hamas for purposes such as obtaining weapons on the international black market to be smuggled into Gaza and used for terrorist purposes, including the October 7 Attack.  From at least 2018 until September 2023, UNRWA inserted into Gaza at least $20 million a month in cash, and by putting that cash into the hands of the Hamas-controlled moneychangers put it into Hamas' own hands.

979.    In fact, a 2018 report commissioned by UNRWA warned of numerous risks associated with making cash disbursements in Gaza, including money laundering risks, the likelihood that funds could be diverted to terrorists or other criminal recipients ("leakage"), and the use of cash to facilitate illegal trade.  Similarly, UNRWA's audits also warned UNRWA

management of risks with the cash distribution system in Gaza.  For example, the warning in the 2022 audit that "UNRWA may not always have the ability to monitor cash distributions in a timely manner, which could potentially increase the risk of incorrect, missed or multiple cash payments being distributed in Gaza."

980.    Each month, UNRWA staff in New York instructed JP Morgan Chase to wire budgeted and approved amounts in U.S. dollars, via Arab Bank in New York, to Arab Bank's branch in Ramallah, in the West Bank.  Funds required for UNRWA payroll and operations in the West Bank are converted and paid in Israeli shekels.  By contrast, funds required for UNRWA payroll and operations in Gaza were transferred to the Bank of Palestine in Ramallah and withdrawn in cash U.S. dollars and then physically transported (across Israeli territory) in trucks to Gaza, with each truck containing millions of dollars in cash and posing significant security risks. If UNRWA paid its Gaza local staff in shekels, which could be transferred electronically from the Arab Bank or the Bank of Palestine in Ramallah directly to banks in Gaza (as, for example, the Palestinian Authority does for payment of its employees in Gaza), these burdens and risks would be unnecessary, and the staff would benefit from increased purchasing power from their salaries because they would not need to pay fees to moneychangers.  Only Hamas benefits from UNRWA's cash-handling practices.

981.    By way of note, Hamas was otherwise prevented from obtaining U.S. cash dollars by, among other things, United States anti-money laundering statutes and regulations.  UNRWA has provided an estimated two-thirds of the cash U.S. dollars physically transferred into Gaza since 2018.  Hamas has used the over one billion in cash U.S. dollars brought into Gaza by UNRWA to buy *via* smugglers its weapons, ammunition, explosives, construction materials for the tunnels, and rocket-making supplies that have been used for a multitude of terrorist acts including but not

limited to the October 7 Attack. Hamas' ability to carry out the October 7 Attack would have been significantly, and possibly fatally weakened without that UNRWA-provided cash. Hamas' sponsors such as the current government of Iran lack the same ability to physically bring cash U.S. dollars in such quantities into Gaza due to Israeli control of Gaza's external borders.

982.    This entirely predictable consequence of UNRWA's Gaza payroll and cash infusion policy is not a hidden side effect but was and is well-known to Defendants. Defendants were aware that UNRWA's auditors as well as various other outside third parties had raised concerns about their cash-handling policies in Gaza. The risk that these massive amounts of cash would be used for wrongful purposes was fully known and foreseeable to the Defendants.

**J.    Defendants knew Hamas controlled UNRWA's Staff Union in Gaza.**

983.    Hamas has controlled the UNRWA Gaza Staff Union since 2009. In September 2012, the Hamas bloc, headed by senior Hamas activist Suhail al-Hindi, again won a landslide victory in the elections to UNRWA Staff Union elections. With a high turnout of approximately 11,500 UNRWA employees who cast their ballot, the Hamas bloc won all 11 seats of the teachers' sector, 6 out of 7 seats of the workers sector and 8 out of 9 seats of the services sector (winning 25 out of 27 total seats in a vote among 10,000 staffers). Defendants knew the outcome of these elections, were aware of the overwhelming majority of its employees' affinity with Hamas yet took no meaningful steps to recruit and hire non-Hamas members or to prevent the Hamas-member employees from using their UNRWA positions to promote Hamas' terror agenda.

**K.    UNRWA, with Defendants' knowledge and approval, chose to use textbooks and teaching curricula approved by Hamas which contained incitement and indoctrination of Palestinian children to support and participate in Hamas' jihadi culture, rather than using other available textbooks consistent with principles and requirements of the United Nations.**

984. UNRWA has made a deliberate and conscious decision that its schools teach a Hamas-approved curriculum in Gaza even though it is not required to do so.

985. Countless studies by governments and NGOs, known to Defendants, have found that UNRWA's textbooks glorify violence and terrorism, encourage jihad and martyrdom, incite antisemitism and hatred of Jews, reject the very existence of Israel and call for its destruction.

986. More than 500,000 students study at schools in the Gaza Strip, with over half attending UNRWA-operated schools. Studies available to UNRWA New York staff by governments and international organizations such as the U.S. Government Accountability Office ("GAO"), the European Union, the UN's Committee on the Elimination of Racial Discrimination (CERD), the Institute for Monitoring Peace and Cultural Tolerance in School Education (IMPACT-se), and reviews by UNRWA itself all show the problematic nature of the Palestinian Authority/Hamas approved textbooks used in its schools.

987. The U.S. Government Accountability Office revealed in a 2019 report that UNRWA schools failed to offset "potentially problematic content" in the textbooks used in Gaza. UNRWA did not train teachers or complete distributing complementary teaching materials even after it had identified these issues in its own review.

988. A 2021 study commissioned by the European Union on Palestinian textbooks found "anti-Semitic narratives and glorifications of violence" in the same textbooks. The European Parliament has repeatedly deplored "the problematic and hateful material in Palestinian school textbooks and study cards which has still not been removed." Indeed, as recently as May 7, 2025, the European Parliament again voted to condemn the textbooks used by UNRWA for "antisemitic incitement, hate speech and glorification of terrorism."

989.    The UN's Committee on the Elimination of Racial Discrimination stated in September 2019 that it is concerned  "About the existence of hate speech, in particular hate speech directed against Israelis, which at times fuels anti-Semitism towards this group, in certain media outlets, in particular those controlled by Hamas, as well as on social media, in public officials' statements and in school curricula and textbooks, which also fuels hatred and may incite violence (art. 4)."

990.    The Institute for Monitoring Peace and Cultural Tolerance in School Education (IMPACT-se)'s extensive research of UNRWA-used school textbooks "has consistently found a systematic promotion of violence, martyrdom, overt antisemitism, and jihad across all grades and subjects, with the proliferation of extreme nationalism and Islamist ideologies throughout the curriculum, including science and math textbooks."

991.    UNRWA willingly and knowingly keeps the hateful content in the curriculum taught in its schools intact. Thus, UNRWA students are intentionally, systematically and constantly indoctrinated to internalized victimization, glorify violence, mayhem and jihad, and support genocide of Jews, Israelis, and the State of Israel itself.

992.    UNRWA also produces its own institutional original teaching materials branded with its logo to complement and enrich host-country curricula. These supplement the teaching of PA textbooks. Multiple studies by the NGO IMPACT-se in 2023, 2022 and 2021 reviewing these institutional UN supplementary materials found that UNRWA teachers, principals, schools, and education departments were regularly involved in drafting, approving, printing, and distributing thousands of pages of teaching materials including content that incites antisemitism, glorifies terrorism, and encourages jihad and martyrdom.

993.    Therefore, UNRWA makes a false claim when it states on its website:

172

"In its more than 700 schools educating more than 500,000 Palestine refugee children across the Middle East, the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) curriculum emphasizes the UN values of neutrality, human rights, tolerance, equality and non-discrimination with regard to race, gender, language and religion. As a matter of course, UNRWA consistently reviews all educational materials and textbooks against these values, and rarely, in cases where discrepancies are found, provides enrichment materials to teachers to enable them to enter into critical thinking discussions with their students to address any issues identified."

994. The content of these textbooks violates the UN's own standards for education. According to the Universal Declaration of Human Rights, adopted by the United Nations General Assembly in 1948, "Education shall be directed to the full development of human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance and friendship among all nations, racial and religious groups and shall further the activities of the United Nations for the maintenance of peace."

995. The UN itself maintains that school education should promote respect, peace and tolerance, and should be "free of wording, imagery and ideologies likely to create prejudices, misconceptions, stereotypes, misunderstandings, mistrust, racial hatred, religious bigotry and national hatred, as well as any other form of hatred or contempt for other groups or peoples". Moreover, the curriculum should be "free of language, content, and imagery that disseminate ideas or theories which justify or promote acts and expressions of violence, incitement to violence, hostility, harm and hatred toward other national, ethnic, racial or religious groups."

173

996. In April 2021, the European Union froze all its funding to the Palestinian Authority of over 220 million EUR in April 2021 for 13 months due to problematic content in textbooks also used in UNRWA schools in Gaza, following an EU-funded report that found "antisemitic narratives and glorification of violence."  In May 2025, the European Parliament recommended another such freeze in funding due to ongoing failure to redress these issues.

997. Defendant Lazzarini admitted UNRWA's awareness of incitement to violence, discrimination, antisemitism, intolerance, and glorification of terrorism in UNRWA's internal reviews of textbooks used in its schools in a September 2021 hearing in the European Parliament.

998. In his testimony, Lazzarini admitted:

> "We as UNRWA have identified three categories of problems in the textbooks when it comes to being in line with UN value[s], which is age appropriateness, gender perception, and then the issues related to incitement to violence, discrimination, and so on. [Turning to the Committee Chair, adding:] antisemitism, intolerance, absolutely. So, these are the type of issues which have been identified by UNRWA through the review of 150 books, and we keep reviewing each of the books being issued by the authorities whenever they need to be used in our class[es]. And whenever we enter difficult issues, either we give guidance to our teachers on how to use it or we ask it not to be taught in the class. Especially when we start to talk about glorification of terrorism for example which has also been an issue."

999. Findings of IMPACT-se's research contradict statements and promises made by UNRWA and Defendant Lazzarini to donor nations in relation to a change in using and teaching the Hamas-approved curriculum.

1000.   UNRWA admitted in 2021 that its teachers drafted hateful content, contradicting its claim of extensive training in countering hate.

1001.   According to its own statements, UNRWA reviews the Hamas-approved textbooks used in its school and is thus necessarily aware of their content.

1002.   At the same time, UNRWA refuses to disclose the results or criteria of its textbook reviews that showcase lessons they deem problematic. It also refuses to disclose teacher guidance materials that allegedly instruct teachers to critically address itemized problematic content.

1003.   Defendants knew that the European Parliament adopted resolutions in May and July 2023, May and December 2022, 2021, 2020 and 2018 which condemned the teaching of hate in textbooks used in UNRWA schools, expressed concerns over the continued failure to remove content not in line with UNESCO standards, and called for conditioning funding based on a curriculum reform.  The EU commissioned a report from 2021 from the Georg Eckhart Institute, a German academic institution focusing on international textbook research, which raised similar concerns about the textbooks used by UNRWA in Gaza to those set forth above.

1004.   Moreover, intermittent and episodic attempts to make the curriculum in the Gaza schools more balanced were rapidly abandoned whenever Hamas objected, as in 2011 when UNRWA proposed to teach children about the historical fact of the Holocaust but then failed to follow through.

1005.  In 2024, UNRWA finally committed to making limited modifications in the textbooks it uses in Gaza, following a firestorm of international criticism.  But by this time the October 7 Attack and Plaintiffs' injuries had already occurred, facilitated in part by UNRWA's own role in indoctrinating future terrorists.

1006.   The following are selected examples from Hamas-authorized textbooks and other instructional material used by UNRWA in Gaza:

a.  3rd grade:

Arithmetic is taught by counting martyrs. Math questions in Grade 3 ask children to write the number of martyrs killed during the First Intifada and the 2014 Gaza War. An Arabic language exercise instructs students to sing and learn by heart: "The land of Kurāma' [generosity].  I swear, I will sacrifice my blood to irrigate the land of generosity, And will remove the usurper from my country. And will exterminate the remnants of the foreigners."

b.  5th grade:

An UNRWA-created 5th grade Arabic Language summary glorifies as heroes infamous terrorists and others affiliated with war, violence, and religious extremism. These include Dalal Mughrabi, known for her role in the 1978 Coastal Road Attack in which 38 civilians including 13 children were killed, and Izz ad-Din al-Qassam, the namesake of Hamas's military wing who promoted Jihad against the British and the Zionists and was killed in action in 1935. These "heroes" are venerated as "the crown of their nation" and "the title of its glory." The text (p. 4) encourages impressionable Palestinian students to see these heroes as their role models: "each of us wishes to be like them." Moreover, it encourages students to take the path of martyrs, as follows: "Drinking the cup of bitterness with glory is much sweeter than a pleasant long life accompanied by humiliation."

c.  6th grade:

UNRWA-produced 6th grade Arabic study material includes an exercise under a lesson titled "Loving the Homeland" that promotes sacrificing one's life— "the most precious thing" a person has—for the homeland "to nourish the homeland with his blood." Another exercise under the title "My Land" teaches students that their obligation to the homeland is to sacrifice "their blood" for it. The clear intention is to encourage students to pursue violent jihad to "liberate the homeland." This is confirmed by grammar exercises which include the example sentence "I will commit jihad to liberate the homeland".

d. 7th grade:

In the PA's Arabic Language study cards, 7th grade students are presented with a summary of a poem saying that the Palestinian "Right of Return" into Israel proper will take place though violence using "all the means of warfare" against Israel rescuing the land from the "filth of the occupation" instead of through negotiation. The horizon of the "Return" is described in the summary as "painted with the blood of martyrs."

e. 8th grade:

Reading comprehension is taught through a violent story which glorifies suicide bombings, recounting that "the daggers of the fedayeen [Arab guerilla fighters, commandos] fell on the necks" of enemy soldiers and that they "wore explosive belts." Israeli forces are said to "leave behind some of the bodies and body parts, to become food for wild animals on land and birds of prey in the sky." An accompanying illustration depicts Israeli soldiers in a tank, shot dead by a Palestinian gunman.

177

f.  9th grade:

A reading comprehension exercise in 9th grade Arabic Language study material created by UNRWA, contains a story about a Palestinian firebombing attack on a Jewish bus near the West Bank city of Ramallah. The reading comprehension text celebrates the attack as a 'barbecue party' (*haflat shiwaa'*). The translation of the text presented to the student as a reading comprehension exercise is as follows:

The neighbor: "The curfew does not include us in Al-Sharafah [neighborhood]. It is imposed on Al-Tatarish [neighborhood]. It seems that there is a barbecue party [*haflat shiwaa'*] there with firebombs on one of the buses of the colonial settlement Psagot on Mount Al-Tawil."

g.  10th grade:

In Islamic Education, students are taught that Jihad is "for the liberation of Palestine" and a "private obligation for every Muslim."

h.  11th Grade:

An eleventh-grade Palestinian history textbook implies that Jews control the world, using classic antisemitic imagery.

i.  12th Grade:

PA Islamic Education textbook teaches students that giving their lives is a religious duty that carries great rewards and much honor. It amounts to the central meaning of life, the highest point toward which one can aspire.

**L. The indoctrination of hatred of Jews that is taught in UNRWA's curriculum is further exacerbated by UNRWA's allowance of Hamas' student activities in its schools.**

178

1007.   In every UNRWA school, Hamas has a representative of its "Islamic Bloc," called in Arabic "Al-Kutla al-Islamiya" ("al-Kutla"). Al-Kutla is Hamas' student wing and its official arm operating in all educational institutions in Gaza, from elementary schools to colleges and universities, including the educational institutions run by UNRWA. Al-Kutla's strategy in elementary and middle school is focused on attracting students to Hamas through organizing a variety of activities inside school and after school hours that intend to strengthen the students' religious beliefs and exposing them gradually to Hamas ideology in order to recruit them to the movement.

1008.   Examples of al-Kutla's activities inside UNRWA's facilities in Gaza or for students at middle schools run by UNRWA, are as follows:

    a.  On January 1, 2010, al-Kutla organized a soccer tournament in Rafah commemorating Mohammad al-Sharif, an operative of al-Qassam Brigades, who was killed on December 12, 2007. Teams from 18 middle schools in Rafah participated in the tournament, including those run by UNRWA. Rafah middle school G (UNRWA) won the finals defeating al-Omaria middle school (UNRWA). The event was held in the football field of the Services Club founded by UNRWA. This is just one example of the many sports tournaments that al-Kutla organizes for students of UNRWA schools.

    b.  On March 7, 2011, al-Kutla held an event in UNRWA's al-Qarara middle school to honor outstanding students. Hamas senior official Hamad al-Ruqab and the UNRWA school's principle participated in this Hamas event.

    c.  On April 27, 2011, al-Kutla organized a knowledge competition between Khan Yunis' middle schools, including schools run by UNRWA (al Qarara and al

Ma'ari middle schools). Al Ma'ari middle school (UNRWA) won the competition, which was held in commemoration of Hamas co-founder and former supreme leader 'Abd al Aziz al Rantisi, who directed many terrorist attacks by Hamas during the Second Intifada.

d. Events honoring senior leaders of Hamas, including Sheikh Ahmad Yassin, founder and supreme religious authority of Hamas, and Ahmad al-Ja'bari, former commander of al-Qassam Brigades, Hamas' military/terrorist wing.

e. The Islamic bloc spurred schoolchildren to participate in the 2018 so-called "Great March of Return" rallies along the border with Israel, which included acts of violence and terrorist attacks (shooting, throwing explosives, stabbing, arson and more) and served as test runs for the breaches of the border in the October 7 Attack. Videos prepared by the Islamic Bloc call for active participation in the "Great March of Return" rallies, and state that their ultimate goal is to bring about the destruction of the State of Israel.

1009.  The UNRWA education system, its employment of principals, teachers, and other staff who are Hamas members, its textbooks, and the activities of al-Kutla are a powerful vehicle for Hamas to indoctrinate youth in UNRWA schools in the Gaza Strip and to pave the way for their future recruitment to al-Qassam Brigades.

1010.  Reviewing the bio sketches of al-Qassam Brigades' fatalities reveals a repeated pattern. Hundreds of al-Qassam operatives are graduates of UNRWA's schools in Gaza, who joined Hamas and later its military wing al-Qassam Brigades. All were also involved in terrorist attacks against Israel or in attacks against IDF forces.

1011.   UNRWA teachers and staff applauded the October 7 Attack on social media. Examples:

    a.   At 9:09 AM on October 7, as news began to spread about the terrorist atrocities in Israel, UNRWA Gaza teacher Osama Ahmed posted "Allah is Great, Allah is Great, reality surpasses our wildest dreams."

    b.   UNRWA principal Iman Hassan justified the Attack as "restoring rights" and "redressing" Palestinian "grievances."

    c.   Rawia Helles, Director of the Khan Younis Training Center and featured in an UNRWA video, glorified one of the terrorists as a "hero," "raider," and "prince of Khan Younis."

    d.   UNRWA Gaza School employee Hmada Ahmed, posted on October 7: "[We] welcome the great October" and on October 14: "This land cannot accommodate two identities. [It's] either us or us. We are the ones who will remain, and they are the ones passing by."

    e.   UNRWA teachers in a 3,000-member UNRWA staff Telegram group cheered and celebrated the October 7 Attack. The UNRWA staff in the group shared photos and video footage of those events and prayed for the terrorists' success and for Israel's destruction. Examples:

        i.   On the morning of October 7th, Israa Abdul Kareem Mezher (UNRWA Elementary School Arabic Language Teacher), ecstatically celebrated the Hamas terrorists and prayed for their success ("May God keep their feet steady and guide their aim"; "pray for the Mujahidin")[3]. At 7:38

---

[3] Mujahidin (Arabic) means "holy warrior" that is one who conducts jihad.

AM, as news of the Hamas atrocities began to spread, Mezher cheered "God is the greatest God is the greatest." Minutes later he shared a photo of one of the Hamas terrorists armed and in uniform, declaring that "Israel's time is over."

ii.   UNRWA math teacher Shatha Husam Al Nawajha wished for the terrorists' "safe" return "and with booty." At 8:00 AM, she lauded the terrorists for taking "their destiny into their own hands," and again prayed for God to "protect" them and make them "victorious."

iii.   UNRWA teacher Moreed Abdulaziz Issa Shouka (Elementary Coed School) exulted in the success of Hamas' October 7 Attack, calling it "beyond expectations."

1012.   Besides such blatant incitement for ethnic cleaning and genocidal attacks, UNWRA employees are violating the following UN's principles of neutrality with their statements and actions:

a.   UNRWA Staff Regulation 1.4 (staff must "avoid any action and in particular any kind of public pronouncement which may adversely reflect on their status or integrity, independence or impartiality…");

b.   UNRWA Staff Regulation 1.7 (staff must not engage in "any political activity which is inconsistent with or might reflect upon the independence and impartiality required by their status).

## THE DEFENDANTS' LONG-RUNNING PATTERN OF COLLABORATION WITH HAMAS LEADERS

1013.   Defendants provided the material support to Hamas described above with full knowledge of Hamas' goals and methods. In fact, for many years leading up to the October 7

Attack, Defendants routinely met with Hamas officials and expressed their willingness to work with and partner with Hamas. Defendants did the same with other designated terrorist groups and individuals.

1014.   At all relevant times, Hamas, the PIJ, the Democratic Front for the Liberation of Palestine (the "DFLP"), and the Palestinian Liberation Front (the "PLF") were designated as Foreign Terrorist Organizations by the United States and by other countries.

1015.   As discussed below, in certain instances the individuals with whom Defendants met were not only leaders of designated terrorist groups but were themselves individually Specially Designated Global Terrorists.

1016.   The examples listed below are merely some of those available from public reporting and are presented as a sample of the Defendants' meetings and collaboration with Hamas and related terrorist groups.

1017.   For example, on or about December 16, 2014, UNRWA Regional Directors Muhammad Khaled, Ibrahim al-Khatib, Fawzi Kassab and Ahmad Moh met with Ali Baraka, HAMAS Head of Foreign Relations and Masahour Abdul Halim, Hamas Relations Official, in Baraka's office. Ali Baraka is the Head of Foreign Relations for Hamas and one of eight top Hamas leaders sanctioned by the U.S. and U.K. for "heinous crimes." Baraka managed Hamas ties with Tehran and other regimes including Syria and Iraq and was involved in planning the October 7 Attack. On December 13, 2023, President Biden designated Baraka as a Specially Designated Global Terrorist and in September 2024 the United States indicted him for charges related to the October 7 Attack. At the meeting with Baraka, the UNRWA directors congratulated Hamas on the 27th anniversary of its launch and issued a statement with Hamas emphasizing the importance

of cooperation and coordination between the agency and the Palestinian factions to ensure a respectful life for them until they can return their original homes in Palestine.

1018.  By way of another example, another UNRWA Regional Director, Ibrahim al-Khatib, speaks annually at Hamas' yearly summit on UNRWA in Lebanon.

1019.  By way of another example, on or about February 12, 2017, Defendant Krähenbühl, as UNRWA Commissioner General, met at UNRWA's Beirut headquarters with a number of Palestinian factions, including terrorist leaders Ali Baraka (Hamas), Abu Imad Al-Rifai (Palestinian Forces Alliance), Ali Faisal (DFLP), Salah Al-Youssef (PLF), Abu Imad Ramez (Popular Front - General Command), and Hassan Zeidan (Fatah al-Intifada). At that meeting, Krähenbühl asserted the necessity of continued coordination with the groups and promised to continue holding as many meetings as they would like to ensure a "spirit of partnership." According to Krähenbühl, UNRWA needed to keep that partnership secret so as to prevent donors from reducing or stopping their funding of UNRWA:

> I hope that the spirit of partnership will be in both directions, that is, if you have any criticisms, comments, concerns or any matters that you are not satisfied with regarding UNRWA, that we return and hold such meetings even if we meet a thousand times and if you challenge our decisions and if you tell us that we do not want this decision and criticize it, we may change it or tear it up, but that the spirit of partnership prevails among us in our meetings and not be public because this is a challenge to us and our credibility, and what is more dangerous is what this could constitute in terms of a loss of trust between the funding countries and UNRWA, which may move towards reducing or stopping its funding. The issue of your cooperation with us in security aspects and not allowing the closure of UNRWA institutions, facilities, schools or offices, lies in the partnership between us, and if we reach that, it means that we are united, and no one can separate us.

1020.  On or about May 1, 2017, UNRWA Lebanon Director Claudio Cordone and UNRWA Deputy Director of Programs Gwyn Lewis met with Ali Baraka (Hamas), Abu Imad Al-Rifai (PIJ), Ali Faisal (DFLP), Rafiq Ramidh, and Hassan Zeidan (Fatah al-Intifada).   All four were leaders of terrorist groups:

- Mr. Baraka, as discussed above.

- Abu Imad al-Rifai was the leader of PIJ in Lebanon and had participated in suicide bombings against American and British soldiers.  As discussed above, PIJ participated in the October 7 Attack.

- Ali Faisal was a senior leader of the DFLP, had endorsed the wave of Palestinian terror attacks launched from Gaza in 2015 and called a meeting to "build a unified resistance in the Gaza Strip to form a support for the intifada." The DFLP also participated in the October 7 Attack.

- Hassan Zeidan was a leader of Fatah al-Intifada, a hardline terrorist group that splintered off from the original Fatah party in 1983 and has been fighting alongside Hamas in Gaza since the October 7 Attack.

1021.  In February 2018, Gwyn Lewis, UNRWA Deputy Director of Programs in Lebanon, together with other UNRWA officials, held a meeting with Ahmed Fadl, a senior Hamas leader, agreed to have "constant cooperation and coordination in the interest of the refugees."

1022.  On or about February 12, 2019, Defendant Krähenbühl, UNRWA Lebanon Director-General Cordone, and staff officer Hakam Shahwan met with a coalition of armed Palestinian terrorist groups, including Ayman Shana'a, Hamas Head of National Relations in Lebanon, Khaled Zuaiter, Hamas political relations officer, and Jamal Khattab, Sheikh of Islamic Jihad (Mujahideen) in Lebanon.  In the meeting, Shana'a stressed the importance of "considering the Palestinian factions as a basic partner for UNRWA in preserving the dignity of our people and our camps with all the meanings they symbolize."

1023.  On or about April 28, 2021, UNRWA Director for Tyre, Mohammad Abu Attia, hosted representatives from PIJ, Fatah al-Intifada and the Palestinian Popular Struggle Front, a

group of Palestinian organizations, including Hamas, who reject peace with Israel. UNRWA "agreed" with these representatives "to continue communication, consultation, cooperation and coordination." On or about January 29, 2022, Mr. Abu Attia, met with Jihad Muhammad, a senior PIJ official, on "the need for cooperation between local forces and UNRWA."

1024. Defendant UNRWA Commissioner General Lazzarini regularly met with Hamas leadership in Gaza.

1025. On June 2, 2021, Defendant UNRWA Deputy Commissioner General Leni Stenseth met with the head of Hamas and mastermind of the October 7 Attack, Yahya Sinwar. Sinwar stressed "the pride of our people in general, and its factions, especially Hamas, in particular, in the positive and constructive relationship with UNRWA and the historic role it played in strengthening the steadfastness of our people and establishing their rights. Stenseth thanked Sinwar "for his positivity and desire to continue cooperation in facilitating the agency's work in the Gaza strip." The meeting concluded with both parties stressing the need for "direct communication and dialogue" and "cooperation."

1026. On or about January 29, 2022, UNRWA Director for Tyre, Mr. Abu Attia, met with Jihad Muhammad, senior PIJ official, on "the need for cooperation between local forces and UNRWA."

1027. On or about June 1, 2022, Defendant Lazzarini and UNRWA Gaza Director Thomas White met in Gaza with the Joint Refugee Committee, a consortium of Hamas, PIJ and DFLP, and other violent radical groups (for example, the meeting included Mahmoud Khalaf, senior leader of the DFLP). At the end of the meeting the two sides stressed the need to "continue meetings" and the importance of their "partnership." At a similar December 28, 2022, meeting,

also with Khalaf, Thomas White, UNRWA Gaza Director, emphasized "the importance of joint work and cooperation between UNRWA and the Joint Refugee Committee."

## THE NUMEROUS NEW YORK JURISDICTIONAL CONTACTS RELATED TO DEFENDANTS' SUBSTANTIAL ASSISTANCE TO HAMAS

1028.   Money is the lifeblood of terrorism, just as fundraising is the lifeblood of any charitable or humanitarian organization.  Virtually all the money UNRWA has spent in assisting Hamas to build up its terror infrastructure in Gaza came from UNRWA's New York City bank account at JPMorgan Chase and came into that account in the first place as a result of donations solicited in New York as a result of Defendants' travel to New York to solicit donors face to face there.

1029.   As already noted, to obtain virtually all its financing, UNRWA solicits donations from donor countries, and sometimes donor organizations.  In general, it is not funded out of general UN revenues, however, the United Nations may supply occasional emergency bailout funding or other incidental support.

1030.   That solicitation effort culminates in an annual event held in New York known as the Pledging Conference, where donors from around the world are solicited face to face to renew or increase the funding they each agreed to provide UNRWA the prior year.  Senior UNRWA personnel, including the Individual Defendants, typically travel in person to New York to solicit funding in person at this event.  For example:

> a.  At the end of 2010 and 2012, Defendant Ellis traveled to New York to attend the Pledging Conference and solicit funds for calendar years 2011 and 2013, respectively.

b.  At the end of 2013, Defendant Ellis traveled to New York to attend the Pledging Conference and solicit funds for calendar year 2014, apologizing to those present that defendant Grandi was not there in person that year.

c.  In December 2014, Defendant Ellis traveled to New York to attend the Pledging Conference and solicit funds for calendar year 2015,

d.  In October 2015, Defendant Mitchell traveled to New York to solicit funds in person at that year's Pledging Conference, claiming that UNWRA had just "emerge[d] from a financial crisis that was unprecedented in its severity" thanks to additional donations obtained to cover a $100 million shortfall but that reforms would be undertaken to reassure donors in the future.

e.  By 2018, the Pledging Conference had been re-scheduled from year-end to June, so that UNWRA could try to solicit additional funds mid-year to deal with its chronic financial shortfalls.   Defendant Krähenbühl traveled to New York to solicit funds in person at that June 2018 conference.

f.  In June 2019, Defendant Krähenbühl traveled to New York again to solicit funds in person at the Pledging Conference, where he proudly proclaimed: "Today in New York, we witnessed another remarkable mobilization and great generosity in support of UNRWA.  I am deeply grateful for the trust of United Nations (UN) member states, for the pledges of more than US$ 110 million, and for the commitment to the dignity and rights of Palestine refugees."

g.  In June 2022 Defendant Stenseth traveled to New York to solicit funds in person at that year's Pledging Conference, and while there was distracted by the need to brief donors "on allegations of hate speech recently levied against several

188

[UNWRA] staff members."  Indeed, UNRWA complained in a press release that the allegations were "timed to disrupt" the Pledging Conference, even though Stenseth conceded that the allegations were credible enough for the accused staff to have been placed on administrative leave pending further investigation.

    h.   In June 2023, at the last Pledging Conference before the October 7 Attack, Defendant Lazzarini traveled to New York to solicit funds in person.

1031.  Without the Individual Defendants' systematic and repeated travel to and other actions in New York to solicit this funding in person here, Defendants would have been unable to fund any of UNRWA's policies in Gaza discussed herein.  The Individual Defendants knew this and purposefully availed themselves of New York's status as the world's financial capital to secure the funding they knew they needed to continue to knowingly provide material assistance to, and "partnership" with, Hamas in Gaza.

1032.  Each of the Defendants who served as Commissioner-General or Deputy Commissioner-General had direct oversight of UNRWA's Gaza operations and in that capacity was fully aware of the material support for Hamas that UNRWA was providing in Gaza.  They possessed such knowledge before and during each trip they took to New York to solicit funds, with full knowledge that a material portion of any funds they successfully solicited in New York would be disbursed in Gaza in fashions that enabled Hamas to build up its terror infrastructure, and likewise with full knowledge of Hamas' prior track record and ongoing present and future intent to use its terror infrastructure, predictable resulting in the genocidal murders of Israeli and Jewish American civilians.  In short, while raising these funds, they knew exactly what the funds were going to be used for and what policies they were going to support.

1033.   Defendants have also traveled to New York to solicit and receive money outside the usual "conference" cycle.  For example, in June 2015 Defendant Krähenbühl flew to New York to obtain a one-off $15 million donation from Kuwait via its UN ambassador, even though Kuwait's own capital is located much closer to UNRWA's offices in Jordan than either of those locations is to New York.

1034.   Similarly, in September 2019 the Foreign Minister of the Kingdom of Saudi Arabia, announced a contribution of $50 Million to the core program budget of UNRWA for 2019 in a meeting with Defendant Krähenbühl in New York.

1035.   UNRWA's Commissioner-General also hosts and typically attends the UNRWA Ministerial Meeting in New York, an annual meeting co-hosted by the ministers of various nations with the goal of mobilizing political and financial support for UNRWA.

1036.   For example, in September 2018, Defendant Krähenbühl flew personally to New York to attend a Ministerial Meeting and raised $122 million. Krähenbühl thanked the donors, stating: "The results of the New York meeting, added to the support received from other partners this year, represent a very significant achievement."

1037.   In September 2021, Defendant Lazzarini attended a Ministerial Meeting in New York co-hosted by the Foreign Ministers of Sweden and Jordan and attended by ministers and representatives from Egypt, the European Union, Germany, the Netherlands, Norway, Palestine, Qatar, Saudi Arabia, the United Kingdom, and the United States. The participants "agreed on the vital importance to break the vicious cycle of financial crises of UNRWA... confirmed that UNRWA needs to be provided with sufficient, sustainable, and predictable funding... [and] agreed to invite all donors to actively support UNRWA, to help the Agency bridge the 2021 funding gap and ensure sustainable financial support in 2022 and beyond."

1038.  Money pledged to UNRWA because of the Individual Defendants' solicitation activities in New York is typically not immediately paid in full by donors.  UNRWA's New York-based staff, supervised by Defendant Gunnarsdottir, follows up to ensure payment in appropriate installments into UNRWA's New York bank account at JPMorgan Chase before the funds are then sent on to various locations in the Middle East to be spent there, including the funds spent in Gaza to enhance Hamas' terror infrastructure there.  Such amounts are wired from New York to various locations in the Middle East in regular installments, not an entire year's funding at once.  UNRWA's New York-based staff may also follow up with donors to encourage earmarks on particular donations to be removed or softened to give UNRWA additional spending flexibility.

1039.  Moneys earmarked for Gaza are broken out separately in UNRWA's budget documents, which are approved in New York with New York-based staff involved in shepherding the proposals through the approval process.  When installments of money are wired from New York to the Middle East they are earmarked specifically either for Gaza or some other region.  Because of the way the cash is transmitted, the relevant UNWRA staff in New York are aware that moneys destined to Gaza are disbursed differently, as detailed above, from funds sent for use in Jordan, Lebanon, Syria, or the West Bank.

1040.  A 2018 report commissioned by UNRWA from an outside consultant reminded it, as Defendants were aware, of numerous risks associated with dealing in cash in Gaza, including money laundering risks, the likelihood that funds could be diverted to terrorists or other inappropriate recipients ("leakage"), and the use of cash to facilitate illegal trade.

1041. UNRWA's New York-based staff and its fundraising, accounting, and disbursement functions are all overseen and directed by Defendant Gunnarsdottir, who is also a member of UNRWA's senior policy-making team.  Because of her close work with the rest of

senior management, she was aware at all relevant times of how UNRWA disbursed its funds and conducted its activities in Gaza and the benefits provided thereby to Hamas and was thus aware of how her own actions benefited Hamas.  Defendant Gunnarsdottir's work was, in turn, overseen and directed by Defendants Lazzarini and (during her UNRWA employment) Stenseth, as their predecessors as Commissioner-General and Deputy Commissioner-General had overseen and directed the New York duties of Defendant Gunnarsdottir's predecessors in her position.

1042.   Defendants and the New York staff under their supervision also continuously act in New York to lobby and liaise with representatives of significant countries to raise political support for UNRWA and with representatives of other United Nations affiliates.  UNRWA's website is hosted in New York, and the substantial assets of UNRWA's pension fund for its employees in all locations, including Gaza, are held in the United States, and senior personnel are paid out of New York even if they are primarily based in the Middle East.

## THE OCTOBER 7 ATTACK AND ITS AFTERMATH

1043.   All the assistance provided over the prior decade-plus to Hamas by the Defendants had, by October 2023, the result and effect, which was at all relevant times entirely foreseeable to Defendants, of building up Hamas' terror infrastructure to the point where atrocities of the magnitude of the October 7 Attack could be carried out.  Given Hamas' prior words and deeds, Defendants knew of Hamas' specific intent to perpetrate genocide, and it was entirely foreseeable that the capacity to commit genocidal atrocities of that magnitude against civilians would in time be used to do so.  And indeed, Hamas used the support provided by Defendants discussed above, including the command-and-control infrastructure, tunnels, weapons storage, rocket launcher positions, cash, recruitment and indoctrination, to perpetrate the October 7 Attack.

1044.   The stories of the horrific experiences of the named Plaintiffs herein and their murdered loved ones are given above in considerable detail but represent only a fraction of what the much larger number of other victims suffered that day and afterwards.

1045.   In addition to genocide, mass murder, torture, and hostage-taking, the October 7 Attack included, as has been widely reported, countless incidents of weaponized rape, sexual assault, and mutilation of corpses as a terror tactic.  The horrific methods employed in these rapes were sufficiently uniform in different locations to show preplanning and coordination by Hamas rather than opportunistic outrages committed by individual Hamas terrorists.  Gang rape, sexualized torture, and deliberately leaving the mutilated and naked corpses of murdered rape victims in public locations to instill terror in others were all part of this modus operandi.  The UN confirmed these reports in statements by Pramila Patten, the Secretary General's Special Representative on Sexual Violence in Conflict, as have other prominent international figures with no pro-Israeli leanings.

1046.   Numerous terrorists who directly and personally participated in the October 7 Attack were UNRWA employees, as detailed above.

1047.   The October 7 Attack was a human catastrophe for its victims, but separately created a public relations and financial crisis for UNRWA, as it became subject to heightened and unwelcome international scrutiny regarding its prior Hamas-enabling activities in Gaza and the U.S. and many other donor countries suspended their financial support.

1048.   UNRWA has not denied that a material number of its staff personally participated in the October 7 Attack, although it has quibbled with the numbers estimated by credible outside sources.  Indeed, UNRWA has since the attack carried out a spin campaign trying to minimize the nature and degree of its institutional culpability in providing material support to Hamas, trying to

portray it as the work of a few rogue low-level employees rather than reflecting conscious institutional policy decisions made at the highest levels by the Individual Defendants.

1049.  For example, on January 26, 2024, Defendant Lazzarini, despite his own culpable actions, knowledge, and intent as set forth in detail above, issued the following statement (emphasis added): "The Israeli Authorities have provided UNRWA with information about the alleged involvement of several UNRWA employees in the horrific attacks on Israel on 7 October…I have taken the decision to immediately terminate the contracts of these staff members and launch an investigation in order to establish the truth without delay.  *Any* UNRWA employee who was involved in acts of terror will be held accountable, including through criminal prosecution."

1050.  The same day, a spokesperson for United Nations Secretary-General Antonio Guterres issued the following statemen (emphasis added): "The Secretary-General has been briefed by the Commissioner-General of the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA), Philippe Lazzarini, regarding extremely serious allegations which implicate several UNRWA staff members in the terror attacks of 7 October in Israel. The Secretary-General is horrified by this news and has asked Mr. Lazzarini to investigate this matter swiftly and to ensure that *any* UNRWA employee shown to have participated or *abetted* what transpired on 7 October, or in any other criminal activity, be terminated immediately and referred for potential criminal prosecution."

1051.  To date, Defendant Lazzarini has not referred any UNRWA employee for criminal prosecution for participating in or abetting the October 7 Attack.

1052.  A subsequent purportedly independent inquiry into certain aspects of UNRWA's conduct in Gaza headed by the French diplomat Catherine Colonna was largely a whitewash of

UNRWA's culpability, but it did find that certain aspects of UNRWA's school curriculum were inappropriate and contrary to the UN's espoused values. UNRWA immediately pledged to take corrective action, but the damage from the prior terrorist-indoctrination curriculum has already been done regardless of belated efforts supposedly now being undertaken "to mitigate the risks attached to the promotion of hate and the incitation of violence in textbooks and the classroom."

## THE OCTOBER 7 ATTACK VIOLATED FUNDAMENTAL "JUS COGENS" NORMS OF INTERNATIONAL HUMAN RIGHTS LAW

1053.   The October 7 Attack violated fundamental "jus cogens" norms of international law and those violations were caused by, among other things, the substantial and knowing assistance provided to Hamas by the Defendants. Aiding and abetting violations of jus cogens norms is itself a jus cogens violation.

1054.   The jus cogens norms violated by Hamas with the substantial and knowing assistance of the Defendants included:  (a) the prohibition against the deliberate targeting of civilians, whether by regular military forces or irregular armed factions such as Hamas; (b) the prohibition against actual or attempted mass killing of civilians, whether by regular military forces or irregular armed factions such as Hamas; (c) the prohibition against taking civilian hostages, whether by regular military forces or irregular armed factions such as Hamas; (d) the prohibition against systematic and "weaponized" rape and sexual assault as a tool of terror and intimidation; (e) the prohibition against perpetration torture; and (f) the prohibition against incitement, actual or attempted genocide, whether by state actors or non-state actors.

1055.   Genocide is defined by international treaty as "any of the following acts committed with intent to destroy, in whole or in part, a national, ethnic, racial or religious group, as such:

    a.   Killing members of the group;

    b.   Causing serious bodily or mental harm to members of the group;

    c.   Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;

    d.   Imposing measures intended to prevent births within the group;

    e.   Forcibly transferring children of the group to another group."

1056.   Treaties and the practice of international war-crimes tribunals in recent decades make clear that attempted genocide, conspiracy to commit genocide, and aiding and abetting of, or other complicity in, genocide, and inciting genocide, are just as proscribed as direct commission of genocide. Because the intent to destroy the group may be "in whole or in part" Hamas' goal to kill or drive into exile all Jews living in Israel is genocidal even if not coupled with a plan to commit genocide against Jews in other parts of the world.

1057.   Moreover, the UN itself, through Security Council Resolution 1373, promulgated in 2001 and binding on all Member States, requires among other things that all nations "[p]revent and suppress the financing of terrorist acts" and "[e]nsure that any person who participates in the financing … of terrorist acts or in supporting terrorist acts is brought to justice."

## COUNT I

### (Violation of the Anti-Terrorism Act)

1058.   Paragraphs 1 through 1057 are incorporated by reference as if fully stated herein.

1059.   All Defendants carried out actions which, if committed in the United States, would be criminal violations of 18 U.S.C. § 2339B(a)(1) by providing material support to Hamas while knowing or being willfully blind to Hamas' intention to use the support thus provided to commit genocidal terror attacks, and with knowledge that (i) Hamas is a designated terrorist organization under section 219 of the Immigration and Naturalization Act and that (ii) Hamas had and has engaged in "terrorism" within the meaning of the Foreign Relations Authorization Act, Fiscal

Years 1988 and 1989 and/or engaged in "terrorist activity" within the meaning of section 212(a)(3)(B) of the Immigration and Naturalization Act.

1060.  All Defendants carried out actions which, if committed in the United States or otherwise within the statute, would be criminal violations of 18 U.S.C. § 2339C(a)(1)(B) by financing terrorism, i.e., by unlawfully and willfully providing funds, directly or indirectly, to Hamas with the knowledge that such funds were to be used, in full or in part, to carry out genocidal terror attacks intended to cause, and which in fact did cause, death or serious bodily injury to civilians when the purpose of such acts was to intimidate a population and/or to compel a government to do or to abstain from doing an act.  These actions also were also unlawful and criminal under 50 U.S.C. § 1705, which sets forth the penalties for evading the anti-money-laundering and similar regulations issued pursuant to the International Emergency Economic Powers Act.

1061.  Defendants' actions thus constitute acts of "international terrorism" as defined in 18 U.S.C. § 2331(1) because they were, under the circumstances and given Defendants' knowledge of Hamas' genocidal and terroristic intentions,

      a.  acts dangerous to human life that are a violation of the criminal laws of the United States or that would be a criminal violation if committed within the jurisdiction of the United States;

      b.  acts that appeared to be intended (because among other things Defendants appeared to intend the natural and foreseeable consequences of their actions) to intimidate or coerce a civilian population and/or to influence the policy of a government by intimidation or coercion; and

c. acts that transcended national boundaries in terms of the means by which they were accomplished.

1062. Defendants' acts of international terrorism were a proximate cause of the October 7 Attack, and all of the ATA Plaintiffs are nationals of the United States or the estates, survivors, and or heirs of such nationals, who were each injured in their person, property, and/or business as a result of the October 7 Attack and its predictable and foreseeable subsequent consequences and thus by Defendants' acts of international terrorism.

1063. While certain of the ATA Plaintiffs or their relevant U.S.-citizen decedents or relatives are or were dual citizens of the United States and Israel, dual citizens have all the same rights under the ATA as individuals who are only U.S. citizens do. Moreover, dual citizens are barred by the caselaw from relying on their non-U.S. citizenship to pursue the remedies that might be available in this Court to non-citizens under the Alien Tort Statute, 28 U.S.C. § 1350.

1064. The "act of war" exclusion of 18 U.S.C. § 2336(a) cannot be invoked as a defense to liability because, among other things, the Anti-Terrorism Clarification Act of 2018, Pub L. 115-253, excludes designated foreign terrorist organizations such as Hamas from the statutory meaning of "military force." *See* 18 U.S.C. 2331(6) (codifying amendment).

1065. Each Defendant is thus civilly liable to each ATA Plaintiff for three times that Plaintiff's injuries in an amount to be proven at trial, plus the costs of suit including attorney's fees, under 18 U.S.C. § 2333(a).

## COUNT II

### (Aiding and Abetting Hamas' Violations of the Anti-Terrorism Act)

1066. Paragraphs 1 through 1065 are incorporated by reference as if fully stated herein.

1067. All of the ATA Plaintiffs are nationals of the United States and/or estates, survivors and/or heirs of such nationals, who were each injured in their person, property, and/or business by

198

the October 7 Attack and its predictable and foreseeable subsequent consequences as set forth above.

1068.   The October 7 Attack constituted international terrorism committed by Hamas as defined in 18 U.S.C. § 2331(1) because it

   a.   Involved violent acts or acts dangerous to human life that would be criminal violations if committed within the jurisdiction of the United States or of one or more of the several States;

   b.   Appeared to be intended to intimidate or coerce a civilian population and/or to influence the policy of a government by intimidation or coercion; and

   c.   Occurred primarily outside the territorial jurisdiction of the United States.

1069.   The October 7 Attack was committed, planned, and/or authorized by Hamas, which as of the dates of that planning, authorization, and/or commission was designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act.

1070.   Each of the Defendants aided and abetted Hamas' actions related to the October 7 Attack by knowingly providing substantial assistance to Hamas, with that substantial assistance being a proximate cause of Plaintiffs' injuries from the October 7 Attack.

1071.   As already set forth above, neither dual citizenship of certain ATA Plaintiffs nor the "act of war" exclusion insulates Defendants from liability.

1072.   Each Defendant is thus civilly liable to each ATA Plaintiff for three times that Plaintiff's injuries in an amount to be proven at trial, plus the costs of suit including attorney's fees under 18 U.S.C. §§ 2333(a) and (d)(2).

## COUNT III

**(Civil Conspiracy to Violate Anti-Terrorism Act)**

1073.   Paragraphs 1 through 1072 are incorporated by reference as if fully stated herein.

1074.   UNRWA, each of the Individual Defendants, and unaffiliated third parties including but not limited to Bank of Palestine conspired with each other to commit international terrorism via the acts of providing material support and funding to Hamas as set forth above in Count I.

1075.   While certain Individual Defendants joined the conspiracy later than others and some became inactive after leaving UNRWA's employment, none of them ever affirmatively withdrew from the conspiracy by taking affirmative actions inconsistent with the object of the conspiracy.

1076.   Each Defendant committed one or more overt acts in furtherance of the conspiracy, as detailed above, and each participated in the conspiracy intentionally in furtherance of the goal of providing material support and funding to Hamas.

1077.   The conspiracy and the resulting acts of providing material support and funding to Hamas were planned and/or authorized by Hamas, which at all relevant times was designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act.

1078.   Each Defendant is personally liable as a co-conspirator for each act of international terrorism committed by any other Defendant in connection with the conspiracy.

1079.   The co-conspirators' acts of international terrorism arising from the conspiracy were a proximate cause of the October 7 Attack, and all of the ATA Plaintiffs are nationals of the United States, or the estates, survivors and/or heirs of such nationals, who were each injured in their person, property, and/or business by the October 7 Attack and its predictable and foreseeable subsequent consequences and thus by those acts of international terrorism.

1080.   As already set forth above, neither dual citizenship of certain ATA Plaintiffs nor the "act of war" exclusion insulates Defendants from liability.

1081.   Each Defendant is thus civilly liable to each ATA Plaintiff for three times that Plaintiff's injuries in an amount to be proven at trial, plus the costs of suit including attorney's fees under 18 U.S.C. §§ 2333(a) and (d)(2).

## COUNT IV

**(Aiding and Abetting Violations of Torture Victims Protection Act –
Against the Individual Defendants)**

1082.   Paragraphs 1 through 1081 are incorporated by reference as if fully stated herein.

1083.   The decedents from whom certain Plaintiffs derive their standing to recover damages were subjected to extrajudicial killing within the meaning of the TVPA.

1084.   Other Plaintiffs were subjected to torture within the meaning of the TVPA, including by being subjected, for reasons based on religious and ethnic discrimination, to the threat of imminent death, the threatened infliction of severe physical pain or suffering, and/or the threat that others would be imminently subjected to death, starvation, severe physical pain, or suffering, all at a time when they were in de facto Hamas custody during and/or after the October 7 Attack.

1085.   The Hamas terrorists who carried out these acts of extrajudicial killing and torture were individuals acting "under actual or apparent authority, or color of law, of any foreign nation," because Hamas is in this context a de facto government as recognized in the case law.  *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (even though other countries did not afford diplomatic recognition to armed faction in actual control of one portion of former Yugoslavia, it was potentially a de facto state for these purposes); *Doe v. Islamic Salvation Front*, 993 F. Supp. 3 (D.D.C. 1998) (armed faction in de facto control of significant portion of Algerian territory during civil war could potentially be "foreign nation" for TVPA purposes even though it was not the recognized government of Algeria).

1086.   For the reasons described above Defendants (except for UNRWA as an entity) are jointly and severally liable for the damages caused to each such Plaintiff by the TVPA violations by Hamas-affiliated individuals whom they aided and abetted.

1087.   Under the circumstances, the "color of law" requirement does not separately apply to aiders and abettors or, in the alternative, an international organization like UNRWA is a "foreign nation" within the meaning of the statute and the Individual Defendants' acts were carried out under the actual or apparent authority of UNRWA.

## COUNT V[4]

### (Aiding and Abetting Assault and Battery and Wrongful Death / Survival)

1088.   Paragraphs 1 through 1087 are incorporated by reference as if fully stated herein.

1089.   The actions of Hamas described above also constituted assault and battery under the common law and/or other applicable law, which proximately caused damage to each of the Plaintiffs and/or the deceased predecessors-in-interest of certain Plaintiffs.

1090.   The fatal injuries Hamas inflicted upon those deceased predecessors-in-interest also gave rise to wrongful death and/or survival causes of action in favor of their estates, estate representatives, and/or legally appropriate survivors and family members.

1091.   For the reasons described above Defendants are jointly and severally liable to Plaintiffs for the damages caused by Hamas' torts which they aided and abetted.

## COUNT VI

### (Aiding and Abetting Intentional Infliction of Emotional Distress)

1092.   Paragraphs 1 through 1091 are incorporated by reference as if fully stated herein.

---

[4] Choice of law issues need not be resolved at this preliminary stage of the action.  However, we note that, due to the legacy of pre-1948 British rule, the tort principles of Israeli law largely derive from English common-law roots, just as those of New York do.

1093.  The actions of Hamas described above also constituted intentional infliction of emotional distress under the common law and/or other applicable law, which proximately caused damage to each of the Plaintiffs and/or the deceased predecessors-in-interest of certain Plaintiffs.

1094.  For the reasons described above Defendants are jointly and severally liable to each Plaintiff for the damages caused by Hamas' torts which they aided and abetted.

## COUNT VII

### (Aiding and Abetting Loss of Consortium and Solatium)

1095.  Paragraphs 1 through 1094 are incorporated by reference as if fully stated herein.

1096.  As a result of the tortious actions of Hamas described above, each of the surviving Plaintiffs who is a close family member of another injured victim of Hamas has a claim under applicable law for loss of consortium and/or solatium.

1097.  For the reasons described above Defendants are jointly and severally liable to each such Plaintiff for the damages caused by Hamas' torts which they aided and abetted.

**WHEREFORE**, Plaintiffs demand judgment against each and every Defendant, jointly and severally (except only against the Individual Defendants jointly and severally with regard to the TVPA claims), for:

    a.  A money judgment for compensatory damages in an amount to be proven at trial, trebled with respect to all damages awarded under the ATA;

    b.  An award of punitive damages in an appropriate amount to be determined at trial;

    c.  Pre- and post-judgment interest;

    d.  Costs of this action, including reasonable attorneys' fees to the full extent permitted by applicable law, including but not limited to the ATA; and

e.  Such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims.

Dated:  New York, New York
          July 9, 2025

AMINI LLC

By ____/s/ Avery Samet_____
     Bijan Amini
     Avery Samet
     John W. Brewer
131 West 35th Street, 12th Floor
New York, New York 10001
Tel. (212) 490-4700
bamini@amnillc.com
asamet@aminillc.com
jbrewer@aminillc.com

MM~LAW LLC

By ____/s/ Gavriel Mairone_____
    Gavriel Mairone (admitted to S.D.N.Y. Bar)
    Ariel Mairone (N.Y. state bar # 4993259,
    pro hac vice application to be filed)
    Jonathan Goldberg (pro hac vice application to be
    filed)
    Talya Woolf (pro hac vice application to be filed)
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Tel. (312) 253-7444
ctlaw@mm-law.com
ariel@mm-law.com
jonathan@mm-law.com
talya@mm-law.com
Docket@mm-law.com

*Attorneys for Plaintiffs*

Of Counsel:
Mark Sunshine, Esq.
Thomas Berner, Esq.